**FILED**
7/14/2020
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | CASE NUMBER: **20CR353** |
| SAM HOWARD; <br> WILLIE TATE; <br>       also known as "Junebug"; <br> KELVIN FRANKLIN, <br>       also known as "Kevo" or "Nico"; <br> STEVEN DYER; <br> MORRIO BONDS; <br> ANTONIO LEE; <br> BRYANT BARNES; <br> DWAYNE PETERSON; <br> ANTHONY DAVIS; <br> FLOYD STEWART; <br> WILL HOWARD; <br> TORIAN JOHNSON; <br> JAMES HUGHES; <br> KAMRON GARRAWAY; <br> SAVAN WARD; <br> JEREMY HAMPTON; <br> JOHNNIE DANIELS; and <br> ROBERT STUCKEY, <br>       also known as "Ant" | **UNDER SEAL** |

### CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

From no later than in or about February 2019 to in or about November 2019, in the Northern District of Illinois, Eastern Division, and elsewhere, the defendants violated:

| Code Section | Offense Description |
|---|---|
| Title 21, United States Code, Section 846 | did conspire with each other, and with others known and unknown, to knowingly and intentionally possess with intent to distribute and distribute a controlled substance, namely, 400 grams or more of a mixture and substance containing a detectable amount of fentanyl (N- |

phenyl-N-[1-(2-phenylethyl)-4-piperindinyl] propanamide), a Schedule II Controlled Substance, one kilogram or more of a mixture and substance containing a detectable amount of heroin, a Schedule I Controlled Substance, and a quantity of a mixture and substance containing a detectable amount of acetyl fentanyl, valeryl fentanyl, and furanyl fentanyl, Schedule I Controlled Substances and analogues of fentanyl (N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propanamide), a Schedule II Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(1).

This criminal complaint is based upon these facts:

 X  Continued on the attached sheet.

JAMES J. LEE
Special Agent, Drug Enforcement Administration (DEA)

Sworn to before me and signed prior to submission.

Date: July 14, 2020

_Judge's signature_

City and state: Chicago, Illinois

HEATHER K. MCSHAIN, U.S. Magistrate Judge
_Printed name and Title_

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

ss:

## **AFFIDAVIT**

I, JAMES J. LEE, being duly sworn, state as follows:

1.      I am a Special Agent with the Drug Enforcement Administration (DEA),

and have been so employed for eight years.[1]  My current responsibilities include the

---

[1] On September 1, 2016, Special Agent James J. Lee appeared before a Magistrate Judge in the Northern District of Illinois as the affiant on an application for a search warrant to search the first floor unit at 4601 South Albany, Chicago, Illinois.  The Magistrate Judge issued the warrant and the DEA executed it the same day.  During the evening of September 1, 2016, based on information regarding the execution of the warrant, SA Lee and an AUSA who had assisted with the warrant realized that the search warrant affidavit contained inaccurate information. The government notified the Magistrate Judge about the inaccurate information in the search warrant application, stating:

[P]aragraph 19 of the Affidavit submitted in support of the search warrant stated that "Agents saw De La TORRE exit his vehicle, enter through a gate door on 46th Street, and then enter the back door leading into the first floor of the Subject Premises." However, in fact, agents saw De La TORRE exit his vehicle, enter through a gate door on 46th Street [which was the courtyard gate door], and then disappear into the courtyard. Agents had surveillance on two visible doors to 4601 South Albany Ave. and believed that De La Torre went into the back door of 4601 South Albany Ave. that was not visible. In other words, the affidavit should have provided that agents believed that De La TORRE went into the back door based on the facts set forth above, rather than stating that they saw him enter that back door.

Paragraph 20 of the Affidavit further stated that: "At approximately 5:54 p.m., surveillance agents observed De La TORRE exit the  back door of the Subject Premises, walk to the alleyway behind the Subject Premises ...." That paragraph should have provided that agents observed De La TORRE exit the back *gate* door of the Subject Premises, not the back door of the Subject Premises.

After receiving this information, the Magistrate Judge told the government she would not have signed the warrant if the surveillance had been accurately described by the agent, and that she expected the U.S. Attorney's Office to make a disclosure regarding SA Lee if he were going to testify or be an affiant on future complaints or warrants.

Later in the investigation, agents observed the same subject enter and exit the back door that was described in the original affidavit, and the subject admitted that he did in fact reside in the unit described in the affidavit.  A DEA Office of Professional Responsibility investigation did not conclude that SA Lee knowingly and intentionally provided false information, and he was issued a non-disciplinary letter of caution for inattention to duty.

investigation of narcotics trafficking offenses. I am currently assigned to the office of the Chicago Field Division located in Chicago, Illinois. I have received training in and have experience investigating violations of federal narcotics and money laundering laws including, but not limited to, Title 21, United States Code, Sections 841, 843, and 846 and Title 18, United States Code, Section 1956, 1957, and 1960. I have participated in numerous investigations involving a variety of investigative techniques, including physical and electronic surveillance methods, controlled purchases and deliveries of narcotics, the analysis of a wide variety of records and data, including pen register and trap and trace data as well as cell phone location data, and the debriefing of defendants, informants, and witnesses, as well as others who have knowledge of the distribution, transportation, storage, and importation of controlled substances.

2.     This affidavit is submitted in support of a criminal complaint alleging that, beginning no later than in or about February 2019 and continuing to in or about November 2019, in the Northern District of Illinois and elsewhere, defendants SAM HOWARD, WILLIE TATE, also known as "Junebug," KELVIN FRANKLIN, also known as "Kevo" or "Nico," STEVEN DYER, MORRIO BONDS, ANTONIO LEE, BRYANT BARNES, DWAYNE PETERSON, ANTHONY DAVIS, FLOYD STEWART, WILL HOWARD, JEREMY HAMPTON, JOHNNIE DANIELS, TORIAN JOHNSON, JAMES HUGHES, KAMRON GARRAWAY, SAVAN WARD, and ROBERT STUCKEY, also known as "Ant," did conspire with each other, and with others known and unknown, to knowingly and intentionally possess with intent to distribute and

distribute a controlled substance, namely, 400 grams or more of a mixture and substance containing a detectable amount of fentanyl (N-phenyl-N-[1-(2-phenylethyl)-4-piperindinyl] propanamide), a Schedule II Controlled Substance, one kilogram or more of a mixture and substance containing a detectable amount of heroin, a Schedule I Controlled Substance, and a quantity of a mixture and substance containing a detectable amount of acetyl fentanyl, valeryl fentanyl, and furanyl fentanyl, Schedule I Controlled Substances and analogues of fentanyl (N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propanamide), a Schedule II Controlled Substance, all in violation of Title 21, United States Code, Section 846.

3.     The information in this affidavit is based on my participation in this investigation, information provided by other local and federal law enforcement officers ("LEOs"), the results of physical surveillance, review of consensually recorded conversations, review of wire and electronic communications intercepted pursuant to court orders, law enforcement reports, my training and experience, and the training and experience of other law enforcement officers with whom I have consulted.

4.     Because this affidavit is being submitted for the limited purpose of establishing probable cause in support of a criminal complaint charging SAM HOWARD, TATE, FRANKLIN, DYER, BONDS, LEE, BARNES, PETERSON, DAVIS, STEWART, WILL HOWARD, HAMPTON, DANIELS, JOHNSON, HUGHES, GARRAWAY, WARD, and STUCKEY with conspiracy to possess with intent to distribute and distribute heroin, fentanyl-laced heroin, and fentanyl-analogue laced heroin, I have not included each and every fact known to me

concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that the defendants committed the offense alleged in the complaint.

## FACTS SUPPORTING PROBABLE CAUSE

I. <u>BACKGROUND OF THE MONTICELLO DTO</u>

5.    Since approximately February 2019, the DEA and the Chicago Police Department (the "CPD") have conducted a criminal investigation into a drug trafficking organization (the "Monticello DTO") responsible for distributing approximately 12.6 kilograms of heroin, 16.2 kilograms of fentanyl-laced heroin, 7.4 kilograms of fentanyl-analogue laced heroin, and 2.56 kilograms of heroin laced with both fentanyl and fentanyl analogue at an illicit retail drug market on the 1000 block of N. Monticello Avenue in the Humboldt Park neighborhood of Chicago (the "Monticello Avenue Drug Spot"). As part of that investigation, the DEA and CPD introduced multiple undercover agents who have made approximately eighty purchases of heroin, fentanyl-laced heroin, and fentanyl-analogue laced heroin from various members of the Monticello DTO.

### A.    Roles of the Defendants

6.    Throughout the course of the investigation, the DEA and CPD have identified numerous drug traffickers involved in the sale of narcotics at this illicit market. Based on the investigation, including approximately eighty undercover purchases, surveillance of the Monticello Avenue Drug Spot, review of CPD Pole

Camera video, and intercepted phone calls and text messages, the investigation has revealed that:

a.     SAM HOWARD and KELVIN FRANKLIN, also known as "Kevo" or "Nico," were street-bosses or street managers for the Monticello DTO, working with WILLIE TATE, MORRIO BONDS, and ANTONIO LEE to ensure that the Monticello DTO had sufficient quantities of heroin, fentanyl-laced heroin, and fentanyl-analogue laced heroin to distribute to customers. SAM HOWARD and FRANKLIN also coordinated the distribution of narcotics to customers while on Monticello Avenue by directing customers to particular street-level distributors. Over the course of the investigation, SAM HOWARD and FRANKLIN personally distributed narcotics to undercover officers on 15 and 19 occasions, respectively.

b.     WILLIE TATE, MORRIO BONDS, and ANTONIO LEE had access to sources of supply of heroin, fentanyl-laced heroin, and fentanyl-analogue laced heroin, obtained and cut the narcotics with additives and dilutants, re-packaged the narcotics in aluminum foil and/or baggies, and provided the narcotics to SAM HOWARD and FRANKLIN and other members of the Monticello DTO in order to provide those narcotics to street-level traffickers of the Monticello DTO who would, in turn, distribute the narcotics to customers.

c.     STEVEN DYER, BRYANT BARNES, DWAYNE PETERSON, ANTHONY DAVIS, FLOYD STEWART, WILL HOWARD, JEREMY HAMPTON, JOHNNIE DANIELS, TORRIAN JOHNSON, JAMES HUGHES, KAMRON GARRAWAY, SAVAN WARD, and ROBERT STUCKEY, and others were street-level

traffickers who sold narcotics to customers on Monticello Avenue at SAM HOWARD and FRANKLIN's direction. Following these sales, the street-level traffickers provided SAM HOWARD and FRANKLIN with the proceeds of the sales. As discussed above and below, SAM HOWARD and FRANKLIN personally sold narcotics to customers as well.

### B. Summary of Probable Cause

7. Between on or about February 19, 2019 and in or about November 2019, the Monticello DTO distributed at least 12.6 kilograms of heroin, 16.2 kilograms of fentanyl-laced heroin, 7.4 kilograms of fentanyl-analogue laced heroin, and 2.56 kilograms of substances containing a fentanyl analogue, fentanyl, and heroin to individual customers at the Monticello Avenue Drug Spot. Specifically, and as discussed in greater detail below:

a. Between February 19, 2019 and November 2019, law enforcement participated in approximately 80 hand-to-hand exchanges of heroin, fentanyl-laced heroin, and fentanyl-analogue laced heroin at the Monticello Avenue Drug Spot.

b. Between February 19, 2019 and October 2019, undercover law enforcement officers purchased approximately 188.937 grams of heroin, 244.39 grams of fentanyl-laced heroin, and 112.859 grams of substances containing a fentanyl analogue, over the course of approximately 80 separate purchases at the Monticello Avenue Drug Spot from various members of the Monticello DTO. These transactions included:

      i.      On March 6, 2019, BARNES and JOHNSON sold approximately 1.76 grams of heroin to UC-2.

      ii.      On March 22, 2019, TATE delivered a supply of heroin to the Monticello Avenue Drug Spot, a portion of which DWAYNE PETERSON sold to UC-1.

      iii.      On April 2, 2019, SAM HOWARD, JAMES HUGHES, and Individual A sold approximately 2.194 grams of heroin to undercover officers.

      iv.      On April 9, 2019, TATE delivered a resupply of heroin to the Monticello Avenue Drug Spot, a portion of which (approximately 18.095 grams) STEVEN DYER sold to UC-2.

      v.      On April 19, 2019, SAM HOWARD and KAMRON GARRAWAY sold approximately 4.072 grams of heroin to undercover officers, while BARNES looked out for police.

      vi.      On May 3, 2019, DYER sold approximately 21.013 grams of heroin laced with fentanyl and a fentanyl analogue (acetyl fentanyl) to UC-2.

      vii.      On May 3, 2019, ANTHONY DAVIS and FLOYD STEWART sold approximately 7.302 grams of heroin to undercover officers.

      viii.      On May 30, 2019, DYER sold approximately 33.345 grams of heroin laced with and a fentanyl analogue (furanyl fentanyl) to UC-2.

      ix.      On June 13, 2019, FRANKLIN, JEREMY HAMPTON and JOHNNIE DANIELS sold approximately 5.29 grams of heroin to undercover agents.

x.  On June 14, 2019, DYER sold approximately 31.249 grams of heroin to UC-2.

xi.  On June 18, 2019, SAM HOWARD and FRANKLIN sold approximately 25.575 grams of fentanyl-laced heroin to undercover agents.

xii.  On June 28, 2019, DYER sold approximately 31.926 grams of fentanyl-laced heroin to UC-2.

xiii.  On July 18, 2019, FRANKLIN sold approximately 40.338 grams of heroin to undercover officers.

xiv.  On October 1, 2019, SAM HOWARD, STUCKEY and SAVAN WARD sold approximately 6.294 grams of heroin to undercover agents.

c.  Throughout the conspiracy, LEE, BONDS, SAM HOWARD, and FRANKLIN managed the narcotics supply at the Monticello Avenue Drug Spot, monitoring inventory on the block and keeping the block supplied for street-level sales.  Among other things:

i.  SAM HOWARD and FRANKLIN arranged to resupply the Monticello Avenue Drug Spot following DYER's sale of narcotics to UC-2 on August 16, 2019.

ii.  On September 3, 2019, FRANKLIN provided DYER a quantity of heroin laced with a fentanyl analogue, a portion of which (approximately 22.7 grams) DYER sold to UC-2.

iii. On September 4, 2019, FRANKLIN supplied WILL HOWARD with narcotics, a portion of which (approximately 3.6 grams of heroin and 1.2 grams of cocaine) was seized by LEOs.

iv. In September 2019, LEE and BONDS discussed narcotics that they previously cut on behalf of the DTO prior to giving them to SAM HOWARD and FRANKLIN for distribution at the Monticello Avenue Drug Spot.

v. On September 23, 2019, BONDS arranged the collections of narcotics proceeds from FRANKLIN.

vi. On September 29, 2019, LEE instructed FRANKLIN to distribute narcotics to BONDS.

vii. On September 29, 2019, LEE and BONDS arranged to provide FRANKLIN with narcotics for the Monticello Avenue Drug Spot.

d. Throughout the conspiracy, members of the Monticello DTO discussed the management and operation of the Monticello Avenue Drug Spot, including: (i) the coordinated efforts of all street-level traffickers selling narcotics on the block; (ii) the sale of narcotics packaged by and obtained from the same source; (iii) street-level managers directing customers to street-level traffickers to complete hand-to-hand exchanges; (iv) DTO leaders directing DTO block managers to distribute free samples of narcotics to increase sales at the drug spot; (v) DTO members coordinating efforts to monitor and avoid detection by law enforcement; (vi) the possession of firearms to protect the drug spot; (vii) the staffing and hiring of

11

street-level traffickers on the block; and (viii) the monitoring of the narcotics supply and street-level traffickers at the Monticello Avenue Drug Spot.

e.    Based on the quantity of narcotics purchased by undercover officers throughout the course of the investigation, intercepted phone calls reflecting thousands of dollars of narcotics proceeds generated on a daily basis during the course of the interception periods alone, surveillance, and CPD Pod camera video reflecting street-level traffickers on Monticello Avenue transacting business, agents believe that, between February 2019 and October 2019, members of the Monticello DTO possessed with intent to distribute and distributed at least 12.6 kilograms of heroin, 16.2 kilograms of fentanyl-laced heroin, 7.4 kilograms of fentanyl-analogue laced heroin, and 2.56 kilograms of substances containing a fentanyl analogue, fentanyl, and heroin.

II.    <u>SURVEILLANCE OBSERVES NUMEROUS AND COORDINATED HAND-TO-HAND EXCHANGES AT THE MONTICELLO AVENUE DRUG SPOT</u>

8.    As discussed below, SAM HOWARD, FRANKLIN, TATE, BONDS, and LEE and other members of the Monticello DTO used numerous individuals to traffic hundreds of grams of fentanyl-laced heroin to numerous customers, including undercover agents, at the Monticello Avenue Drug Spot.

**A.    Background on the Creation and Use of "Drug Spots" by Drug Trafficking Organizations**

9.    Through training, experience, law enforcement training publications about narcotics distribution, and from my conversations with confidential sources and other law enforcement officers who have expertise in such matters, I am familiar

with various characteristics of street-level drug trafficking organizations and their use of the use of designated locations as "drug spots." For example, I am aware that:

     a.     Drug spots are organized street-level retail narcotics markets that operate on a permanent or semi-permanent basis. Drug spots often consist of a group of people working in "shifts" to run the spot, and drug spot workers often work at one or more jobs, such as recruiting buyers on the street, providing security, looking out for law enforcement, collecting money, mixing and packaging narcotics for resale, distributing narcotics to street-level dealers and users, and maintaining stash houses to store narcotics and narcotics proceeds.

     b.     DTOs operating on the street-level are typically hierarchical organizations with individuals who have connections to narcotics suppliers, liaise with the suppliers, obtain bulk narcotics, and cut and re-package the narcotics to increase the quantity of narcotics available for distribution and adjust the potency of the narcotics. DTOs operating on the street-level often have street-level bosses or managers, who supervise street-level traffickers, assist in serving customers, and obtain narcotics proceeds, which are later provided to the individuals with connections to the suppliers to obtain additional quantities of narcotics. Street-level traffickers distribute narcotics to customers in hand-to-hand transactions in exchange for cash. Often times, DTOs store narcotics and/or narcotics proceeds in homes, vacant lots, and vehicles, which serve as stash locations. Street-level bosses and street-level traffickers typically deal in smaller quantities because they are serving end-use customers and because they seek to minimize losses in case of a

seizure or robbery and legal exposure by possessing and distributing smaller amounts of narcotics, which are associated with lower penalties.

      c.    Narcotics traffickers, including drug spot workers, use a number of methods to evade detection by law enforcement, including, for example: using cellular phones or messaging applications registered to fictitious or false names or nicknames; using coded language to identify themselves and to discuss and conduct their illegal activities; frequently changing cellular phone numbers or messaging application accounts, or using multiple phone and messaging accounts simultaneously.

      d.    DTOs typically package 13 individual doses of heroin (called "blows" or "bags"), together, which is referred to as a "jab." Each "bag" in the "jab" contains less than one gram of mixed heroin, fentanyl-laced heroin, or fentanyl-analogue laced heroin. Six "jabs" are packaged together to make a "bundle." After packaging the heroin in this manner, DTO members deliver the "bundle" to the drug spots, where the individual jabs are distributed between the street-level traffickers for resale to individual customers. Typically, street-level traffickers receive 13 bags in a jab, and return the proceeds for some smaller number of bags (11 or 12), keeping the price of the remaining bags (1 or 2) as their share of the profit off each jab.

## B. Surveillance Observes Numerous and Coordinated Hand-to-Hand Exchanges at the Monticello Avenue Drug Spot

      10.    Between February 2019 and November 2019, law enforcement officers conducted regular surveillance near the Monticello Avenue Drug Spot. Throughout this period, surveillance regularly observed patterns of behavior that, in my

experience and based on my familiarity with this investigation, show that the area functioned as an open-air drug spot. Among other things:

a. On numerous occasions, surveillance observed various people, including SAM HOWARD, FRANKLIN, DYER, and others, standing or sitting near the intersection of Monticello Avenue and Augusta Boulevard, while various other people walked up and down the sidewalks around that area before returning to the intersection where others remained in place. Based on my training, experience, and familiarity with this investigation – including the movements of these individuals, subsequent controlled purchases from various individuals on that block, and a subsequent seizure of narcotics from a location on that block – I believe that some of the people whom agents observed on those occasions were working on the Monticello Avenue Drug Spot as lookouts, security, street-level narcotics dealers, runners, money collectors, or marketers (commonly known as "hypes" or "touts," who advertise the sale of narcotics to customers on the street).

b. On numerous occasions, surveillance observed individuals approach the area around the Monticello Avenue Drug Spot, both on foot and by car, speak briefly with individuals situated on the block, and then conduct a quick hand-to-hand exchange with people in nearby vacant lots. Based on my training, experience, and familiarity with this investigation – including the movements of these individuals, subsequent controlled purchases from various individuals on that block, and a subsequent seizure of narcotics from a location on that block – I believe that many of the individuals whom agents observed engage in hand-to-hand

transactions were drug customers who paid money for narcotics during these exchanges.

11. According to Chicago police reports, between January 1, 2017 and May 13, 2020, there have been approximately 2,424 arrests for narcotics related offenses, approximately 227 arrests for weapons-related offenses, and 19,241 narcotic calls for service in the area around the Monticello Avenue Drug Spot.

12. Based on my training and experience, familiarity with the investigation, a review of police reports, controlled purchases of narcotics (discussed below), and surveillance of numerous, coordinated hand to hand transactions, I believe the 1000 block of N. Monticello Avenue is a drug spot operated by the Monticello DTO.

## III. CONTROLLED PURCHASES OF NARCOTICS AT THE MONTICELLO AVENUE DRUG SPOT

13. Between February 19, 2019 and October 2019, undercover law enforcement officers purchased approximately 188.937 grams of heroin, 244.39 grams of fentanyl-laced heroin, and 112.859 grams of substances containing a fentanyl analogue, over the course of approximately 80 separate purchases at the Monticello Avenue Drug Spot from various members of the Monticello DTO, including SAM HOWARD, FRANKLIN, and DYER. Among many other controlled purchases of narcotics[2]:

---

[2] Unless otherwise noted, each of the undercover purchases of narcotics discussed below, and each undercover purchase that occurred throughout the course of the investigation, was recorded by body-worn cameras operated by the undercover officer making the purchase and/or CPD Pod cameras setup on Monticello Avenue, and observed by surveillance agents. Immediately following each undercover purchase from the Monticello DTO, the suspected narcotics were turned over to the DEA and later tested by the DEA North Central Laboratory.

- KELVIN FRANKLIN sold approximately 43.261 grams of heroin, 66.451 grams of fentanyl-laced heroin, 8.81 grams of fentanyl-analogue laced heroin, and 14.34 grams of fentanyl-analogue laced heroin and cocaine as part of approximately 19 sales to undercover officers.

- SAM HOWARD sold approximately 17.227 grams of heroin and 33.468 grams of fentanyl-laced heroin as part of approximately 15 sales to undercover officers.

- STEVEN DYER sold approximately 102.573 grams of heroin, 160.749 grams of fentanyl-laced heroin, and 95.248 grams of fentanyl-analogue laced heroin as part of approximately 21 sales to undercover officers.

- BRYANT BARNES sold approximately 11.387 grams of heroin and 6.929 grams of fentanyl-laced heroin as part of approximately 11 sales to undercover officers.

- DWAYNE PETERSON sold approximately 4.611 grams of heroin and 8.506 grams of fentanyl-laced heroin as part of approximately 8 sales to undercover officers.

- ANTHONY DAVIS sold approximately 7.303 grams of fentanyl-laced heroin as part of approximately 3 sales to undercover officers.

- FLOYD STEWART sold approximately 9.33 grams of fentanyl-laced heroin as part of approximately 4 sales to undercover officers.

- JEREMY HAMPTON sold approximately 5.29 grams of fentanyl-laced heroin as part of approximately 2 sales to undercover officers.

- JOHNNIE DANIELS sold approximately 3.289 grams of heroin and 6.526 grams of fentanyl-laced heroin as part of approximately 5 sales to undercover officers.

- JAMES HUGHES sold approximately 3.338 grams of heroin as part of approximately 3 sales to undercover officers.

- TORIAN JOHNSON sold approximately 4.139 grams of heroin as part of 3 sales to undercover officers.

- KAMRON GARRAWAY sold approximately 4.072 grams of heroin as part of 2 sales to undercover officers.

---

Each drug exhibit tested positive for heroin and/or fentanyl-laced heroin, including fentanyl analogues.

- SAVAN WARD sold approximately 6.294 grams of heroin as part of 2 sales to undercover officers.

- WILL HOWARD sold approximately 4.1 grams of heroin as part of approximately 2 sales to undercover officers

- ROBERT STUCKEY sold approximately 6.294 grams of heroin as part of approximately 2 sales to undercover officers.

The following details some of the aforementioned controlled purchases.

    A. *UC-2 Purchases 1.76 Grams of Heroin from BARNES and JOHNSON on March 6, 2019.*

14.    On or about March 6, 2019, at approximately 11:30 a.m., law enforcement officials established surveillance in the area of Monticello Avenue in anticipation of an undercover officer (UC-2) attempting to purchase narcotics from members of the Monticello DTO. UC-2 was equipped with an audio and video recording device prior to the transaction.

15.    At approximately 11:47 a.m., surveillance observed UC-2 arrive on Monticello Avenue and walk southbound down the street. While UC-2 walked down the street, BRYANT BARNES[3] and TORIAN JOHNSON[4] approached and engaged

---

[3] Law enforcement officials identified BRYANT BARNES as follows: on February 19, 2019, UC-2 purchased four tin foil packets of heroin from an individual (later determined to be BARNES). Following the distribution on February 19, 2019, law enforcement officials approached the individual to identify him and completed an ISR. During that stop, the individual identified himself as BRYANT BARNES. Officers then pulled a photograph of BRYANT BARNES from a law enforcement database. UC-2 reviewed the photograph and identified BRYANT BARNES as the individual who facilitated the sale of heroin on February 19, 2019.

[4] Law enforcement officials identified TORIAN JOHNSON as follows: following the distribution on March 6, 2019 discussed below, law enforcement officials approached the individuals whom UC-2 had encountered in order to identify them and completed an ISR. During that stop, one individual identified himself as TORIAN JOHNSON. Officers then pulled a photograph of TORIAN JOHNSON from a law enforcement database. UC-2

in a recorded conversation with him.  During the conversation,[5] UC-2 stated: "Hey, bro, could I get four [blows of heroin]?"  JOHNSON replied: "What you want?"  UC-2 responded: "Blow [heroin]."  UC-2 asked JOHNSON: "How you've been, man?  You've taken care [sold narcotics to] of me before."  BARNES replied: "I know who you is, I've seen you around here.  Keep walking, that way."  JOHNSON asked: "How much you need?"  UC-2 responded: "Four [blows of heroin]."  BARNES said: "He's [JOHNSON] going to hit [serve] you."  UC-2 responded: "Yeah."  JOHNSON replied: "Stay right here, I got you."  UC-2 responded: "Alright, man."  JOHNSON replied: "Keep your head up.  Four [blows of heroin]?"  UC-2 responded: "Yeah."

16.    According to UC-2 and body cam video, shortly after this exchange, JOHNSON handed UC-2 four tin foil packets containing a white powdery substance and UC-2 gave JOHNSON $40 in government funds.

17.    UC-2 provided the four tin foil packets containing the white powdery substance distributed by BARNES and JOHNSON to the DEA North Central

---

reviewed the photograph and identified TORIAN JOHNSON as the individual who provided the narcotics to him on March 6, 2019.

[5] Some of the lawfully intercepted conversations ("recorded conversations") have been summarized in this Affidavit. The language that is quoted from the recorded conversations throughout this Affidavit is based draft, not final, transcripts of the recorded conversations. The times listed for the recorded conversations are approximate and, unless otherwise indicated, reflect the time in the North American Central Time Zone. The summaries do not include all statements or topics covered during the course of the recorded conversations.  At various points in the Affidavit I have included in brackets my interpretation of words and phrases used in the recorded conversations. My interpretations are based on information received from the contents and context of the recorded conversations, events that took place before and after the conversations, my knowledge of the investigation as a whole, my experience and training, and the experience and training of other law enforcement agents in this investigation

Laboratory. According to the laboratory, the substance weighed approximately 1.76 grams and tested positive for the presence of heroin.

   B.  *TATE Delivers a Supply of Heroin to the Monticello Avenue Drug Spot, a Portion of Which DWAYNE PETERSON Sells to UC-1 on March 22, 2019.*

18.     On or about March 22, 2019, at approximately 9:30 a.m., law enforcement officials established surveillance in the area of Monticello Avenue in anticipation of an undercover officer (UC-1) attempting to purchase narcotics from members of the Monticello DTO. UC-1 was equipped with an audio and video recording device prior to the transaction.

19.     At approximately 9:19 a.m., surveillance observed UC-1 arrive on Monticello Avenue and walk southbound towards Augusta Blvd. where UC-1 observed three individuals at the northwest corner of Augusta Boulevard and Monticello Avenue. UC-1 recognized one of the three individuals as DWAYNE PETERSON.[6]

20.     According to UC-1 and body cam video, at approximately 9:25 a.m., UC-1 approached a narcotics customer (Individual H) to discuss the sale of heroin.

---

[6] Law enforcement officials identified DWAYNE PETERSON as follows: on February 22, 2019, an undercover officer purchased a small quantity of heroin from an individual on Monticello Avenue. After the purchase, law enforcement officials stopped the individual who had sold the undercover officer the heroin. The individual supplied his name (DWAYNE PETERSON) and date of birth. Officers pulled a booking photograph of "Dwayne Peterson" and confirmed that the individual depicted in the photograph was the same person that had sold heroin to the undercover officer on February 22, 2019. In addition, during the course of the investigation, law enforcement officials (UC-1, UC-2, UC-3) purchased heroin from an individual on February 22, March 8, and March 15, 2019 and took photographs of that individuals. Law enforcement officials compared the surveillance photographs and video recordings from the purchases to photographs from law enforcement databases and determined that the individual who had sold heroin to the UCs was PETERSON.

During that recorded encounter, UC-1 asked: "They're not up [selling heroin] right now?" Individual H responded: "Nah." UC-1 replied: "What they [the street-level traffickers] say?" Individual H answered: "They say about five to ten minutes."

32. According to UC-1 and body cam video, UC-1 then walked towards the middle of Monticello Avenue and approached PETERSON and the other two individuals. UC-1 asked the three individuals for some "D [heroin]." PETERSON stated to UC-1: "Go wait by the lot down there," and directed UC-1 to go wait in an empty lot in the middle of the block. Before UC-1 walked to the vacant lot, UC-1 asked: "How long [before the street-level traffickers could distribute more heroin]?" PETERSON responded: "10 minutes." UC-1 then walked to the vacant lot located in the middle of Monticello Avenue.

33. At approximately 9:38 a.m., law enforcement officers conducting surveillance observed a Chevy Impala drive north bound on Monticello Avenue and park in the area of a residence on Monticello Avenue. Law enforcement officials observed that the vehicle was only occupied by one individual, the driver, TATE.[7] Upon TATE's arrival in the Chevy Impala, agents observed the following:

---

[7] Law enforcement officials identified WILLIE TATE as follows: first, law enforcement officials pulled a Chicago Police booking photograph of WILLIE TATE and showed the photograph to a source of information ("SOI-1") who confirmed that WILLIE TATE is the same individual he knew as Junebug. Second, after the April 9, 2019 distribution by DYER and TATE, law enforcement officials who conducted surveillance confirmed that the individual who arrived during the encounter to supply DYER was the same person depicted in the booking photograph of WILLIE TATE.

On or about May 24, 2019, the Honorable Rubén Castillo, then Chief Judge for the Northern District of Illinois, entered an order authorizing the initial interception of wire

     a.    PETERSON immediately approached the passenger window of the Chevy Impala and reached into the vehicle through the window. PETERSON retrieved a small-unidentified object from the Chevy Impala and placed it into his right jacket pocket. The encounter took only a few seconds.

     b.    After retrieving the item from the Chevy Impala, PETERSON walked at a fast pace to the gangway of a residence on Monticello Avenue.

     c.    Less than a minute later, PETERSON emerged from the gangway of the residence on Monticello Avenue and called UC-1 to approach him.

34.    Based on my training, experience, and familiarity with this case – including prior and subsequent surveillance and recorded conversations with PETERSON, the timing of TATE's arrival, and PETERSON's subsequent sale of heroin to UC-1 – I believe that the workers at the Monticello Avenue Drug Spot, including PETERSON, had temporarily run out of narcotics to sell and TATE delivered a resupply of heroin for the block.

---

communications to and from Target Phone 1 (the "May 24, 2019 Order"). Interception began on May 24, 2019 and terminated on June 13, 2019.

Law enforcement officials identified TATE as the driver of the Chevy Impala as follows: after arriving on Monticello Avenue and meeting with PETERSON, who obtained items from the Chevy Impala and sold two packets of heroin to UC-1, the driver of the Chevy Impala exited and reentered the Chevy Impala on multiple occasions. During one occasion, law enforcement officials conducting surveillance approached the driver of the Chevy Impala and asked his name and date of birth. The driver identified himself as "Willie Tate" and provided his date of birth. Officers later pulled booking photographs for TATE from the Chicago Police Department database and confirmed that the individual depicted in the photographs was the same individual whom they had stopped driving the Chevy Impala. Agents conducting surveillance on March 22, 2019 identified the driver of the Chevy Impala as TATE.

35.     According to UC-1 and body camera video, UC-1 approached PETERSON and gave PETERSON $20 in government funds and PETERSON gave UC-1 one bag containing a white powdery substance.  PETERSON stated to UC-1: "You want one [blow of heroin]?"  UC-1 told PETERSON: "I want two [blows of heroin].  Give me another one, dog, let me get one more, baby."  PETERSON then directed UC-1 to go back where he was standing on the sidewalk.    PETERSON immediately returned to the gangway of the residence on Monticello Avenue and re-approached UC-1.    PETERSON then gave UC-1 another bag containing a white powdery substance.

36.     UC-1 provided the bags containing a white powdery substance supplied by PETERSON to the DEA North Central Laboratory.  According to the laboratory, the two bags weighed approximately .904 grams and tested positive for the presence of heroin.

C. *UCs Purchases 2.194 Grams of Heroin from SAM HOWARD, JAMES HUGHES, and Individual A on April 2, 2019.*

37.     On or about April 2, 2019, at approximately 9:30 a.m., law enforcement officials established surveillance in the area of Monticello Avenue in anticipation of UC-3 and UC-10 attempting to purchase narcotics from members of the Monticello DTO.  UC-3 and UC-10 were equipped with audio and video recording devices prior to the transaction.  Based on a review of the UCs audio and video recordings, and according to the UCs:

a.     At approximately 3:51 p.m., surveillance observed UC-3 and UC-10 enter Monticello Ave and walk southbound towards W. Augusta Blvd.  While

walking through Monticello Ave., SAM HOWARD[8] and JAMES HUGHES[9] approached UC-3 and UC-10 and engaged in a recorded conversation with them. During the conversation, UC-10 asked: "You got that D [heroin]?" SAM HOWARD replied: "Next block," while pointing southbound down Monticello Avenue.

      b.    While continuing to walk southbound, UC-3 and UC-10 observed Individual A. Individual A yelled to UC-10: "How many [blows of heroin]?" UC-10 responded: "Three [blows of heroin]. Five [blows of heroin]. Five [blows of heroin]. I got fifty dollars [$50]."

      c.    SAM HOWARD then joined Individual A, UC-3, and UC-10 and asked: "You ain't the police, you all?" UC-10 responded: "We come here last week." SAM HOWARD replied: "What kind of blows [heroin] we got?" UC-3 responded: "Tin foil." SAM HOWARD replied: "Yeah you know [what kind of narcotics the Monticello DTO distributed]. How many [blows of heroin] you all want?" UC-3 responded: "Three [blows of heroin]." SAM HOWARD then stated to UC-10: "Aight, Aight, how many you want?" UC-3 responded: "Three [blows of heroin]. Three [blows of heroin]."

---

[8] Law enforcement officials were able to identify SAM HOWARD as follows: on February 22, 2019, UC-7 purchased 0.946 grams of heroin and fentanyl from an unknown male and another individual (later identified as SAM HOWARD). Subsequent to that buy, officers approached SAM HOWARD to identify him and completed an ISR. Officers then compiled a photo array and UC-7 was able to positively identify SAM HOWARD as the individual who sold him narcotics on February 22, 2019.

[9] Law enforcement officials identified JAMES HUGHES as follows: on April 2, 2019, UC-7 purchased 1.144 grams of heroin from an individual (later identified as JAMES HUGHES). Following the distribution on April 2, 2019, law enforcement officials approached that individual and completed an ISR. During that stop, the individual identified himself as JAMES HUGHES. Officers then pulled a photograph of JAMES HUGHES from a law enforcement database. UC-7 reviewed the photographs and identified JAMES HUGHES as the individual who facilitated the sale of heroin on April 2, 2019.

d. UC-10 asked: "You got that D [heroin], man?" SAM HOWARD stated to Individual A: "No, he [UC-10] want D [heroin], man! Individual A responded: "I said C [crack cocaine]." UC-3 responded: "No, he [UC-10] said D [heroin]." UC-10 added: "No. I want D [heroin]." UC-3 responded: "The soft [heroin]." SAM HOWARD pointed at UC-3 and asked: "How many [blows of heroin] you want? How many, how many?" UC-3 responded: "Three [blows of heroin]." UC-10 responded: "I got fifty [$50]." HOWARD replied: "How many you want, five [blows of heroin]?" UC-10 responded: "Fifty [$50 worth of heroin]." UC-3 responded: "Three [blows of heroin]. Three [blows of heroin]." SAM HOWARD replied: "Aight."

e. At this point, HUGHES approached UC-3 and UC-10 and stated: "I got you." SAM HOWARD replied: "They [the blows of heroin] all together, right?" HUGHES said: "Oops [HUGHES realized that he did not have enough blows of heroin readily available to fill the UCs' order]. I'll give you what I got." UC-3 responded: "How many you got?" HUGHES replied: "I got three [blows of heroin]." UC-10 responded: "Oh. Fuck [UC-10 saw that HUGHES did not have three blows of heroin readily available]." HUGHES replied: "Thirty bucks [$30]. Thirty bucks [$30], come on [hurry up]."

f. UC-10 then gave HUGHES $30 in government funds and HUGHES gave UC-10 three tin foil packets containing a white powdery substance. UC-3 asked: "You don't got any more [blows of heroin]?" HUGHES replied: "It's gonna be . . . it's gonna be like five minutes [until he obtained more heroin to distribute]. Not even like five minutes. Two. Three minutes." UC-3 responded: "Alright."

g.      At that point, UC-3 and UC-10 began to depart the area with the plan of returning to purchase additional heroin from SAM HOWARD, HUGHES, and Individual A once they had been resupplied.  Before the UCs departed, Individual A whistled at UC-3 and UC-10 to get their attention to come back to him.  UC-3 and UC-10 walked back to the vacant lot where HUGHES had distributed the tin foil packets containing a white powdery substance.  HUGHES asked: "How much [heroin did the UCs want to purchase]?  How many [blows of heroin]?"  UC-10 responded: "two [blows of heroin], two [blows of heroin], two [blows of heroin]."  HUGHES gave UC-10 two more tin foil packets containing a white powdery substance and UC-10 gave HUGHES $20 in government funds.

h.      After the distribution to UC-10, UC-3 told HUGHES: "Three [blows of heroin]."  UC-3 asked: "You do six [blows of heroin] for fifty [$50]?"  HUGHES replied: "I can't do it, bro."  UC-3 asked: "Who's your boss?  Maybe you could ask."  HUGHES replied: "I, I can't.  I ain't got no boss."  UC-3 responded: "Aww. Fuck."  UC-10 responded: "Maybe tomorrow when we come back."

i.      According to UC-3 and body camera video, HUGHES then gave UC-3 three tin foil packets containing a white powdery substance and UC-3 gave HUGHES $30 in government funds.

38.    Based on my training and experience and knowledge of the investigation, I believe that in the above exchanges: (a) Individual A asked UC-3 and UC-10 how much narcotics they wanted to buy; (b) UC-10 told Individual A that the UCs wanted to purchase three and five blows of heroin, respectively; (c) SAM

HOWARD asked UC-3 and UC-10 if they were the police and what type of heroin the Monticello DTO usually sells on Monticello Avenue in order to determine if the UCs could accurately identify the way in which the drugs are packaged and if they were customers or police; (d) UC-3 told SAM HOWARD that the Monticello DTO usually sold tin foil packaged heroin and SAM HOWARD acknowledged that UC-3 was correct; (e) SAM HOWARD then asked UC-3 and UC-10 how much heroin they want to purchase and UC-3 said three blows of heroin; (f) UC-10 confirmed they wanted heroin and SAM HOWARD confirmed that with Individual A, who indicated that he thought the UCs wanted crack-cocaine; (g) SAM HOWARD confirmed that the UCs could purchase their blows of heroin together; (h) HUGHES and UC-10 agreed that HUGHES would sell $30 worth of heroin; (i) after the initial sale, Individual A whistled to notify the UCs that he and HUGHES had additional heroin to distribute; (j) HUGHES asked about the amount of heroin the UCs wanted to purchase and UC-10 told him that he wanted two blows of heroin and HUGHES sold two blows of heroin to UC-10 for $20; (k) UC-3 then told HUGHES he wanted three additional blow of heroin and asked if HUGHES could sell him six blows of heroin for $50; and (l) HUGHES said that he could not sell six blows of heroin for $50, and when UC-3 suggested HUGHES talk to his boss, HUGHES denied that he had a boss.

39. Following this transaction, UC-3 and UC-10 provided the tin foil packets supplied by SAM HOWARD, HUGHES, and Individual A to the DEA North Central Laboratory. According to the laboratory, the contents of the tin foil packets weighed approximately 2.194 grams and tested positive for the presence of heroin.

D. *TATE Delivers a Resupply of Heroin to the Monticello Avenue Drug Spot, a Portion of Which (18.095 Grams) STEVEN DYER Sells to UC-2 on April 9, 2019*

40.    On or about April 9, 2019, at approximately 11:39 a.m., UC-2 placed a recorded call to STEVEN DYER, using DYER Phone 1.[10]  During the conversation, UC-2 asked DYER: "Hey, you think you can give me umm . . . $400 [worth of heroin]?"  DYER replied: "Huh?"  UC-2 responded: "Four packs [of heroin, approximately 12 grams of heroin], 400 [$400]."  DYER replied: "Yeah, yeah, yeah, yeah."  UC-2 responded: "Alright."  DYER said: "As soon as I make it, I'll give you a call."  UC-2 responded: "About a half hour you say?"  DYER replied: "Yup, like 30 minutes."

41.    At approximately 12:30 p.m., law enforcement officials established surveillance in the area of Monticello Avenue in anticipation of UC-2 attempting to purchase heroin from DYER.  UC-2 was equipped with an audio and video recording device prior to the transaction. Surveillance observed the following:

a.    At approximately 12:43 p.m., UC-2 entered the Monticello Avenue Drug Spot and walked southbound towards W. Augusta Boulevard.  UC-2 arrived at a vacant lot on Monticello Avenue.

---

[10] Law enforcement officials identified DYER and that DYER was the user of DYER Phone 1 as follows: first, on February 19, 2019, an undercover agent (UC-7) purchased four tin foil packets of suspected heroin from an individual (DYER), who exited a residence on Monticello Avenue ("DYER Residence").  Law enforcement officials searched a Chicago Police Database for that address and found that DYER had previously been associated with DYER Residence in the database.  Officers then pulled a photograph of DYER from the database.  In a subsequent photo array, UC-7 identified DYER as the individual who sold him the four packets of heroin earlier that day.  On February 26, 2019, UC-5 purchased four tin foil packets of heroin from DYER.  During this transaction, UC-5 asked DYER for his phone number and DYER provided UC-5 with DYER Phone 1.  UC-5 then called DYER Phone 1 to confirm that he had the correct phone number.  Second, as discussed below, on April 9, 2019, DYER used DYER Phone 1 to call TATE, to obtain a resupply of narcotics, in front of UC-2.

b. At approximately 12:47 p.m., DYER exited DYER Residence, located at the Monticello Avenue Drug Spot, and walked to the backyard.

42. According to UC-2 and body camera video, DYER began having a recorded conversation with UC-2, who was still in the lot of another residence on Monticello Avenue next to DYER. DYER handed UC-2 a black plastic bag, which contained three clear-knotted bags, which further contained numerous tinfoil packets each containing an off-white powdery substance and UC-2 handed DYER $300 in government funds. During the recorded conversation between UC-2 and DYER:

a. DYER stated: "It [the heroin] still ain't come yet." UC-2 asked: "What do you got, 3 [three packs of heroin]?" DYER replied: "Three packs [of heroin] yeah. Yeah, man, I'm finna see how long he [a coconspirator responsible for delivering resupplies of conspiracy narcotics to the drug spot, TATE] finna take to bring this other shit [other one pack of heroin]. Damn, I real needed it." UC-2 asked: "How long you think he [TATE] is going to take?" DYER responded: "I don't know, I'm finna see right now." UC-2 responded: "I could wait in the area." DYER replied: "yeah, yeah, yeah, just don't leave."

43. Based on my training and experience and knowledge of the investigation, I understand that in the above exchange: (a) DYER told UC-2 that the fourth packet of heroin had not arrived yet; (b) DYER told UC-2 that he would contact a coconspirator responsible for delivering a resupply of the DTO's heroin to the drug spot (TATE) to see how long it would take for his supplier to bring the fourth packet

of heroin; and (c) UC-2 and DYER confirmed that UC-2 would wait in the area until DYER received the fourth packet of heroin.

44.     According to UC-2 and body camera video from the interaction, at approximately 12:49 p.m., DYER placed a call in UC-2's presence.  During this conversation, DYER stated: "Yup, my guy [UC-2] here, so how long you think you'll need . . . Oh ok, so you right there."[11]

45.     Based on a review of DYER Phone 1's call records, at approximately 12:49 p.m., DYER placed an outgoing call to TATE, using Target Phone 1.[12]   This call lasted approximately 26 seconds.

46.     After the call, DYER then told UC-2: "Just wait right here."  According to UC-2, DYER walked away from UC-2 through the gangway towards the front of DYER Residence.

47.     At this point, agents conducting surveillance observed and CPD pole camera video reflected TATE walk up to the residence, enter the front yard, and walk

---

[11] DYER's end of the phone conversation was recorded over UC-2's audio and recording device.

[12] Law enforcement officials identified WILLIE TATE as one of two users of Target Phone 1 as follows: first, on or about February 22, 2019, SOI-1 provided information about a narcotics trafficker whom he identified as "Junebug" (WILLIE TATE).  After a February 26, 2019 purchase of 18.095 grams narcotics from STEVEN DYER, during which purchase DYER provided his phone number (DYER Phone 1), agents went back to SOI-1 and asked SOI-1 for TATE's phone number, and SOI-1 provided Target Phone 1.  Second, agents obtained records from T-Mobile, which reflected that Target Phone 1 was registered to "Willie Tate."  Third, as discussed above, during the April 9, 2019 distribution of narcotics from DYER, DYER called Target Phone 1 in order to obtain additional narcotics to sell to the undercover agent, and surveillance observed and pole camera video reflected TATE arrive in the area around the time of the call.  After TATE arrived in the area, he met with DYER and DYER subsequently provided the undercover agent with additional heroin.

towards the gangway where DYER was waiting. Both TATE and DYER then walked together out of sight of surveillance. Shortly thereafter, law enforcement observed TATE walk away from the gangway and leave the area.

48.     According to UC-2, and a review of UC-2's body cam video, at approximately 12:52 p.m., DYER returned to the backyard of his residence and handed UC-2 the remaining pack containing an off-white powdery substance and UC-2 gave DYER another $100 in government funds.

49.     Based on the timestamp of the recording, reflecting that the call that UC-2 overheard was at 12:49 p.m., a review of DYER Phone 1's call records, which reflected a call to Target Phone 1 that same time, corresponding surveillance and pole camera video that showed TATE arriving in the area moments later, TATE's brief and secretive interaction with DYER soon after, and DYER's distributing an additional packet of suspected heroin moments after meeting with TATE, I believe that the phone call that UC-2 overheard DYER making was a call to TATE, using Target Phone 1, in order to confirm that TATE was nearby in order to supply UC-2 with the fourth packet of suspected heroin.

50.     UC-2 provided the four packs supplied by DYER and TATE to the DEA North Central Laboratory. According to the laboratory, the packs weighed approximately 18.095 grams and tested positive for the presence of heroin.

E. *UCs Purchase 4.072 Grams of Heroin from SAM HOWARD and KAMRON GARRAWAY while BARNES Looks Out for Police on April 19, 2019.*

51. On or about April 19, 2019, at approximately 8:50 a.m., law enforcement officials established surveillance in the area of the Monticello Avenue Drug Spot in anticipation of undercover officers attempting to purchase narcotics from members of the Monticello DTO. UC-3 and UC-8 were equipped with audio and video recording devices prior to the transaction.

52. At approximately 8:56 a.m., UC-3 and UC-8 approached SAM HOWARD and KAMRON GARRAWAY[13] in front of a residence on Monticello Avenue and engaged in recorded conversation with both SAM HOWARD and GARRAWAY. During the conversation:

a. SAM HOWARD stated: "How many [blows of heroin]?" UC-3 responded: "Can you, can you give me a special [discounted price for heroin]?" SAM HOWARD replied: "Huh?" UC-3 responded: "Can you give me a pack [of heroin]?" SAM HOWARD, then speaking to GARRAWAY, stated: "You got a pack [of heroin]?" GARRAWAY responded: "Yeah. You know what's up. You already know." SAM HOWARD then stated to UC-3: "I'll give you eleven [baggies of heroin] for hundred [$100] right now." UC-3 responded: "Man, you can't do twelve [baggies of heroin]?"

---

[13] Law enforcement officials identified KAMRON GARRAWAY as follows: on April 19, 2019 UC-3 and UC-8 purchased, in total, 4.072 grams of heroin from an individual (later identified as GARRAWAY). Subsequent to that purchase of narcotics, officers approached the individual to identify him and completed an ISR. During that stop, the individual identified himself as KAMRON GARRAWAY. Law enforcement officials then pulled a photograph of KAMRON GARRAWAY from a law enforcement database and compiled a photo array for UC-3 and UC-8. Both UCs identified GARRAWAY as the individual who distributed the heroin on April 19, 2019.

32

UC-8 then stated: "Bro, we do six [baggies of heroin] for fifty [$50]." SAM HOWARD replied: "I came out late. You know what I'm saying. I don't know what's going on." GARRAWAY stated: "I know you [UC-3] want a deal. I'm working a pack [of heroin]. I give you more than that, I'm only. It's only twelve [baggies of heroin] in there. So, if I give you eleven I'm only gonna make ten [$10] though. Honest to God. It's only twelve [baggies of heroin] in there. I make $20. If I give you twelve, I'm not." UC-8 responded: "Come on, bro. You hook us up six [six baggies of heroin] for fifty [$50]." UC-3 then stated to SAM HOWARD: "You hook me up next time?" SAM HOWARD replied: "Yeah, I got you." UC-3 responded: "Ok. That way I don't have to come back."

53. Based on my training and experience and knowledge of the investigation, I understand that in the above exchange: (a) HOWARD asked UC-3 how much heroin he needed to purchase; (b) UC-3 stated he needed a pack of heroin; (c) SAM HOWARD then asked GARRAWAY if he had a pack to sell to UC-3; (d) SAM HOWARD stated he will give UC-3 eleven baggies of heroin for $100; (e) UC-3 asked SAM HOWARD if he could give them twelve baggies of heroin for $100; (f) GARRAWAY then explained to UC-3 and UC-8 that there was only twelve baggies in a pack and if he gave away his whole pack for $100 he would not make any money.

54. Later in the recorded interaction, SAM HOWARD told BARNES: "Go to the corner, bro." UC-3 responded: "What corner?" SAM HOWARD replied: "No, I'm talking to him [BARNES]." At this point, UC-3 observed BARNES walking to the northwest corner of Monticello Avenue and Augusta Blvd.

55.     Based on my training and experience and knowledge of the investigation, I understand that in the above exchange, SAM HOWARD instructed BARNES to go to the corner of Monticello Avenue to look out for the police because SAM HOWARD, GARRAWAY, and the UCs were about to engage in a drug transaction.

56.     GARRAWAY then stated to UC-3: "You want a pack [of heroin]?  A Pack?"  UC-3 responded: "Yeah, that way . . . ."  UC-3 observed GARRAWAY jump the fence into the vacant lot of a residence on Monticello Avenue and stated: "Sam, I might not have it [a full pack of heroin]."  SAM HOWARD then stated to UC-8: "How many [blows of heroin] you want?"  UC-8 responded: "Six [6 baggies of heroin] for fifty [$50].  Come on, bro, like last time."  UC-8 then observed GARRAWAY reach to the ground and stated: "I ain't got it [enough heroin], y'all."  UC-3 responded: "Fuck.  Cause we don't want to come back."

57.     According to UC-3, GARRAWAY made eye contact with SAM HOWARD and pointed at the corner where BARNES was standing as lookout.  SAM HOWARD then communicated with BARNES, but UC-3 could not determine what SAM HOWARD said.

58.     SAM HOWARD then stated to GARRAWAY: "Alright, man, come on, man."  UC-3 then observed GARRAWAY walking towards UC-3, jump the fence back to the sidewalk and ask: "Ok, you want the pack [of heroin]?"  UC-3 responded: "I do.  You want two fifties [$50] of the . . . ."  GARRAWAY replied: "It don't matter."  UC-3 then observed GARRAWAY count eleven tin foil packets and give them to UC-3.  UC-

3 then gave GARRAWAY $100 in government funds. UC-3 then observed GARRAWAY count out three tin foil packets and give them to UC-8 at which point UC-8 gave GARRAWAY $30 in government funds.

59.     Based on my training and experience and knowledge of the investigation, I understand that in the above exchange: (a) GARRAWAY told SAM HOWARD that he did not have enough heroin to supply both UC-3 and UC-8; (b) SAM HOWARD communicated with BARNES to make sure there was not police in the area so they can safely conduct the heroin transaction; and (c) GARRAWAY served UC-3 with eleven tin foil packets of heroin and UC-8 with three tin foil packets of heroin.

60.     UC-3 and UC-11 provided the eleven tin foils supplied by SAM HOWARD and GARRAWAY to the DEA North Central Laboratory. According to the laboratory, the substances in the packets weighed approximately 4.072 grams and tested positive for the presence of heroin.

> F.  *UC-2 Purchases 21.013 Grams of Heroin, Fentanyl, and Acetyl Fentanyl From DYER on May 3, 2019.*

61.     On or about May 3, 2019, at approximately 8:30 a.m., law enforcement officials established surveillance in the area of Monticello Avenue in anticipation of UC-2 attempting to purchase narcotics DYER. UC-2 was equipped with an audio and video recording device prior to the transaction

62. Around that time, UC-2 placed a call to DYER, using DYER Phone 1.[14] According to UC-2, during the call, UC-2 stated to DYER that he wanted to purchase $500 worth of heroin from DYER. DYER agreed to sell the heroin to UC-2 and instructed UC-2 to come to his residence (DYER Residence) located on Monticello Avenue to conduct the transaction.

63. At approximately 8:48 a.m., surveillance observed and CPD Pod camera video reflected UC-2 enter Monticello Avenue and walk southbound towards DYER Residence. Surveillance observed UC-2 enter the alley behind DYER Residence and stop in the vacant lot on Monticello Avenue where UC-2 observed DYER standing by an opening of the back fence.

64. According to UC-2, surveillance, and body camera video, as DYER approached UC-2, DYER handed UC-2 a clear plastic bag containing five packs of Ziploc baggies, each containing an off-white powdery substance and UC-2 gave DYER $500 in government funds. UC-2 then engaged in a recorded conversation with DYER. During the conversation:

a. UC-2 asked: "Hey, you changed the packaging [of the narcotics]?" DYER replied: "Yeah, they [Monticello DTO members] took 'em out the foil and put 'em in some bags." UC-2 responded: "Yeah, cause last time you gave me black [type of packaging for heroin]. The black ones and I hope they're [the new narcotics] the

---

[14] This call was not recorded due to technical issues with a law enforcement call recording system.

same shit [same heroin as last time]." DYER replied: "yeah, the same shit [same heroin as last time]."

b. UC-2 asked: "So you took them [heroin] out of foil and put 'em [heroin] in these bags?" DYER replied: "Yeah, but I think they're [Monticello DTO] going back to the foil. You know the guy [Monticello DTO member bagging the narcotics] that be doing that shit, you know what I'm saying. I guess sometimes he [Monticello DTO member bagging the narcotics] feeling like doing foil and sometimes takes it easy way out and puts 'em [in] bags." UC-2 responded: "You like to change it up?" DYER replied: "I just get like they [Monticello DTO] get it to me. As long as they flood [provide lots of narcotics to distribute], you know what I'm saying." UC-2 replied: "Alright, b, take care now."

65. Based on my training and experience and knowledge of the investigation, I understand that in the above exchange: (a) UC-2 asked DYER if the Monticello DTO changed the packaging from tin foil to Ziploc baggies; (b) DYER informed UC-2 that other members of the Monticello DTO, including a Monticello DTO member bagging the narcotics, changed the heroin packaging, but it is the same quality heroin as UC-2 had previously purchased; and (c) DYER stated that he did not care how the heroin was packaged as long as it was provided to him in sufficient quality to distribute on Monticello Avenue.

66. UC-2 provided the packets supplied by DYER to the DEA North Central Laboratory. According to the laboratory, the packets weighed approximately 21.013

grams and tested positive for the presence of heroin, fentanyl, and acetyl fentanyl (a fentanyl analogue).

### G. *UCs Purchase 7.302 Grams of Heroin from ANTHONY DAVIS and FLOYD STEWART on May 3, 2019.*

67.     On or about May 3, 2019, at approximately 9:10 a.m., law enforcement officials established surveillance in the area of Monticello Avenue in anticipation of UC-3 and UC-10 attempting to purchase narcotics from members of the Monticello DTO.  UC-3 and UC-10 were equipped with audio and video recording devices prior to the transaction.

68.     At approximately 9:20 a.m., surveillance observed and CPD Pod camera video reflected UC-3 enter Monticello Avenue and walk southbound towards W. Augusta Boulevard.  Surveillance observed UC-3 and UC-10 engage in a recorded conversation with ANTHONY DAVIS.[15]  During the encounter:

    a.     DAVIS asked: "How many [blows of heroin] you want?"  UC-10 responded: "Let me get five [blows of heroin]."

    b.     UC-3 and UC-10 then followed DAVIS into the vacant lot at a residence on Monticello Avenue.  Once in the vacant lot, UC-10 gave DAVIS $20 in

---

[15] Law enforcement officials identified ANTHONY DAVIS as follows: on May 3, 2019, UC-10 purchased 2.286 grams of heroin from an individual (later identified as ANTHONY DAVIS). Following the distribution on May 3, 2019, law enforcement officials approached that individual and completed an ISR.  During that stop, the individual identified himself as ANTHONY DAVIS.  Officers then pulled a photograph of ANTHONY DAVIS from a law enforcement database.  UC-10 reviewed the photograph and identified ANTHONY DAVIS as the individual who facilitated the sale of heroin on May 3, 2019.

government funds and DAVIS gave UC-10 two blue Ziploc bags containing a white powdery substance.

      c.      After the distribution to UC-10, UC-3 asked: "Hey, can I get that pack [of heroin]?" DAVIS replied: "Stay in the lot." UC-3 responded: "Bro. Can I get that pack [of heroin] from last time? I want that deal like last time. I want that deal though." DAVIS replied: "Could you stay in the lot?"

      d.      At this point, UC-3 and UC-10 waited in the vacant lot for approximately one to two minutes when Floyd STEWART[16] approached counting numerous pink tint bags of suspected heroin. During the ensuing recorded encounter, UC-3 asked: "They [Monticello DTO heroin packaging] pink now?" STEWART replied: "How many [blows of heroin] you want?" UC-10 responded: "Let me get three more [blows of heroin]."

      e.      According to UC-10, STEWART pulled out three pink Ziploc baggies containing a white powdery substance and gave the three baggies to UC-10. UC-10 then gave STEWART $30 in government funds.

      f.      During the ensuing recorded encounter, UC-3 stated: "I want a pack [12 bags of heroin, approximately 3-4 grams] like last time." STEWART replied: "Come on." UC-3 then observed STEWART reach into his pants pocket and pull out

---

[16] Law enforcement officials identified FLOYD STEWART as follows: on May 3, 2019, UC-3 purchased 5.017 grams of heroin from an individual (later identified as FLOYD STEWART). Following the distribution on May 3, 2019, law enforcement officials approached the individual and completed an ISR. During that stop, the individual identified himself as FLOYD STEWART. Officers then pulled a photograph of FLOYD STEWART from a law enforcement database. UC-10 reviewed the photograph and identified FLOYD STEWART as the individual who facilitated the sale of heroin on May 3, 2019.

numerous additional pink tint bags containing a white powdery substance. UC-3 stated: "You got it. You gonna give me twelve [blows of heroin]?" According to UC-3, STEWART then gave UC-3 the pink tinted bags containing a white powdery substance while counting additional baggies.

g.       UC-3 then asked: "How much is that?" STEWART replied: "Three [blows of heroin]." UC-3 responded: "Three [blows of heroin]." STEWART replied: "Four. Five. Six. Eight. Nine. Ten. Is that a hundred [$100]?" According to UC-3, at this time, STEWART was counting out additional blows containing a white powdery substance, which STEWART provided to UC-3.

h.       UC-3 responded: "No, you gave me twelve [blows of heroin] last time?" STEWART replied: "Was that a hundred [$100]? I'm gonna give you eleven [eleven blows of heroin]." UC-3 responded: "What?" STEWART replied: "I ain't paying off that, bro?" UC-3 responded: "Hold on." UC-3 then handed STEWART $100 in government funds. STEWART then stated to UC-3: "How many [blows of heroin] you want?" UC-3 responded: "What?" STEWART replied: "How many more [blows of heroin] you want. Want anymore?" UC-3 responded: "No. I thought you were gonna give me twelve [blows of heroin]." STEWART replied: "I don't get paid off that [turn a profit], bro." UC-3 responded: "Ok. Alright, alright. That's cool."

69.     Based on my training and experience and knowledge of the investigation, I understand that in the above exchange: (a) UC-3 asked STEWART how many blows of heroin he had provided to UC-3 and STEWART said three; (b) STEWART then counted out additional blows of heroin (up to ten) that he provided

UC-3; (c) UC-3 asked for twelve blows of heroin for $100, which is the deal he said STEWART had previously given him; and (d) STEWART agreed to provide eleven blows of heroin rather than twelve, informing UC-3 that if he provided twelve blows of heroin, he would not make a profit off the transaction.

70.    According to body camera video, after the distribution, UC-3 yelled to STEWART as STEWART was walking away: "Hey, are these [the blows of heroin] good [high quality] though?  Cause now they're different [in different colored bags]." STEWART replied: "They're [the narcotics in the pink bag] the same as the blue bags."  UC-3 responded: "Oh, ok."  UC-3 and UC-10 then departed the area.  While walking away, UC-3 approached DAVIS and asked: "Same shit [the narcotics in the different-colored bags] though, right?"  DAVIS replied: "Yeah, it's the same shit [the heroin in the blue and pink bags was the same and all came from the same supply]."

71.    Based on my training and experience and knowledge of the investigation, I understand that in the above exchange: (a) UC-3 asked STEWART if the heroin in the pink baggies was the same quality of the heroin in the blue baggies that he had previously purchased from STEWART and STEWART said that they were the same; and (b) UC-3 asked DAVIS if the heroin in the pink baggies and blue baggies was the same and DAVIS said that it was.

72.    UC-3 and UC-10 provided the baggies containing a white powdery substance distributed by DAVIS and STEWART to the DEA North Central Laboratory.  According to the laboratory:

a.      the baggies containing a white powdery substance DAVIS and STEWART distributed to UC-10 weighed approximately .751 grams and tested positive for the presence of heroin, fentanyl, and acetyl fentanyl;

b.      the baggies containing a white powdery substance STEWART distributed to UC-10 weighed approximately 1.535 grams and tested positive for the presence of heroin and fentanyl; and

c.      the baggies containing a white powdery substance STEWART distributed to UC-3 weighed approximately 5.017 grams and tested positive for the presence of heroin and fentanyl.

H. *UC-2 Purchases 33.345 Grams of Heroin and Furanyl Fentanyl from DYER on May 30, 2019.*

73.      On or about May 30, 2019, at approximately 3:30 p.m., UC-2 placed a recorded call to DYER, using DYER Phone 1.  During the call, DYER stated: "What up, bro."  UC-2 responded: "Hey, B, what's up, man?"  DYER replied: "Yup, I'm good." UC-2 responded: "I was out of town, my father, is real sick and stuff so I had to go down to umm, Indiana.  Hey, bro, I just got back, man, my boss said everybody is hitting me up and telling me to go buy [U/I]."  DYER replied: "Hell yeah."  UC-2 responded: "Ok, about how long will it take you?"  DYER replied: "Shit, how long you finna be?"  UC-2 responded: "Umm, I can be there in about a half an hour."  DYER replied: "Ok cool."  UC-2 responded: "You coming, right? [U/I]."  DYER replied: "Yeah, I got you."  UC-2 responded: "Alright, man, I need to get high, it was dry over there where I was at."  DYER replied: "Alright yeah."  UC-2 responded: "I think everyone else does to so we're waiting on it.  Alright, bro.  I'll see you in a half hour."

74.     Based on my training and experience and knowledge of the investigation, I understand that in the above exchange: (a) UC-2 told DYER that he had been out of town, but that he was told to purchase heroin; and (b) DYER and UC-2 agreed to meet in order for DYER to distribute heroin to UC-2.

75.     At approximately 4:10 p.m., surveillance observed and CPD Pod camera video reflected UC-2 arrive at the Monticello Avenue Drug Spot and walk towards DYER Residence.  UC-2 was equipped with an audio and video recording device. At approximately 4:11 p.m., UC-2 placed a call to DYER who was using DYER Phone 1.[17]  During the call, UC-2 stated: "Hey, B, I'm walking up to your house.  Alright, I got to go all the way around.  Alright I'll be there in a second."  According to UC-2, during this call, DYER instructed UC-2 to go around to the alley and meet with DYER in the back yard of his residence.

76.     Surveillance and CPD Pod camera video reflected UC-2 pass DYER Residence and walk towards the alleyway behind the residence and approach the rear fence.  According to UC-2 and body camera video:

        a.      When UC-2 arrived at the back fence of DYER Residence, DYER was waiting in the back yard.  DYER approached UC-2 and handed UC-2 a plastic bag containing six bundles each containing numerous clear Ziploc bags each containing a tan powdery substance.  UC-2 then gave DYER $600 in government funds.  UC-2 and DYER then engaged in a recorded conversation.  During the conversation:

---

[17] UC-2's portion of the call was recorded over UC-2's body camera.

43

b.      UC-2 stated: "Yeah, I know, you got six [$600 worth of heroin]?" DYER replied: "Yeah, oh shit, got a little hole in it, [U/I]." UC-2 responded: "Alright man, how you been?" DYER replied: "Glad you're back, man. Shit, I've been good, man, I'm glad my guy back, our real guy." UC-2 responded: "So, is this the same guy [quality heroin] as the tin foil." DYER replied: "Yeah, [U/I]." UC-2 responded: "But this is the same guy [quality heroin] as the tin foil?" DYER replied: "Yeah, same shit [quality heroin], [U/I] yeah, man, we [the Monticello DTO] buying right." UC-2 responded: "Alright, alright." DYER replied: "Glad you're back." UC-2 responded: "Yeah, me too, take care now."

77.     Based on my training and experience and knowledge of the investigation, I understand that in the above exchange: (a) UC-2 confirmed that DYER sold UC-2 $600 worth of heroin; and (b) UC-2 asked if the heroin DYER had distributed to UC-2 was the same heroin as the heroin that was packaged in tin foil, and DYER confirmed that it was the same heroin.

78.     UC-2 provided the bundles and Ziploc bags distributed by DYER to the DEA North Central Laboratory. According to the laboratory, the jabs weighed approximately 33.345 grams and tested positive for the presence of heroin and furanyl fentanyl.

I.      *UCs Purchases 5.29 Grams of Heroin from FRANKLIN, JEREMY HAMPTON, and JOHNNIE DANIELS on June 13, 2019.*

79.     On or about June 13, 2019, at approximately 2:17 p.m., surveillance observed and CPD Pod camera video reflected UC-3 and UC-10 walking southbound to the Monticello Avenue Drug Spot. UC-3 and UC-10 were equipped with audio and

video recording devices.  As they were walking, FRANKLIN[18] approached and had a recorded conversation with the UCs.  During the conversation:

a.    FRANKLIN asked: "How many [blows of heroin] do you want?" UC-10 responded: "Let me get five [blows of heroin]."

b.    According to UC-10, FRANKLIN walked across the street and jumped the fence into the yard of a residence on Monticello Avenue.    At that time, UC-3 and UC-10 had a recorded conversation with JEREMY HAMPTON[19] and JOHNNIE DANIELS.[20]   HAMPTON stated: "If you got money [to buy narcotics] go

---

[18] Law enforcement officials identified FRANKLIN as follows: on or about May 17, 2019, an undercover officer purchased a small quantity of heroin from an individual (FRANKLIN) on Monticello Avenue. Law enforcement officials were familiar with FRANKLIN based on multiple prior conversations agents and officers had with FRANKLIN. During the first conversation agents and officers had with FRANKLIN, FRANKLIN identified himself as KELVIN FRANKLIN. Following these interactions, agents and officers reviewed an arrest photo of "Kelvin Franklin" maintained by the Chicago Police Department and, based on that review, determined that (a) the individual who sold heroin to the undercover officer on May 17, 2019 and (b) the individual with whom they directly spoke, matched FRANKLIN's appearance and was FRANKLIN. In addition, during the course of the investigation, law enforcement officials took photographs of the individual selling heroin to UC-1, UC-3, UC-8 and UC-10 on May 17, May 22, May 31, June 13, June 14, and June 18, 2019. Law enforcement officials compared the surveillance photographs and video recordings to the photographs from a CPD CLEAR database and determined that the individual who had sold heroin to the UCs on each of those occasions was FRANKLIN.

[19] Law enforcement officials identified JEREMY HAMPTON as follows: on or about June 13, 2019, UC-10 purchased approximately 2.776 grams of heroin and fentanyl from an individual (HAMPTON) on Monticello Avenue. After the sale, law enforcement officers stopped the individual who sold narcotics to UC-10 and the individual identified himself as JEREMY HAMPTON. Law enforcement officers then pulled a photograph of HAMPTON from a Chicago Police Department database. Later that day, UC-10 reviewed the photograph of HAMPTON and identified HAMPTON as the individual who had sold him heroin.

[20] Law enforcement officials identified JOHNNIE DANIELS as follows: on or about May 10, 2019, UC-10 purchased approximately 1.266 grams of heroin from an individual (DANIELS) on Monticello Avenue. After the purchase, law enforcement officers stopped the individual who sold narcotics to UC-10 and the individual identified himself as JOHNNIE DANIELS. Law enforcement officers then pulled a photograph of DANIELS from a Chicago Police

into the lot.  Whoever don't got the money, keep walking."  UC-3 responded: "Ok."

DANIELS asked: "You keep walking then?"  UC-3 responded: "No.  I want to get some

shit [narcotics] too."  DANIELS asked: "How many [blows of heroin] you want?"  UC-

3 responded: "The six [blows of narcotics] for 50 [$50]."

      c.    DANIELS then asked HAMPTON: "You do the six [blows of

narcotics] for fifty [$50]?"  UC-3 responded, "Yeah.  I always get the six [blows of

narcotics] for fifty [$50].  Tell him or SAM [HOWARD].  You know what I'm saying."

DANIELS replied: "I understand that.  It's not our call.  It's whoever got it [the

narcotics]."

      d.    UC-3 asked: "Oh.  Who's working it [the narcotics]? Ok. Ok. Ok.

SAM [HOWARD] ain't around?"  DANIEL replied: "Naw."  UC-3 responded: "Fuck.

You want me to wait in here [a vacant lot on Monticello Avenue]?"  DANIELS replied:

"Yeah.  Go in there."

80.    Based on my training and experience and knowledge of the

investigation, I understand that in the above exchange: (a) HAMPTON told the UCs

to keep walking and leave the area if they did not have money to buy narcotics; (b)

UC-3 told HAMPTON and DANIELS that they (the UCs) wanted to purchase

narcotics; (c) DANIELS asked UC-3 how many blows the UCs wanted and UC-3 said

six blows of heroin for $50; (d) DANIELS asked HAMPTON if he sold six blows of

narcotics for $50; (e) UC-3 said that he always gets six blows of heroin for $50 and

---

Department database.  Later that day, UC-10 reviewed the photograph of DANIELS and
identified DANEILS as the individual who had sold him heroin.

told DANIELS and HAMPTON to ask SAM HOWARD; (f) DANIELS said that he understood UC-3 got six blows of heroin for $50, but that he did not get to decide on prices and quantities and that decision was made by whomever controlled the narcotics at a given time; and (g) DANIELS said that SAM HOWARD was not in the area and told the UCs to wait in a nearby vacant lot in order to purchase heroin.

81. According to the UCs and body camera video:

a. Moments later, FRANKLIN walked towards the front of the vacant lot and had the following recorded exchange with UC-10. FRANKLIN asked UC-10: "What's up?  Who wants to buy [narcotics]?"  UC-10 responded: "I do."  FRANKLIN replied: "Aight.  Let me give you five [blows of narcotics]."  FRANKLIN then gave UC-10 five clear plastic bags containing a white powdery substance and UC-10 gave FRANKLIN $50 in government funds.

b. FRANKLIN then said: "He [referring to HAMPTON] gonna bring you six [blows of heroin] for fifty [$50]."  UC-3 responded: "Ok."  Moments later, FRANKLIN yelled to UC-3: "Hey, pop."  UC-3 responded: "Yeah?"  FRANKLIN said: "He [HAMPTON] said he can't do that shit, six [blows] for fifty [$50] man."  UC-3 asked: "Why not?  You can't ask SAM [HOWARD]?  SAM knows me.  He [SAM HOWARD] always gives me that deal."  FRANKLIN replied: "He [HAMPTON] said he can't do it."  UC-3 responded: "You know I get a pack [eleven blows of heroin]?"  FRANKLIN replied: "He [HAMPTON] said he can't do it, bro."  UC-3 responded: "Fuck."  UC-10 stated: "Just give whatever [quantity of heroin], man."  UC-3

responded: "All right. That's fine. I come back tomorrow. Give me the five [blows of heroin]."

        c.      HAMPTON then gave UC-3 five clear plastic bags containing a white powdery substance and UC-3 gave HAMPTON $50 in government funds. UC-3 stated to HAMPTON: "It's [the money] real, man." HAMPTON replied: "Counting the money." FRANKLIN told the UCs: "My name Niko."

        82.     Based on my training and experience and knowledge of the investigation, I believe that in the above exchange: (a) FRANKLIN asked the UCs if they wanted to buy heroin; (b) UC-10 said that he did and FRANKLIN gave him five blows of heroin for $50; (c) FRANKLIN told UC-3 that HAMPTON was going to bring him six blows of heroin for $50, but then said that HAMPTON could not sell UC-3 six blows for $50; (c) UC-3 said that SAM HOWARD gave him six blows for $50 and asked for eleven blows; (d) FRANKLIN said that HAMPTON could not sell that quantity; and (e) UC-3 agreed to buy five blows for $50 and come back the next day to purchase additional heroin.

        83.     UC-3 and UC-10 provided the bags supplied by FRANKLIN, HAMPTON and DANIELS to the DEA North Central Laboratory. According to the laboratory, the bags weighed approximately 5.29 grams and tested positive for the presence of heroin and fentanyl.

        J.   *UC-2 Purchases 31.249 Grams of Heroin from DYER on June 14, 2019.*

        84.     On or about June 14, 2019, at approximately 7:14 a.m., UC-2 placed a recorded call to DYER, using DYER Phone 1. During the call, UC-2 asked: "I wake

you up?" DYER replied: "No, I'm already up, I'm back here hitting one of my peoples [supplying a customer with narcotics]." UC-2 responded: "Here's the deal, man, I got $480, think I can get five [five packs of heroin] for that?" DYER replied: "Just come out already, I'mma work it out for you." UC-2 responded: "Alright, alright, alright, I'm going to be there [DYER Residence] in about 15 minutes."

85. Based on my training and experience and knowledge of the investigation, I understand that in the above exchange, UC-2 asked DYER if he could purchase five packs of heroin for $480 and DYER told UC-2 to meet him at DYER Residence.

86. A short time after approximately 7:20 a.m., surveillance observed and CPD Pod camera video reflected UC-2 arrive on Monticello Avenue and enter the east alley behind DYER Residence. UC-2 was equipped with an audio and video recording device prior to the transaction. According to UC-2 and body camera video:

a. At approximately 7:41 a.m., UC-2 arrived at the back fence of DYER Residence, at which time DYER exited his residence and approached UC-2. DYER handed UC-2 five packs or "jabs" containing 54 clear Ziploc baggies, each containing a white powdery substance, and UC-2 gave DYER $480 in government funds.

b. UC-2 stated: "You got $480 [worth of heroin], man?" DYER replied: "So look them four [packs of heroin] eleven [blows of heroin] right there and this a ten [blows of heroin]. Four eleven and a ten." UC-2 responded: "Alright, I got it. Ah, man, I think I got more customers, man, so." DYER replied: "[U/I] Yeah, hit

me up, bro, I'll keep trying to make sure I hit my guy [TATE, who transports resupplies of DTO narcotics to the drug spot] to bring some extra. See what I'm saying, if I would've needed some extra ones [blows or packs of heroin]." UC-2 responded: "Ok did you, alright." DYER replied: "I, you got to do is hit me, bro. You know what I'm saying."

      c.    UC-2 asked: "Is this your only spot, man, cause sometimes I'm like further like west." DYER replied: "Sometimes when you need like that, I'll try and meet you, bro. I got a car." UC-2 responded: "Alright." DYER responded: "I'll try and meet you half way." UC-2 responded: "Alright, you drive, bro. Alright cool." DYER replied: "Yup."

87. Based on my training and experience and knowledge of the investigation, I understand that in the above exchange: (a) UC-2 asked DYER if DYER had $480 worth of heroin to sell UC-2; (b) DYER stated that he had four packs with eleven blows of heroin and one pack with ten blows of heroin; (c) UC-2 told DYER he has more customers and will want additional heroin; (d) DYER told UC-2 that he would call the individual who transports DTO narcotics to the drug spot (TATE) to provide additional heroin; and (e) DYER and UC-2 discussed meeting at different locations for DYER to supply UC-2 with heroin.

88. UC-2 provided the five packs or jabs containing 54 clear Ziploc baggies distributed by DYER to the DEA North Central Laboratory. According to the laboratory, the bundles weighed approximately 31.249 grams and tested positive for the presence of heroin and fentanyl.

K. *UCs Purchase 25.575 Grams of Heroin and Fentanyl from SAM HOWARD and FRANKLIN on June 18, 2019.*

89.     On or about June 18, 2019, at approximately 4:05 p.m., UC-3 placed a recorded call to FRANKLIN, using Target Phone 2.[21]  During the call, FRANKLIN stated: "Who's this?  Oh, what's up Vinny [fictitious name previously given by UC-3]?"  UC-3 responded: "What's up, man?  Hey, you on the block [Monticello Avenue]?"  FRANKLIN later asked: "Yeah.  What you need?"  UC-3 responded: "Aight.  I'll be over there . . . give me about 15-20 minutes.  Aight?"  FRANKLIN replied: "Aight."

90.     Based on my training and experience and knowledge of the investigation, I understand that in the above exchange, FRANKLIN asked UC-3 what kind and quantity of narcotics he wanted to purchase and UC-3 agreed to meet with FRANKLIN on Monticello Avenue to purchase narcotics.

91.     At approximately 4:06 p.m., UC-10 placed a recorded call to FRANKLIN, using Target Phone 2.  During the call, UC-10 said: "Hey, Niko.  It's Sasha [fictitious

---

[21] Law enforcement officials identified FRANKLIN as the user of Target Phone 2 as follows: during the undercover purchase of suspected narcotics on June 13, 2019, discussed above, FRANKLIN gave UC-3 his phone number (Target Phone 2).  UC-3 and UC-10 later called Target Phone 2 and, based on their in-person interactions with FRANKLIN, determined that FRANKLIN was the user of Target Phone 2.  In addition, during intercepted calls over Target Phone 1, SAM HOWARD referred to the user of Target Phone 2 as "Kevo."  Based on encounters with FRANKLIN and other members of the Monticello DTO, agents understand that FRANKLIN, whose first name is "Kelvin," goes by the nickname "Kevo."

On or about August 12, 2019, the Honorable Rebecca Pallmeyer, Chief Judge for the Northern District of Illinois, entered an order authorizing the initial interception of wire communications to and from Target Phone 2.  Interception began on August 14, 2019 and terminated on September 12, 2019.  On or about September 18, 2019, the Honorable Gary Feinerman, Acting Chief Judge for the Northern District of Illinois, entered an order authorizing the renewed interception of wire communications and the initial interception of electronic communications to and from Target Phone 2.  Interception began on September 19, 2019 and terminated on October 18, 2019.

name for UC-10]. I'm with Vinny [UC-3]." FRANKLIN replied: "Yeah." UC-10 said: "I'm gonna, gonna . . . you got, you gotta more than a hundred [$100 worth of narcotics]. Can you give me a deal?" FRANKLIN replied: "Alright, come on. We [members of the Monticello DTO] over here."

92. Based on my training and experience and knowledge of the investigation, I understand that in the above exchange, UC-10 asked FRANKLIN for a deal on $100 worth of narcotics and FRANKLIN told UC-10 to come to the Monticello Avenue Drug Spot where he and other members of the Monticello DTO were selling narcotics.

93. Shortly after approximately 4:32 p.m., surveillance observed and CPD Pod camera video reflected UC-3 and UC-10 enter the Monticello Avenue Drug Spot and meet with FRANKLIN and SAM HOWARD. UC-3 and UC-10 were equipped with audio and video recording devices prior to the transaction. During their recorded encounter:

a. SAM HOWARD asked: "How much [heroin] you need?" UC-3 responded: "How you doing? I was asking for you last time." SAM HOWARD replied: "Tell me how much [heroin] you want." UC-3 said: "He's [UC-10] trying to get a hundred [$100 worth of heroin]. I was trying to see if I could get some [heroin]. Is there any way I can get your number so I can call you?" SAM HOWARD replied: "How much [heroin] you need? I make sure [to get you] how much [heroin] you need." UC-3 responded: "No, because I don't want to deal . . . Every time I come here and

you're not here." SAM HOWARD replied: "Alright. We [the Monticello DTO] gotcha. Go right over there [SAM HOWARD pointed to a vacant lot]."

      b.    FRANKLIN was in the vacant lot holding numerous bags of suspected narcotics. FRANKLIN then gave UC-10 eleven baggies containing a white powdery substance and UC-10 gave FRANKLIN $100 in government funds.

      c.    UC-3 asked UC-10: "How much you get [how much narcotics did you purchase]?" UC-10 responded: "Hundred [$100 worth of heroin]." UC-3 then asked FRANKLIN: "Did you [FRANKLIN] throw him a deal [eleven blows for $100]?" FRANKLIN replied: "Yeah. I got him eleven [eleven baggies for $100]. You want the same thing?" UC-3 responded: "I usually got two [$200 worth of heroin]. Cause that's what I told Sam [SAM HOWARD]." FRANKLIN replied: "You want two [$200 worth of heroin]?" UC-3 responded: "Yeah. You got two [$200 worth of heroin]?" FRANKLIN replied: "Aight, I give you two to two [twenty-two blows of heroin for $200]. You want two hundred [$200 worth of heroin]."

      d.    UC-3 responded, "Can you throw another one [another blows of heroin]?" FRANKLIN replied: "I just did." FRANKLIN said: "He [SAM HOWARD] usually make me give out ten [ten baggies of heroin for $100]." UC-3 responded: "I know. That's why I want a deal [an additional blows of heroin]." FRANKLIN said: "I giving out twenty two [22 blows for $200]."

94. Based on my training and experience and knowledge of the investigation, I understand that in the above exchange: (a) UC-3 asked FRANKLIN if he had given UC-10 eleven blows of heroin for $100 and FRANKLIN confirmed that

he had and asked UC-3 if he wanted the same deal; (b) UC-3 said that he usually purchased $200 worth of heroin from SAM HOWARD and FRANKLIN offered to sell UC-3 $200 worth of heroin; (c) UC-3 asked FRANKLIN for an extra blows of heroin for each pack and FRANKLIN said he would give UC-3 twenty-two blows for $200; and (d) FRANKLIN said that SAM HOWARD usually directed FRANKLIN to only give our ten blows of heroin for $100.

95.     According to UC-3 and the body camera video, UC-3 then gave FRANKLIN $200 in government funds.  UC-3 and FRANKLIN had the following recorded exchange:

a.     UC-3 stated: "You give me twenty two on that [22 blows of heroin], right?"  FRANKLIN replied: "Yeah.  Hey, next time, bro, you call my phone [Target Phone 2]!"  FRANKLIN said: "Look.  You don't have to talk to Sam [SAM HOWARD] no more."  UC-3 responded: "Right."   FRANKLIN said: "That's why I gave you my number [Target Phone 2]."

b.     UC-3 stated: "But I thought Sam [SAM HOWARD] was your Boss!"  FRANKLIN replied: "I ain't got no boss."  UC-3 said: "Because every time he [SAM HOWARD] [tells] you guys what to do.  Alright?"  FRANKLIN replied: "He [Sam] could of told me to give you twelve [12 blows for $100].  That's what I gonna do right now."  UC-3 responded: "Alright . . . Alright.  I'll call you next time."

c.     FRANKLIN bent down and went through a black plastic bag and counted numerous clear Ziploc bags containing a white powdery substance. FRANKLIN then put the remaining bags in the black plastic bag and concealed the

bag in the front right tire of a vehicle parked on the street. FRANKLIN then approached UC-3 and counted out 22 bags and gave them to UC-3.

96. Based on my training and experience and knowledge of the investigation, I understand that in the above exchange: (a) UC-3 confirmed with FRANKLIN that he was getting twenty-two blows of heroin for the $200 he had provided and FRANKLIN agreed; (b) FRANKLIN encouraged UC-3 to call him directly, using Target Phone 2, to facilitate future narcotics transactions; (c) UC-3 said that he had not done so previously because he understood that he needed to go through SAM HOWARD first, whom he understood to be FRANKLIN's boss; and (d) FRANKLIN denied that SAM HOWARD was his boss, but said that he would have given UC-3 the deal that SAM HOWARD offered FRANKLIN and would do so here.

97. UC-3 and UC-10 provided the bags distributed by FRANKLIN and SAM HOWARD to the DEA North Central Laboratory. According to the laboratory, the bags provided by the UCs weighed approximately 25.575 grams and tested positive for the presence of heroin and fentanyl.

L. *UC-2 Purchases 31.926 Grams of Heroin and Fentanyl from DYER on June 28, 2019.*

98. On or about June 28, 2019, at approximately 8:34 a.m., UC-2 placed a recorded call to DYER, using DYER Phone 1. During the call, UC-2 asked: "Hey man, you up on the block [Monticello Avenue Drug Spot]?" DYER replied: "Yeah, yeah, yeah I'm at the crib [DYER Residence, located in the area of the Monticello Avenue Drug Spot]." UC-2 responded: "Think you can hook me up with 500 [$500 worth of heroin]?" DYER replied: "Huh?" UC-2 responded: "500 blow [heroin]." DYER replied:

"Yeah, yeah, yeah." UC-2 responded: "Alright, man, I didn't think it would be a problem, cause, it's just 5 [$500 worth of heroin]. I'll be there in about five to seven minutes man." DYER replied: "Alright, I'm waiting on you."

99.     At approximately 8:43 a.m., surveillance and CPD Pod camera video observed UC-2 arrive on the Monticello Avenue Drug Spot and walk towards DYER Residence. UC-2 passed DYER Residence and walked towards the alleyway behind DYER Residence and UC-2 approached the rear fence of DYER Residence. UC-2 was equipped with an audio and video recording device. According to UC-2 and body camera video:

        a.      As UC-2 approached the rear fence, DYER was already waiting in the back yard. DYER handed UC-2 a black plastic bag containing five packs with numerous tin foil packets inside. UC-2 then gave DYER $500 in government funds.

        b.      DYER stated: "They [the heroin] back in the foils [tin foil packaging] too." UC-2 responded: "They back in the foils [tin foil packaging]?" DYER replied: "Yup, aluminum foil." UC-2 responded: "Yeah I don't know about the foil, but the foil for some reason is better, man?" DYER replied: "Yeah, my guy [Moticello DTO associate who packages and resupplies block with DTO heroin] one minute have foil, the other have bags, [U/I]." UC-2 responded: "As long as it's [the heroin] the same thing. Yeah, that's what I'm saying." DYER replied: "As long as he [DYER's heroin supplier from the Monticello DTO] keeping it coming too." UC-2 responded: "Right, right, yeah, man."

c. DYER stated: "When you get the bags, mother fuckers like [U/I]. As long as he don't switch it up, see what he did last time, the guy, our real guy [Monticello DTO's source of narcotics supply] got busted, so they [SAM HOWARD and FRANKLIN, who have connection with DTO's source of supply] went and fucked with another dude [a different heroin supplier]. You know when I had the blue bags. That was not our [the Monticello DTO's] shit, that was the shit they went to get from another motherfucker [a different heroin supplier], see our guy [narcotics supplier] got bumped [arrested], but our guy been back." UC-2 responded: "He [narcotics supplier] got bumped, man?" DYER replied: "Yeah, our guy [narcotics supplier] got bumped, but he cool, so the feds grabbed his ass." UC-2 responded: "Oh really? Is he, is he out already?" DYER replied: "Yeah he out, he cool." UC-2 responded: "So then he was [U/I] to bring you?" DYER replied: "So we [Monticello DTO] always gonna have foils or bags." UC-2 responded: "Ok." DYER replied: "[U/I]." UC-2 responded: "Alright, B." DYER replied: "Hit me up, bro, [U/I]."

100. Based on my training and experience and knowledge of the investigation, I understand that in the above exchange: (a) DYER told UC-2 that the heroin he had distributed to UC-2 was back in the tin foil packaging; (b) DYER said that his heroin supplier occasionally had tin foil and occasionally had bags containing the heroin; (c) UC-2 said that he had no preference as long as it was of the same quality and DYER agreed that he had no preference as long as the heroin kept coming from his supplier; (d) DYER referenced a prior heroin supplier who had been arrested and the Monticello DTO using a different heroin supplier while their prior heroin

supplier was in federal custody; and (e) DYER told UC-2 that the Monticello DTO would always have heroin available to purchase.

101.    UC-2 provided the five packs each with the tin foil packets containing a white powdery substance supplied by DYER to the DEA North Central Laboratory. According to the laboratory, the contents of the tin foil packets weighed approximately 31.926 grams and tested positive for the presence of heroin and fentanyl.

M. *UCs Purchases 40.338 Grams of Heroin from FRANKLIN on July 18, 2019.*

102.    On or about July 18, 2019, at approximately 2:00 p.m., UC-3 placed a recorded call to FRANKLIN.  During the phone call:

a.      FRANKLIN stated: "What's up, Vinny [name provided by UC-3]?" UC-3 responded: "What's up, Niko [FRANKLIN].  Hey, you gonna be, uh.  You around?"  FRANKLIN replied: "I'm always around."  UC-3 responded: "Aight.  You, you on the block [Monticello Avenue Drug Spot]?  You want me to meet you there or what?"  FRANKLIN replied: "I'm on the block [Monticello Avenue] already, man.  Just meet me on the block [Monticello Avenue]."

b.      UC-3 responded: "Ok. Hey.  Alright, cool.  Hey, I'm gonna bring Sasha [UC-10] with me.  Cool."  FRANKLIN replied: "Yeah.  What you all need [how much narcotics]?"  UC-3 responded: "Uh.  Same shit, man.  Fucking soft [heroin]." FRANKLIN replied: "Ok.  Twenty three [23 blows] and eleven [eleven blows]."  UC-3 responded: "Aight, cool."  FRANKLIN responded: "Bet."

103.    At approximately 2:35 p.m., surveillance observed and CPD Pod camera video reflected UC-3 and UC-10 arrive at the Monticello Avenue Drug Spot.  Body camera video from UC-3 and UC-10 reflected FRANKLIN standing in the front yard of a residence on Monticello Avenue.  UC-3 and UC-10 were equipped with audio and video recording devices prior to the transaction.   During the ensuing recorded interaction, and according to UC-3 and UC-10:

a.    FRANKLIN stated: "Hey, Vinny [UC-3]."  UC-3 and UC-10 walked towards FRANKLIN and FRANKLIN motioned for UC-3 and UC-10 to go to the back alley of the residence.

b.    Once in the back alley, FRANKLIN closed the back door of the residence and walked down from the porch towards UC-3 and UC-10.   FRANKLIN counted numerous clear Ziploc bags and stated: "Eleven [11 blows of heroin]."  UC-3 said to UC-10: "That's [the 11 blows] for you."  FRANKLIN then gave UC-10 eleven clear zip lock baggies containing a white powdery substance and UC-10 gave FRANKLIN $100 in government funds.

c.    UC-3 then gave FRANKLIN $200 in government funds.  UC-10 then asked UC-3: "Ok.  You getting more or no?"  UC-3 responded: "Yeah . . . [U/I] . . . what's that?"  FRANKLIN then gave UC-3 eleven clear plastic bags containing a white powdery substance.  FRANKLIN stated: "Eleven [blows of heroin]."  UC-3 responded: "Eleven [blows of heroin]."

d.    FRANKLIN then gave UC-3 another twelve clear Ziploc baggies containing a white powdery substance.  UC-3 asked: "How much is that?"

FRANKLIN replied: "Twenty three [blows of heroin] altogether." UC-3 responded: "Ok. Can you give me more [heroin]? Another hundred [$100 worth]?" FRANKLIN replied: "Yeah." UC-3 replied: "Hundred dollars' worth." FRANKLIN replied: "Hundred dollars' worth?" UC-3 responded: "Yeah. I got to get it for my guy."

   e. UC-3 gave FRANKLIN an addition $100 in government funds and FRANKLIN gave UC-3 eleven more clear plastic Ziploc baggies containing a white powdery substance. UC-3 responded: "How much is that?" FRANKLIN replied: "Eleven bags [of heroin]." UC-3 replied: "Give me one extra one [baggie of heroin]." FRANKLIN replied: "I told you eleven [baggies of heroin]." UC-3 responded: "Come on. Throw me one bone, [one additional baggie of heroin] man. I want to make some off that one. Come on." FRANKLIN replied: "Here, Vinny [UC-3]." FRANKLIN then gave UC-3 one more clear plastic Ziploc baggie (bringing the total to twelve) containing a white powdery substance.

  104. Based on my training and experience and knowledge of the investigation, I understand that in the above exchange: (a) UC-3 gave FRANKLIN $200 in government funds; (b) FRANKLIN gave UC-3 twenty-three bags containing a white powdery substance; (c) UC-3 asked FRANKLIN for another $100 worth of heroin; (d) FRANKLIN agreed and gave UC-3 eleven more baggies of heroin for $100; (e) UC-3 asked FRANKLIN for an additional free baggie of heroin so he could make a small profit when re-selling the drugs; and (f) FRANKLIN gave UC-3 one additional baggie of heroin.

105. In total, FRANKLIN gave UC-3 and UC-10 thirty-five baggies containing a white powdery substance. UC-3 and UC-10 provided the thirty-five baggies supplied by FRANKLIN to the DEA North Central Laboratory. According to the laboratory, the substance inside the packets provided by UC-3 and UC-10 weighed approximately 40.338 grams and tested positive for the presence of heroin.

### N. *UCs Purchase 6.294 Grams of Heroin from SAM HOWARD, ROBERT STUCKEY and SAVAN WARD on October 1, 2019.*

106. On or about October 1, 2019, at approximately 7:40 a.m., surveillance observed and CPD Pod camera video reflected UC-3 and UC-11 meeting with SAVAN WARD[22] and SAM HOWARD at the Monticello Avenue Drug Spot. UC-3 and UC-11 were equipped with audio and video recording devices. During the recorded conversation:

a. UC-3 stated: "Hey what's up, you guys got it [narcotics]? You guys up?" WARD replied: "Yeah." UC-3 responded: "Can I get like last time?" WARD replied: "What you trying to do?" UC-3 responded: "Huh. This mother . . . ." SAM HOWARD replied: "It's all good. What [quantity of narcotics] you need?" UC-3 responded: "I know. I'm just saying, I'm talking. He's [WARD] talking to me. I don't know." WARD replied: "What [quantity of narcotics] you need?"

---

[22] Law enforcement officials identified SAVAN WARD and ROBERT STUCKEY as follows: on October 1, 2019, UC-3 and UC-11 purchased 6.294 grams of heroin from SAM HOWARD and two other individuals (WARD and STUCKEY). Following the distribution on October 1, 2019, law enforcement officials searched a CPD database and obtained booking photographs of SAVAN WARD and ROBERT STUCKEY and conducted photo arrays. UC-3 reviewed the photographs and identified SAVAN WARD and ROBERT STUCKEY as the individuals with SAM HOWARD who sold him and UC-11 the heroin.

b.      UC-3 responded: "How you been?  This my girl [referencing UC-11]."  SAM HOWARD replied: "Hey."  WARD replied: "Hello."  UC-3 responded: "Can you do the deal [discounted price for heroin]?"  SAM HOWARD replied: "Tell me.  I . . . ."  UC-3 responded: "A pack [of heroin]."  SAM HOWARD replied: "Alright.  Hold on.  Stay right there."  UC-3 stated: "You [UC-11] want some too?"  UC-11 stated: "Yeah."  UC-3 stated to SAM HOWARD: "Hey, hey."  SAM HOWARD replied: "Huh?"  UC-3 responded: "Her too, she getting some for her sister.  How many [blows of heroin] you [UC-11] want?"  UC-11 responded: "Can you give me six [6 blows of heroin] for fifty [$50]."  UC-3 responded: "Can you give . . . yeah can you?"  SAM HOWARD replied: "Yeah.  Go to the back [of the residence]."  UC-3 responded: "Ok."

107.   Based on my training and experience and knowledge of the investigation, I understand that in the above exchange: (a) UC-3 asked if WARD, have any heroin for sale; (b) WARD asked UC-3 what quantity of narcotics he wanted to purchase; (c) UC-3 asked for a deal and then asked SAM HOWARD for a pack of heroin; (d) SAM HOWARD directed UC-3 to wait for the heroin in a vacant lot of Monticello Avenue; (e) UC-3 then told SAM HOWARD that UC-11 wanted to purchase heroin and UC-11 asked for six baggies of heroin for $50; and (f) SAM HOWARD told the UCs to go to the back of the residence on Monticello Avenue.

108.   At this point, UC-3 and surveillance observed, and CPD Pod camera video reflected, SAM HOWARD walk to a different residence on Monticello Avenue and engage in conversation with STUCKEY who was at the front door of the residence.  Shortly thereafter, while the UCs were in the vacant lot on Monticello

Avenue, UC-3 observed SAM HOWARD and STUCKEY walk towards the UCs. During this portion of the recorded conversation:

      a.    UC-3 stated: "How much [narcotics] you gonna give me though?" SAM HOWARD replied: "You all got to come back cause it's [the narcotics] the last one [pack of heroin]. You all come back I gotcha you all. Cause you really . . . this [the last pack of heroin] is for somebody. Somebody want the whole ten [ten baggies of heroin]. The whole."

      b.    UC-3 responded: "Ok. Can you at least give me some [blows of heroin]?" SAM HOWARD replied: "Yeah. You all got to split them [the blows of heroin] though. I'm gonna give her . . . ." UC-11 responded: "Oh. That's fine. I'll split with you some."

109. Based on my training and experience and knowledge of the investigation, I understand that in the above exchange: (a) SAM HOWARD told the UCs that they have to come back later because the Monticello DTO street-level traffickers only had one pack of heroin left and the pack was earmarked for another customer; (b) UC-3 asked if SAM HOWARD could give the UCs some blows of heroin; and (c) SAM HOWARD told UC-3 that he is going to give UC-11 some heroin and UC-11 will have to share it with UC-3.

110. UC-3 then observed SAM HOWARD counting out seven clear zip lock baggies each containing a white powdery substance. During this portion of the recorded conversation:

a. SAM HOWARD stated: "Four. Five. Six. Seven. I'm, I'm gonna do you a deal [provide additional blows of heroin] later. I can't. This [pack of heroin] for some. This already counted." SAM HOWARD then gave UC-3 seven clear plastic bags containing a white powdery substance.

b. SAM HOWARD stated: "That's seven [blows of heroin]. It's seven [blows of heroin]." UC-3 responded: "Yeah, you got your own [customer]. Another customer." SAM HOWARD replied: "Yeah. Yeah. So." UC-3 responded: "I got you." HOWARD replied: "But, but I'm gonna give it [heroin] to you all bunch of. I'm gonna come wait. That's the other thing [another supply of heroin] we [the Monticello DTO] got left. How many [blows of heroin] you want?"

c. UC-3 stated: "Oh. You got them different [a new supply of heroin in different packaging] now?" SAM HOWARD replied: "Yeah, man." UC-3 responded: "Are these . . . good [high quality]?" SAM HOWARD replied: "It's the bomb. It's a . . . listen." UC-3 responded: "It's better [quality] than the tin foils [normal heroin]?" SAM HOWARD replied: "Yeah. I swear to God." UC-3 responded: "Ok."

d. UC-11 stated: "You take six [blows of heroin] for fifty [$50]." UC-3 responded: "Cause last time." SAM HOWARD replied: "Can't. That's all we got left right now. I trying to split for both . . . You know what I'm saying." UC-3 responded: "How much [quantity of heroin] you gonna give us for?" HOWARD replied: "It's only. This ain't nothing." UC-3 responded: "No. How much is it? Twelve [blows of heroin]." SAM HOWARD replied: "It's fourteen [blows of heroin]." UC-3 responded: "How

64

much you gonna give it for?" SAM HOWARD replied: "Give me . . . uh." UC-3 responded: "Hundred [$100]."

      e.    STUCKEY replied: "Fourteen [blows of heroin]." SAM HOWARD replied: "Give me. Give me one-twenty [$120]." UC-3 responded: "Oh, man." SAM HOWARD replied: "I can't. This." UC-3 responded: "Niko [FRANKLIN] gives it [that deal] to me." SAM HOWARD replied: "I, I know. Listen this the last pack [of heroin]." UC-3 responded: "Ok." SAM HOWARD replied: "I'm split for both you all. I'm give you seven [7 blows of heroin] and give her seven [7 blows of heroin]."

111. Based on my training and experience and knowledge of the investigation, I understand that in the above exchange: (a) SAM HOWARD gave UC-3 and UC-11 seven blows of heroin each, which would normally cost approximately $120; (b) SAM HOWARD confirmed that he was providing the last of the heroin available for sale on the block at the time, which he said was of the same quality as the normal tin-foil heroin distributed by the Monticello DTO; (c) the UCs asked for a deal on the price of the heroin and STUCKEY confirmed that it was fourteen blows, which SAM HOWARD said would cost $120; and (d) UC-3 said that he got a lower price from FRANKLIN and SAM HOWARD said that he knew, but that this was the last pack of heroin that the Monticello DTO had on hand to distribute and that he could not give the UCs a deal.

112. According to UC-3, SAM HOWARD gave UC-11 six clear Ziploc baggies containing a white powdery substance and UC-11 then gave HOWARD $50 for the narcotics. During this portion of the recorded conversation:

65

a.    UC-3 stated: "You got . . . then throw one [blow of heroin] in. Throw it in."  SAM HOWARD replied: "Huh . . . [U/I]."  UC-3 responded: "Come on. You know we always come back.  How much?"  SAM HOWARD replied: "Give me sixty bucks [$60]."  UC-3 then gave HOWARD $60 in government funds.

b.    UC-3 then asked: "You can't throw it [a blow of heroin] in?" STUCKEY asked: "You gonna buy it [the additional blow of heroin]?"  UC-3 responded: "Give it for five [$50].  Five [$50].  Come on!"  SAM HOWARD replied: "I got you."  UC-3 responded: "Ok.  I'll take it.  I'll take it.  Cause then I don't want to come back."

c.    STUCKEY gave UC-3 one clear Ziploc baggie containing a white powdery substance and UC-3 gave STUCKEY an additional $10 for the narcotics.

d.    UC-3 asked: "Niko [FRANKLIN] ain't around?"  SAM HOWARD replied: "He [FRANKLIN] be like around hour.  Everything cool [U/I]."  UC-3 responded: "No, no, I know.  I know, I got you."  SAM HOWARD responded: "What you need?  I know I got you.  But when I say I got you. I got you."  UC-3 went on to ask: "You got C [crack cocaine]?"  SAM HOWARD replied: "Yeah we [the Monticello DTO] got C [crack cocaine]."  UC-3 responded: "Ok.  Alright, how much we can get on that?"  SAM HOWARD replied: "That's . . . come on, come back.  I don't got this.  My peoples [the Monticello DTO] got this."  UC-3 responded: "They [crack cocaine] dimes [$10] or nickels [$5]."

113.  Based on my training and experience and knowledge of the investigation, I understand that in the above exchange: (a) UC-3 asked HOWARD

whether or not FRANKLIN was on Monticello Avenue selling narcotics and SAM HOWARD said that FRANKLIN would be around in an hour or so; (b) SAM HOWARD asked what narcotics UC-3 needed and UC-3 asked SAM HOWARD if the Monticello DTO had any crack cocaine for sale and how much crack cocaine he could purchase; and (d) SAM HOWARD stated that other member of the Monticello DTO had crack cocaine for sale and that they charge $5 or $10 per bag of crack cocaine.

114. The UCs provided the 14 total baggies supplied by SAM HOWARD, WARD, and STUCKEY to the DEA North Central Laboratory. According to the laboratory, the substances weighed approximately 6.294 grams and tested positive for the presence of heroin.

IV. LEE, BONDS, SAM HOWARD, AND FRANKLIN MANAGE THE NARCOTICS SUPPLY AT THE MONTICELLO AVENUE DRUG SPOT

115. As agents continued to conduct controlled purchases of narcotics from Monticello DTO members at the Monticello Avenue Drug Spot, agents began to intercept SAM HOWARD and FRANKLIN, and later LEE and BONDS, coordinating and managing the supply of narcotics distributed at the drug spot.

A. *SAM HOWARD and FRANKLIN Arrange to Resupply the Monticello Avenue Drug Spot Following DYER's Sale of Narcotics to UC-2 on August 16, 2019.*

116. As discussed below, on or about August 16, 2019, DYER sold UC-2 a quantity of fentanyl analogue-laced heroin and advised UC-2 that all the individuals selling narcotics at the Monticello Avenue Drug Spot work together. Following the sale, SAM HOWARD instructed UC-2 to begin buying narcotics from him directly,

then arranged with FRANKLIN to resupply the Monticello Avenue Drug Spot with more narcotics.

> 1. *DYER Sells UC-2 6.34 Grams of Heroin Laced With Fentanyl and Furanyl Fentanyl on August 16, 2019.*

117. On or about August 16, 2019, at approximately 8:19 a.m., UC-2 placed a recorded call to DYER, using DYER Phone 1. During the call, DYER asked: What's the word?" UC-2 responded: "Think I can get $300 worth [of narcotics], bro?" DYER replied: "Umm, let me umm, right now I just got two [$200 worth of narcotics] . . . ." UC-2 responded: "I'll take the two [$200 worth of narcotics]." DYER replied: "Ok, cool I got two [$200 worth of narcotics] for you." UC-2 responded: "Alright." UC-2 responded further: "Alright, bro. I'll be there in about 15-20 minutes."

118. At approximately 8:35 a.m., surveillance observed and CPD Pod camera video reflected UC-2 arrive at the Monticello Avenue Drug Spot and walk towards DYER Residence. As UC-2 approached DYER Residence, UC-2 placed another call to DYER, using DYER Phone 1. During the recorded call, UC-2 stated: "Hey, B, as a matter of fact I'm walking right in front of your house." DYER replied: "Ok, cool, I'm on my way down. Meet you in the back." UC-2 responded: "Alright."

119. Surveillance then observed and CPD Pod camera video reflected UC-2 walk to the alleyway behind DYER Residence. Once there, UC-2 observed DYER walking towards the back fence from DYER Residence. UC-2 was equipped with an audio and video recording device. During this recorded meeting:

a. As DYER approached UC-2, DYER handed UC-2 two plastic bags containing several blue zip lock bags and packages wrapped in tin foil, which bags

and tin foil packages contained a white powdery substance and UC-2 gave DYER $200 in government funds.

b.      DYER was engaged in a phone conversation.  During the call, DYER said to the individual on the other end of the call: "Yeah, ok, as soon as you make it, hit me up right, right ok, cool.  Alright, I already know how n----s be trying to hold packs [of narcotics] for themselves, yeah, whatever you can give me."

c.      DYER stated to UC-2: "I'm glad to see you back."   UC-2 responded: "You getting some more packs [of narcotics]?"  DYER replied: "Yeah, I'm gonna get some more [packs of narcotics], yeah, look them from last night, I sold, them was my bros, I sold them, yeah, my guy [co-conspirator who transports DTO heroin to the block] on his way with the other shit [additional narcotics]."  UC-2 responded: "Ok."  DYER replied: "He [co-conspirator who transports DTO heroin to the block] talking about, I'm not gonna be able to hit you with seven packs [of narcotics].  I might have to hit you with four [packs of narcotics], I'll take whatever, I ain't tripping, just bring that shit [the four packs of narcotics]."  UC-2 responded: "Yeah, yeah, yeah."  DYER replied: "Yeah, I'm glad you're back."

120.  Based on my training and experience and knowledge of the investigation, I understand that in the above exchange: (a) UC-2 asked DYER if he was going to have additional narcotics for distribution; (b) DYER had a phone call, during which he complained about people not providing him with additional narcotics to distribute; (c) DYER told UC-2 that he sold narcotics that he had on him yesterday and was going to be re-supplied; and (d) DYER said that his associate who transports

69

narcotics to the DTO members at the drug spot indicated that he might only be able to provide DYER with four packs of narcotics and DYER said that he would take the four packs of narcotics.

121.    Later in the recorded conversation:

a.    UC-2 said: "Yeah, man, so you get like seven packs [of heroin] per day.  Oh, is that what you get?"  DYER replied: "But I really like say . . . Start me off in the morning.  I normally get 7 [packs of heroin] in the morning, I've been already run through them [the seven packs of heroin] by the afternoon and then get my next shit [a new supply of heroin] for the night time so I usually run through it [the heroin] like that so now that I know you are back I'm gonna be holding that shit [the heroin] to the side."

b.    UC-2 responded: "Yea, cause the other guys [UC-2's purported narcotics customers] are calling too that they want more.  I just hurried up and got a few [blows of heroin]."  DYER replied: "As soon as I do, I'm gonna call you, as soon as I get that shit [a new supply of heroin]."

c.    UC-2 asked: "How about your boys out here in the street?  You're not with them?  Or?"  DYER replied: "Yeah, I'd be fucking with them too, though . . . You know what I'm saying, just say we are all together [Monticello DTO], but I just be fucking with the back.  They [other Monticello DTO members] be catching deliveries out there in the front."

122.  Based on my training and experience and knowledge of the investigation, I understand that in the above exchange: (a) DYER stated that he

typically receives seven packs of heroin each morning from the DTO associate who provides narcotics for the drug spot; (b) DYER stated that he usually sells those seven packs of heroin by the afternoon and then will get additional heroin to distribute at night; (c) DYER told UC-2 that once he gets more heroin, he will contact UC-2 and set it aside for UC-2; and (d) UC-2 asked DYER if he is associated with the other street-level traffickers at the Monticello Avenue Drug Spot and DYER said that they are all together, but that other members of the Monticello DTO deal with customers on the street and DYER deals to the customers coming through the alleyway.

123.    UC-2 provided the baggies and tin foils supplied by DYER to the DEA North Central Laboratory.  According to the laboratory, the contents of the baggies and tin foils weighed approximately 6.34 grams and tested positive for the presence of heroin, furanyl fentanyl, and fentanyl.

### 2. *SAM HOWARD Encourages UC-2 to Begin Obtaining Narcotics from Him Directly*

124.    On August 16, 2019, soon after UC-2 met with DYER and as he was walking away from DYER Residence, UC-2 encountered SAM HOWARD.  During the recorded conversation:

a.    UC-2 asked: "What's up, man?"  SAM HOWARD replied: "Hey, you still be fucking with buddy in the house [DYER]?"  UC-2 responded: "Yeah, with B."  SAM HOWARD asked: "What he sell you?"  UC-2 responded: "two . . . two packs [of heroin]."  SAM HOWARD replied: "They [narcotics] good [high quality], they good?"  UC-2 responded: "Yeah, they [narcotics] be good."  SAM HOWARD asked: "Aluminum foil [heroin wrapped in aluminum foil]?  Aluminum foil?"  UC-

responded: "What you mean? Say that again?" SAM HOWARD replied: "Aluminum foil [heroin wrapped in aluminum foil]? Aluminum foil baggies?" UC-2 responded: "No, no, no, they're tin foils." SAM HOWARD replied: "Ok, ok, ok alright."

b.   UC-2 stated: "Yeah, he [DYER] been taking care of me for months now." SAM HOWARD replied: "Ok, that's cool." UC-2 responded: "Alright, man, now if you give me a deal, I'll buy from you." SAM HOWARD replied: "I got you next time, next time I got you." UC-2 responded: "Alright, I got your number, man?" SAM HOWARD replied: "I don't got my phone, I got you next time." UC-2 responded: "Alright, man, cause usually I buy like five to seven packs." SAM HOWARD replied: "Ok, ok."

125.   Based on my training and experience and knowledge of the investigation, I understand that in the above exchange: (a) SAM HOWARD asked UC-2 if he was purchasing heroin from DYER; (b) UC-2 confirmed that he had purchased heroin from DYER and SAM HOWARD asked if the heroin was high quality; (c) UC-2 confirmed that it was high quality heroin and SAM HOWARD and UC-2 confirmed that the heroin was wrapped in tin foil; (d) UC-2 said that DYER had been supplying heroin to UC-2 for months and offered to buy heroin from SAM HOWARD if SAM HOWARD gave him a deal (free blows of heroin with each pack); and (e) SAM HOWARD refused to give UC-2 his phone number, but said that he would serve UC-2 the next time UC-2 went to Monticello Avenue to buy heroin.

3. *SAM HOWARD and FRANKLIN Arrange to Resupply the Monticello Avenue Drug Spot between August 16 and 20, 2019*

126. On or about August 16, 2019, at approximately 2:33 p.m. (TP2 Session 479), FRANKLIN, using Target Phone 2, received a call from SAM HOWARD, using Target Phone 3.[23] During the call:

a. FRANKLIN stated: "[U/I] on the block [Monticello Avenue Drug Spot]. What's the word, Sut." SAM HOWARD responded: "You got up with my dude [co-conspirator who transports DTO heroin to the block]?" FRANKLIN replied: "I got up with him [co-conspirator who transports DTO heroin to the block] already. You [U/I] the 6 car [6 packets of narcotics] though right?" SAM HOWARD responded: "[U/I] what you [U/I]?" FRANKLIN replied: "Green, I got him. But you want me to get uh, 1 [packet of narcotics] left. You want me to give it to one of the motherfuckers that's out here [narcotics distributors on Monticello Avenue]?" SAM HOWARD asked: "Finished with it [is FRANKLIN out of narcotics]?" FRANKLIN replied: "Am I finished, finished [out of narcotics]? Nah. Almost though."

---

[23] Law enforcement officials identified SAM HOWARD as the user of Target Phone 3 based on the following: On or about May 24, 2019, at approximately 8:11 p.m. (TP1 Session 123), an individual other than TATE used Target Phone 1 on a call with Individual A. During the call, Individual A said: "This Nub?" The user of Target Phone 1 responded: "No, this Sam." Individual A responded: "What the fuck you on Nub phone for, Sam?" SAM HOWARD replied: "This ain't no Nub phone, baby, this June Bug [TATE's] phone." Law enforcement officials otherwise familiar with SAM HOWARD's voice from interactions with SAM HOWARD at the Monticello Avenue Drug Spot listened to the above recording and identified SAM HOWARD as the user of Target Phone 1. Monitors later listened to intercepted calls involving the user of Target Phone 3 and identified that voice as the same individual who was using Target Phone 1 (SAM HOWARD).

On or about September 18, 2019, the Honorable Gary Feinerman, Acting Chief Judge for the Northern District of Illinois, entered an order authorizing the interception of wire communications to and from Target Phone 3. Interception began on September 19, 2019 and, for Target Phone 3, terminated on September 27, 2019.

b.      Later in the conversation, FRANKLIN said: "He [another narcotics trafficker] gave me 3 [units of narcotics] I can bring you a 4 car [units of narcotics] right now. That's what I'm trying to tell you." SAM HOWARD responded: "I'm trying to tell you do it low key. Nobody see what you doing. That's all I'm trying to say. You ain't see Rob [Monticello DTO co-conspirator], nobody . . ." FRANKLIN later stated: "Police hot as hell [active and present in the area of the Monticello Avenue Drug Spot] anyway. Transformers [unmarked police cars] parked on Thomas. Blue and white [marked police car] just came up the one way and they was parked on Augusta when I pulled up."

c.      SAM HOWARD responded: "A'ight fuck it. You say you got a 4 car [units of narcotics] right now?" FRANKLIN replied: "Yeah." SAM HOWARD responded: "How long [U/I]?" FRANKLIN replied: "[U/I] I'm waiting on a phone call. If you want to do something, I can put 2 packs [units of narcotics] out here and I could work them bitches." SAM HOWARD responded: "No, you ain't got to do all that. [U/I] park it and bring the 4 [units of narcotics] and we finna slide. I'm finna call him. Know what I'm saying . . . ."

127. Based on my training and experience and knowledge of the investigation, I understand that in the above exchange: (a) SAM HOWARD and FRANKLIN discussed the supply of narcotics available at the Monticello Avenue Drug Spot; (b) SAM HOWARD asked FRANKLIN if he had supplied a member of the Monticello DTO to give him more narcotics; (c) FRANKLIN and SAM HOWARD discussed the presence of police in the area of the Monticello Avenue Drug Spot; and

(d) FRANKLIN told SAM HOWARD that the street-level Monticello DTO traffickers needed two packs of narcotics from SAM HOWARD to sell at the Monticello Avenue Drug Spot.

128.   On or about August 20, 2019, at approximately 6:12 p.m. (TP2 Session 1330), FRANKLIN, using Target Phone 2, called SAM HOWARD, using Target Phone 3.  During the call, SAM HOWARD stated: "Where you at?"  FRANKLIN replied: "I'm at the gas station, what up?"  SAM HOWARD responded: "You send Will [WILL HOWARD] out?"  FRANKLIN replied: "Will [WILL HOWARD] ain't [I/A] the phone, man."  SAM HOWARD responded: "Not Will [WILL HOWARD].  You know I'm talking about the other n----."  FRANKLIN replied: "Yeah."  SAM HOWARD responded: "What, you gave him a 3 plate [units of narcotics], 3 piece slice or 2?"  FRANKLIN replied: "You talking about Blood [Monticello DTO member]?  2 [units of narcotics?"  SAM HOWARD responded: "A'ight, okay."

129.  Based on my training and experience and knowledge of the investigation, I understand that in the above exchange SAM HOWARD asked FRANKLIN how much narcotics FRANKLIN gave a Monticello DTO member known as "Blood" and FRANKLIN said that he gave "Blood" two units of narcotics.

   B.  *FRANKLIN Provides DYER a Quantity of Heroin Laced with a Fentanyl Analogue, a Portion of Which (Approximately 22.7 Grams) DYER Sells to UC-2 on September 3, 2019.*

130.  On or about August 29, 2019, at approximately 11:26 a.m., UC-2 placed a recorded call to DYER, who was using DYER Phone 1.  During the call, UC-2 asked: "You think you can get me 6, 600 [$600] of blow [heroin] today?"  DYER replied: "You

said later?" UC-2 responded, "Ugh, you tell me, I got all day, brother." DYER replied: "Umm yeah I should be able to get that [$600 worth of heroin] to you by later, right now I have a good 300 [$300 worth of heroin]." UC-2 asked: "How long will it take you to get the six [$600 worth of heroin]?" DYER replied" "I'm finna hit my guy [FRANKLIN] right now. I get it [heroin] from real quick and I hit you right back."

131.     On or about August 29, 2019, at approximately 11:57 a.m. (TP2 Session 2978), FRANKLIN, using Target Phone 2, received a call from DYER, using DYER Phone 1. This call lasted 31 seconds and, due to suspected technical issues, no audio was captured. Based on the above call with UC-2 indicating that he was going to call his associate who controls the DTO's heroin supply, and the call summarized below, where DYER indicates to UC-2 that he spoke to his associate, I believe that during this call DYER ordered $300 worth of heroin from FRANKLIN.

132.     On or about August 29, 2019, at approximately 12:00 p.m., UC-2 received a call from DYER, who was using DYER Phone 1. During the call, DYER said: "Yeah, so look, my guy [FRANKLIN] said it will probably be an hour, hour and a half before he can get me something else [the other $300 worth of heroin]." UC-2 responded: "Alright, alright, what time is it now, it's about 12, ok so around 1:30 then?" DYER replied: "Yup, once he do [FRANKLIN re-supplies DYER], I'll just hit you back." UC-2 responded: "Alright, yeah, so it might be sooner."

133. Based on my training and experience and knowledge of the investigation, I understand that in the above exchange: (a) DYER told UC-2 that he had spoken to his heroin supplier/another Monticello DTO member (FRANKLIN),

76

and that FRANKLIN told him that he would be able to supply DYER with heroin in approximately an hour or so; and (b) DYER told UC-2 that he would call UC-2 when he obtained the heroin from FRANKLIN.

134. On or about August 29, 2019, at approximately 12:09 p.m. (TP2 Session 2981), FRANKLIN, using Target Phone 2, called DYER, using DYER Phone 1. During the call:

a. DYER stated: "I was hitting you up to see if you had a couple of extra ones for my guy [UC-2]." FRANKLIN replied: "What? Some loose ones [baggies of heroin]?" DYER responded: "Uh-uh, hell no." FRANKLIN replied: "What they want?" DYER responded: "Packs [full packs of heroin]." FRANKLIN replied: "How many [packs of heroin]?" DYER responded, "He need 3 [packs of heroin]."

b. FRANKLIN stated: "Let me see what they [other members of the Monticello DTO] got. I can see what I can scrape up. You can tell him come through here [Monticello Avenue Drug Spot]." DYER responded: "Alright cool and then yeah, just let me know and then I'll let him know. A'ight."

135. Based on my training and experience and knowledge of the investigation, I understand that in the above exchange: (a) DYER asked FRANKLIN if FRANKLIN could supply DYER with $300 worth of heroin so that DYER can supply UC-2 and FRANKLIN asked if DYER wanted loose baggies of heroin; (b) DYER told FRANKLIN that his customer (UC-2) did not want baggies, but packs of heroin; and (c) FRANKLIN told DYER to tell DYER's customer (UC-2) to go to the Monticello

Avenue Drug Spot so that FRANKLIN could arrange for the appropriate quantity of heroin to be distributed.

136.     Over the next two hours, UC-2 and DYER exchanged several missed calls.  At that point, law enforcement put off the controlled purchase of narcotics until September 3, 2019.

137.     On or about September 3, 2019, at approximately 1:19 p.m., UC-2 placed a recorded call to DYER, using DYER Phone 1.  During the call, UC-2 asked: "Yeah, hey, man, umm, how many bags [of narcotics] you got right now?"  DYER replied: "Well look, lemme hit you right back, 'cause I don't know how many [bags of narcotics] I got.  Let me hit you right back, so I can umm . . . ."  UC-2 responded: "Alright, let me know."

138.     On or about September 3, 2019, at approximately 1:22 p.m. (TP2 Session 4437), FRANKLIN, using Target Phone 2, received a call from DYER, using DYER Phone 1.  During the call:

          a.     DYER stated: "[U/I] gonna need you. I'm gonna see him [narcotics customer, UC-2] . . . ."  FRANKLIN replied: "Huh?"  DYER responded: "I say I'm probably finna need you, so you can . . . you know . . . so I could hit my guy [narcotics customer, UC-2].  I'm gonna see how many [bags of narcotics DYER has available to sell].  You dig?  'Cause you know . . . ."  FRANKLIN replied: "Okay, just let me know, cause I think I got like 1 or 2 [packs of heroin] on me.  I gotta go see.  That's why I was calling you."

b. FRANKLIN replied: "I called you anyway. I was finna ask you, did you need one [pack of narcotics] because I remember you said earlier, you had one [pack of narcotics] earlier." DYER responded: "Yeah. Cause see my guy [DYER's customer, UC-2] . . . I just told him . . . he just called me. He was like, 'Man, I'll probably need about 5 or 6 [packs of narcotics]." I said, 'Man, bro, I ain't even gonna lie. Let me call you right back. I'm gonna call my guy [DYER's supplier/Monticello DTO member, FRANKLIN]. I'm gonna see what he got and then I could put what I got, and then we'll see what we get from there.' So you think you probably got 2 [2 packs of narcotics] if possible?" FRANKLIN replied: "Yeah, hold on. No, I said I think . . . . I know I got one [pack of narcotics], for sure." DYER responded: "Right, you know you got one [pack of narcotics], for sure." FRANKLIN replied: "Yeah. Let me check the other one here."

c. DYER responded: "Right. Alright, look, I'm just gonna let his [DYER's customer, UC-2] ass know motha fucka only got like 3 packs [of narcotics] for his ass. I could give him my 2 [packs of narcotics] and then your 1 [pack of narcotics], and he'll have to . . . ." FRANKLIN later said: "[U/I] could we get them [additional narcotics] though. 'Cause I could probably like help you out [supply additional narcotics]. Like what you could be getting, you could get it now for the 100 [$100] . . . ." DYER responded: "Yeah, that's what I'm saying . . . ." FRANKLIN replied: "12 [baggies of narcotics] or whatever." DYER responded: "[U/I] his 11 [baggies of narcotics] for the 100 [$100]. [U/I] Shit, I'm gonna see what he [DYER's customer, UC-2] want, cause we'll fuck around [U/I], you know, bump his head, if you

got some. Just make it what he needs . . . even if you got like 10 [baggies of narcotics]. I'll just short his ass [provide fewer baggies than in a typical pack, 13]! I don't care. As long he get almost what he wants."

        d.    FRANKLIN replied: "Look, this is what I'm gonna tell you. Call him [DYER's customer, UC-2] and see like, for sure what [quantity of narcotics] he wants, and then call me right back so I could see." DYER responded: "Right." FRANKLIN replied: "If that's the case, depending on how long he could take, we could call and try to get some more [narcotics]." DYER responded: "Hell yeah, that's what I said. I'm gonna hit his [DYER's customer, UC-2] ass right back, see and I'm gonna hit you right back." FRANKLIN replied: "Alright."

        139.    Based on my training and experience and knowledge of the investigation, I understand that in the above exchange: (a) DYER called FRANKLIN to see if FRANKLIN had enough narcotics to supply DYER and accommodate the request of UC-2; (b) FRANKLIN said that he had 1 or 2 packs of narcotics (approximately 12 to 24 baggies); (c) DYER told FRANKLIN that UC-2 wanted to purchase a substantial quantity of narcotics (between 5 and 6 packs) and that DYER had told UC-2 he would call FRANKLIN to see how much narcotics he could get to distribute to UC-2; (c) DYER and FRANKLIN talked about providing UC-2 with several packs of narcotics and possibly shorting him on the total amount; and (d) FRANKLIN told DYER to call UC-2 back, confirm the total quantity of narcotics UC-2 wanted, and then FRANKLIN would see if they could obtain more if necessary.

140. On or about September 3, 2019, at approximately 1:28 p.m., UC-2 received a call from DYER, using DYER Phone 1. During the call:

      a.    DYER told UC-2: "Yup, I only got 2 [packs of narcotics], but my guy [FRANKLIN] said he gonna get me two [packs of narcotics], so . . . ." UC-2 responded: "So 4 [packs of narcotics] altogether." DYER replied: "Yup." UC-2 responded: "Alright, yeah, if you want to I could even go pick it up from your guy [FRANKLIN], so you don't have to go. You know what I mean? I can have my boss drop me off. We can do it that way too." DYER replied: "Yeah, all you gotta do is hit me up. He [FRANKLIN] just told me, ummm, let me know what you gonna do. So he [FRANKLIN] can bring it, if you're gonna come through."

      b.    UC-2 responded: "Yeah, yeah for sure, for sure, yeah let me get the 4 [packs of narcotics], if that's all you can get for sure, you're going to give me the four [packs of narcotics]?" DYER replied: "Yeah." UC-2 responded: "Ok." UC-2 responded: "I'll bring $400." DYER replied: "Ok cool." UC-2 responded: "They [UC-2's fictitious narcotics customers] love your, your heroin, man. They love their heroin, that's why that's why, 'cause we go to a couple of places, man, but they love that tin foil, bro." DYER replied: "Yeah, yup, that's [heroin] what I got. So, yeah, uh, just hit me up, I'm finna tell him he [DYER's supplier, FRANKLIN] can bring it [the packs of heroin]." UC-2 responded: "Alright, B, man, I'll see ya in a bit."

141. Based on my training and experience and knowledge of the investigation, I understand that in the above exchange: (a) DYER told UC-2 that he was going to obtain 2 packs of narcotics from DYER's supplier/Monticello DTO

member (FRANKLIN) and would be able to provide 4 packs of narcotics to UC-2; (b) UC-2 confirmed the amount (4 packs of narcotics) and amount that he would pay DYER ($400) and offered to pick up 2 packs directly from FRANKLIN; (c) UC-2 told DYER that his narcotics customers loved the quality of the heroin that UC-2 purchased from DYER and DYER said that he had that same quality heroin; and (d) DYER told UC-2 that he would contact FRANKLIN to bring the 2 packs of heroin.

142.    On or about September 3, 2019, at approximately 1:28 p.m. (TP2 Session 4438), FRANKLIN, using Target Phone 2, received a call from DYER, using DYER Phone 1.  During the call:

a.    DYER stated: "So look, this is what you could do.  You could just get me a whole one [pack of narcotics] and 8 [baggies of narcotics]."  FRANKLIN replied: "A whole one [pack of narcotics] and 8 [baggies of narcotics]?"  DYER responded: "Yeah."  FRANKLIN replied: "Okay."  DYER responded: "'Cause I just told him [DYER's customer, UC-2], I could fuck with it like that.  Cause that n---- . . . he was trying to go too over board [obtain too much narcotics in one purchase], so I told him, 'As soon as we get right, right, I'm gonna hit his line.'  'Cause that n---- [UC-2] was trying to spend a whole 1,000 [$1,000].  And I told him, 'Oh, bro, you gotta wait.'"  FRANKLIN replied: "How many you got [packs of narcotics]?  How many you got all together?  You ain't got none [packs of heroin] up there?"  DYER responded: "3 [packs of narcotics]."  FRANKLIN replied: "3 whole ones [packs of narcotics]?"

b.    DYER responded: "3 [packs of narcotics].  So that's why I told him [DYER's customer, UC-2], 'Just wait 'til a motha fucka do something,' [U/I]."

FRANKLIN replied: "You got 3 whole ones [packs of narcotics] up top?" DYER responded: "Yeah." FRANKLIN replied: "Alright, call his ass [DYER's customer, UC-2] back!" DYER responded: "Put together for him [DYER's customer, UC-2]." FRANKLIN replied: "Call his [DYER's customer, UC-2] ass back! Tell his [DYER's customer, UC-2] ass you got . . . tell his [DYER's customer, UC-2] ass to bring like 700 [$700]. You got 'em." DYER responded: "Yeah." FRANKLIN replied: "Yo 3 [packs of narcotics] . . . I got 2 [packs of narcotics] . . . I think what's his name [another Monticello DTO member] got 2 [packs of narcotics], so see, that's 4 [packs of narcotics] right there." DYER responded: "Yeah. He [DYER's customer, UC-2] still on his way though, so I'm gonna slide down you." FRANKLIN replied: "Alright I'm just gonna put the whole one [pack of narcotics] and the 8 [baggies of narcotics] together for you." DYER responded: "Alright."

143. Based on my training and experience and knowledge of the investigation, I understand that in the above exchange: (a) DYER asked FRANKLIN for narcotics FRANKLIN had on hand, including 1 full pack of heroin (12 baggies) and 8 loose baggies of heroin; (b) FRANKLIN said that his customer, UC-2, was asking for too large a quantity of narcotics ($1,000 worth) and that he wanted his customer to wait; (c) FRANKLIN and DYER confirmed the amount of narcotics they had available to distribute to UC-2, including 3 packs with DYER; (d) FRANKLIN told DYER to charge UC-2 $700 for the total amount of narcotics (4 packs and 8 loose baggies); (e) FRANKLIN said that other members of the Monticello DTO had full packs of narcotics that DYER could give to UC-2; and (f) DYER told FRANKLIN that

UC-2 was on his way, so he could not collect additional heroin from other members of the Monticello DTO.

144. At approximately 2:02 p.m., surveillance observed and CPD Pod camera video reflected UC-2 enter the alley behind DYER Residence at the Monticello Avenue Drug Spot. UC-2 was equipped with an audio and video recording device. According to UC-2 and body cam video, when UC-2 approached the fence at DYER Residence, DYER walked over to UC-2 and handed UC-2 four packs, which contained tin foil packets and UC-2 gave DYER $400 in government funds. UC-2 then departed the area.

145. UC-2 provided the tin foil packets supplied by DYER to the DEA North Central Laboratory. According to the laboratory, the contents weighed approximately 22.7 grams and tested positive for the presence of heroin and furanyl fentanyl.

146. Less than seven minutes after this transaction, at approximately 2:09 p.m. (Call Session 4440), FRANKLIN, using Target Phone 2, received a call from DYER, using DYER Phone 1. During the call, DYER said: "I say when you gonna be out front [street side of the Monticello Avenue Drug Spot] again?" FRANKLIN replied: "Uh, soon as we wrap the rest of this shit [narcotics] up. Grey transit [unmarked police vehicle] went past. They [police] didn't even look down here." DYER responded: "Right. I'm gonna slide up, then I'm gonna slide down." FRANKLIN replied: "I'm right here. I'm already in the front. I'm right here, come on."

147.   At approximately 2:11 p.m., CPD POD camera video reflected DYER walking down the front steps of DYER Residence, while FRANKLIN was standing in front of DYER Residence.  At that point, DYER handed FRANKLIN an object through the wrought iron fence and the two quickly departed in different directions.

148.   Based on my training and experience and knowledge of the investigation, including several prior purchases of narcotics by UCs from DYER and FRANKLIN on Monticello Avenue, the intercepted calls between FRANKLIN and DYER from earlier that day, UC-2's purchase of narcotics from DYER minutes earlier, and CPD POD camera video reflecting a meeting between DYER and FRANKLIN minutes later, I believe that DYER met with FRANKLIN in order to provide FRANKLIN with proceeds from the sale of narcotics to UC-2 or in order for FRANKLIN to re-supply DYER with additional narcotics.

   C.   *FRANKLIN Supplied WILL HOWARD with Narcotics, a Portion of Which (3.6 Grams of Heroin and 1.2 Grams of Cocaine) was Seized by LEOs on September 4, 2019.*

149.   On or about September 4, 2019, at approximately 10:25 a.m., surveillance observed DYER park his vehicle in front of a residence at the Monticello Avenue Drug Spot and FRANKLIN exit the passenger's side front door.  FRANKLIN then walked to a different residence on Monticello Avenue and met with WILL HOWARD.[24]  During that meeting, FRANKLIN reached under his hooded sweatshirt and removed a black bag, which he handed to WILL HOWARD.

---

[24] Law enforcement officials identified WILL HOWARD as follows: as discussed below, on September 4, 2019, WILL HOWARD was arrested following the review of CPD Pod camera video reflecting him engage in a suspected hand-to-hand transaction of narcotics and the

150. Based on my training and experience and knowledge of the investigation, including numerous narcotics transactions brokered by FRANKLIN and DYER and intercepted calls regarding FRANKLIN supplying members of the Monticello DTO with narcotics, and, as discussed below, CPD Pole Camera video depicting WILL HOWARD transfer items to an unknown male in exchange for money and the later seizure of a bag containing tin foil packets further containing a white powdery substance and blue Ziploc baggies further containing a white rock-like substance, I believe that during their meeting, FRANKLIN provided WILL HOWARD with narcotics for distribution.

151. That same day, at approximately 10:40 a.m., CPD Pod camera video located on Monticello Avenue captured the following:

a. WILL HOWARD gestured towards an older male and engaged in a short conversation with him before approaching the wrought iron fence of a residence on Monticello Avenue.

b. At that point, WILL HOWARD reached through the fence and retrieved one of two small cigarillos bags hidden inside the fence. WILL HOWARD then reached into the bag and retrieved small items from the bag, before placing the bag back onto the grass of the residence.

---

seizure of narcotics from that same area. As part of the arrest, WILL HOWARD was processed and fingerprinted and identified based on preexisting records in the Chicago Police Department database from prior arrests.

c.     WILL HOWARD returned to the older male and provided the items that he had just retrieved from the bag to the older male in exchange for an unknown amount of cash.

152.    Based on their training and experience, knowledge of the investigation, and monitoring of the CPD Pod camera video, officers believed that they had just witnessed a narcotics transaction and relocated to the area to perform an investigatory stop and a search of the lawn at the residence on Monticello Avenue.

153.    During this search, agents seized the two cigarillo bags, from which they had observed WILL HOWARD retrieve the items he later provided to the older male in exchange for cash.  The two cigarillo bags contained five tin-foil packets containing a white powdery substance and ten blue-tinted Ziploc bags each containing a white rock-like substance.

154.    Agents submitted the substances they seized from WILL HOWARD's cigarillo bags to the Illinois State Laboratory for analysis.  The Illinois State Laboratory determined that the substances within the tin foils contained approximately 3.6 grams of heroin and that the blue Ziploc contained approximately 1.2 grams of cocaine.

155.    At approximately 10:51 a.m., officers observed WILL HOWARD on the 1000 block of North Lawndale Avenue, approximately one-half block away from the residence on Monticello Avenue where agents had seized the heroin and cocaine. Officers arrested WILL HOWARD relating to an active arrest warrant for traffic

violations. Minutes earlier, CPD officers briefly detained FRANKLIN before releasing him.

156. On or about September 4, 2019, at approximately 10:48 a.m. (TP2 Session 4604), FRANKLIN, using Target Phone 2, called Individual I, using Individual I Phone. During the call:

a. FRANKLIN stated: "The police just had me, so I'm not doing nothing [dealing in narcotics] right now! You hear me? Nothing!" Individual I responded: "I know, your uncle called me. It's booming [lots of law enforcement] over there." FRANKLIN replied: "Yeah. Shit shaking right now. I'm sorry, but shit shaking right now." Individual I responded: "Nah, it's cool! I'd rather for you to be safe than sorry." FRANKLIN replied: "Hell yeah."

b. Individual I stated: "He [FRANKLIN's uncle] coming back from down there. He [FRANKLIN's uncle] say he saw you ride past him." FRANKLIN replied: "Yeah, they had me for mistaken identity. Ain't even me!" Individual I responded: "For real?" FRANKLIN replied: "Hell yeah! I coulda just went to jail for somebody else [WILL HOWARD's] shit [narcotics]!" FRANKLIN later stated: "I already know. Shit, the motha fucka they looking for [WILL HOWARD], they [CPD] got him." Individual I responded: "They got him?" FRANKLIN replied: "Yeah. They be looking for my homie [WILL HOWARD]."

157. Based on my training and experience and knowledge of the investigation, I believe that: (a) FRANKLIN told Individual I that he had just been arrested in connection with WILL HOWARD's narcotics; (b) FRANKLIN told

Individual I that he was not going to be selling narcotics around that time because of the arrest and the presence of law enforcement in the area; (c) FRANKLIN told Individual I that the police had arrested WILL HOWARD; and (d) FRANKLIN believed that WILL HOWARD had been arrested for narcotics because FRANKLIN had supplied him with narcotics just over 20 minutes earlier.

158. On or about September 4, 2019, at approximately 11:14 a.m. (TP2 Session 4612), FRANKLIN, using Target Phone 2, received a call from Individual C, using Individual C Phone 1. During the call, FRANKLIN stated: "Yeah, this n---- [WILL HOWARD] ain't even get up outta there. Guess where they catch him at? Lawndale. Walking." Individual C responded: "Oh, so he [WILL HOWARD] thought he was just carefree, just walking down the street?" FRANKLIN replied: "Yeah, and they found the shit [heroin and cocaine]!"

159. Based on my training and experience and knowledge of the investigation, I understand that in the above exchange: (a) FRANKLIN told Individual C that WILL HOWARD was arrested walking in the area; (b) Individual C asked FRANKLIN if WILL HOWARD was just walking casually and FRANKLIN agreed that he was; and (c) FRANKLIN said that law enforcement had recovered the narcotics that WILL HOWARD possessed and distributed.

> D. *LEE and BONDS Discuss Narcotics that They Previously Cut on Behalf of the DTO Prior to Giving them to SAM HOWARD and FRANKLIN for Distribution at the Monticello Avenue Drug Spot in September 2019.*

160. On or about September 22, 2019, at approximately 1:47 p.m. (TP2 Session 6763), SAM HOWARD, using Target Phone 2, received a call from LEE, using

Target Phone 5.[25]  During the call:

         a.    LEE stated: "What's good though, you good?"  SAM HOWARD

replied: "Yeah.  Hey, they say . . . ."  SAM HOWARD then began speaking to

FRANKLIN on his end of the call,[26] asking, "You said they [narcotics customers] said

what?"  FRANKLIN, on SAM HOWARD's end of the call stated: "They said it's

---

[25] Law enforcement officials identified ANTONIO LEE and identified LEE as the user of Target Phone 5 as follows: on or about October 4, 2019, intercepted calls over Target Phone 2 (TP2 Sessions 9036, 9038 9040 and 9041) reflected that FRANKLIN was going to meet with the user of Target Phone 5 for a re-supply of narcotics.  Based on those calls, agents established surveillance on FRANKLIN and SAM HOWARD and followed FRANKLIN and SAM HOWARD to a residence on the 2000 block of N. Karlov Street in Chicago.  Agents observed SAM HOWARD enter and exit the residence and, shortly thereafter, surveillance observed MORRIO BONDS arrive in BONDS Vehicle.  Minutes later, another individual exited the residence and departed the area in BONDS Vehicle with BONDS.  During that surveillance, agents took a photograph of the individual who exited the residence and departed with BONDS.  Law enforcement later reviewed a booking photograph of LEE from a Chicago Police Department database and determined that LEE was the individual depicted in the photograph discussed above.

On or about October 9, 2019, FRANKLIN, using Target Phone 2 (TP2 Sessions 10216 - 10229, 1031-10241, 1025-10248), exchanged several calls with the user of Target Phone 5.  During those calls, FRANKLIN and the user of Target Phone 5 discussed a meeting for a re-supply of narcotics.  Based on those calls, agents monitored the meeting area using CPD POD cameras located in the area.  At approximately 1:49 p.m., surveillance observed a black Jeep drive onto the block of 1000 N. Monticello Ave. and FRANKLIN enter the rear driver's side of the Jeep.  At approximately 2:00 p.m., surveillance observed LEE exit a nearby residence and walk towards the Jeep.  Approximately two minutes later, surveillance observed LEE enter the rear driver's seat of the same Jeep that FRANKLIN had just entered.  Surveillance observed LEE exit the vehicle shortly thereafter and depart the area.  Based on those intercepted calls and surveillance observations, agents determined that: (1) LEE was the user of Target Phone 5 communicating with FRANKLIN about a re-supply of narcotics; and (2) LEE met with FRANKLIN to re-supply FRANKLIN with narcotics.

On or about October 28, 2019, the Honorable Rebecca Pallmeyer, Chief Judge for the Northern District of Illinois, entered an order authorizing the interception of wire and electronic communications to and from Target Phone 5.  Interception began on October 28, 2019 and terminated on November 26, 2019.

[26] Law enforcement officials identified both SAM HOWARD and FRANKLIN's voices using Target Phone 2 during the course of this intercepted call.

[narcotics previously supplied by LEE] not the same." SAM HOWARD then stated to LEE: "They [narcotics customers at the Monticello Avenue Drug Spot] said it's [the narcotics] not the same [quality]. It's different."

      b.    LEE responded: "What they [narcotics customers] say though? I know it's [the narcotics] the same [quality]. He [MORRIO BONDS,[27] associate responsible for cutting DTO narcotics with additives to increase quantity] probably ain't shake [mix the narcotics] the way I shake [mix the narcotics]. What they [narcotics customers] say though?" SAM HOWARD then resumed speaking to FRANKLIN, asking: "They said it's [narcotics] too strong?" SAM HOWARD then said to LEE: "They [narcotics customers] said it's [narcotics] too strong, man. It [the narcotics] look mostly white. They said it's [narcotics] under than what you give them [narcotics customers]. They said it's under that. It [the narcotics] ain't really popping no shit [does not have the same effect] but it [the narcotics] ain't the same."

---

[27] On September 22, 2019, between 1:18 a.m. and 2:54 a.m. (TP2 Sessions 6677 through 6696, 6698-6703), FRANKLIN, using Target Phone 2, exchanged multiple text messages with BONDS, using Target Phone 4. In one text message at approximately 1:25 a.m. (TP2 Session 6680), BONDS said to FRANKLIN: "He [LEE] told me to put it [narcotics supply] in your hands." In messages later that day between approximately 2:40 p.m. and 2:52 p.m., (TP2 Sessions 6777 through 6784), FRANKLIN, using Target Phone 2, exchanged messages with BONDS, using Target Phone 4. In one message at 2:50 p.m., (TP2 Session 6782), BONDS wrote: "Tell him [SAM HOWARD] to let me know what he got left [how much narcotics]." FRANKLIN responded, (TP2 Session 6783): "Shidd [shit] we still up there [Monticello Avenue Drug Spot] It's b [been] a slow morning n afternoon bt [but] I gotchu [will be able to provide narcotics proceeds]." Based on these messages between FRANKLIN and SAM HOWARD regarding the distribution of narcotics on September 22, 2019 and managing of the drug supply, I believe that in the intercepted call between FRANKLIN, SAM HOWARD, and LEE that same day, LEE referenced BONDS as the individual with whom he was working who cut the narcotics supplied to the Monticello DTO.

c.      LEE responded: "He [FRANKLIN, relaying the comments from the narcotics customers] says what now?" SAM HOWARD replied: "He [FRANKLIN] says it's [the narcotics] really not the same. It ain't how you do it [not the way that LEE normally mixes narcotics]." LEE responded: "Everything [the narcotics and additives] the same. He [FRANKLIN] said what? It's too strong? He [BONDS] made it [the narcotics] too strong?"

d.      FRANKLIN got on the phone and replied: "I had two of my people [narcotics customers] try that [the narcotics] you know what I'm saying? One bought one [pack of narcotics]. He [narcotics customer] took a whole bag out the window [got rid of the narcotics]. Literally. A whole bag out the window." LEE responded: "He threw the whole bag [of narcotics] out the window? What was he saying? Was it [the narcotics] too strong for 'em? What though?" FRANKLIN replied: "What he's [narcotics customer] saying is that, yeah he ain't like it [the narcotics]. Then I had T called me. I had my auntie try one. She's like it's [U/I]. She like, 'But it'll [narcotics] do. It's [the narcotics] too strong. So when you hit it you, you get to coughing. If a motherfucker with asthma do it and they get to coughing they ass probably go into a asthma attack."

e.      SAM HOWARD got on the phone and said: "It's [the narcotics] too strong. That shit strong." FRANKLIN replied: "That shit [narcotics] white like chalk, that shit ain't like [U/I] with the little specks or none of that. That shit pure white. Like that motherfucker just powder [the narcotics was not cut like it normally was]." SAM HOWARD replied: "Right."

161. Based on my training and experience and knowledge of the investigation, I believe that in the above exchange: (a) SAM HOWARD and FRANKLIN informed LEE that narcotics customers were dissatisfied by LEE and BONDS's most recent supply of narcotics, which they found to be too strong; (b) LEE told SAM HOWARD and FRANKLIN that the narcotics were the same quality, but that BONDS had mixed the narcotics, which may have been done differently than he normally mixes the narcotics; (c) FRANKLIN told LEE that one customer used the narcotics and immediately threw an entire bag out his car window because he did not like the narcotics and that he had given a sample to his aunt, who also found the narcotics to be different than normal; and (d) FRANKLIN and SAM HOWARD told LEE that the narcotics appeared different (pure white and powdery), which was atypical.

162. On or about September 22, 2019, at approximately 1:52 p.m. (TP2 Session 6764), SAM HOWARD, using Target Phone 2, received a call from LEE, using Target Phone 5. During the call:

a. LEE stated: "Yeah, I was trying to park. The fucking police was behind me and shit and I ain't had no seat belt on. What he [FRANKLIN] say now? He said god dammit one . . . Auntie said it [narcotics] worked but she said it's too strong too. One motherfucker [narcotics customer] said what?" SAM HOWARD replied: "He [narcotics customers] said, 'We gonna get rid of it [narcotics].' But it's like . . ."

b.     LEE responded: "No, they [narcotics customers] ain't saying . . . That n---- don't know . . . The thing I ain't want him [BONDS] to go hit it [narcotics] like I hit it.  I told him [BONDS] to do it [cut the narcotics] a little softer [less additive].  That's probably why it's [narcotics] too strong.  You know what I'm saying?" SAM HOWARD replied: "Yeah."

c.     LEE responded: "Then mother fucker [BONDS] shake [cut the narcotics] ain't like mine.  I don't give a fuck who you with on Chicago.  That mother fucker shake ain't like mine.  Everything in that biz [supply and quality of narcotics is] good.  It's [narcotics] probably too strong for a motherfucker.  I know.  Everything I got [supply of narcotics] is so fucking strong.  You know what I'm saying?  Then some motherfuckers that hit it, they'll . . . if it's too strong, that don't mean it ain't no good.  It's too strong for them.  Dude, probably put that motherfucker out the window 'cause it was too strong for him."

d.     SAM HOWARD replied: "Yeah, that's probably what it was [narcotics were too strong]."  LEE responded: "I'm keeping it 100 I know my D [heroin].  He [narcotics customer] probably tasted it [narcotics], and he like, no, he probably told to sell to him to himself and then threw the motherfucker out the window.  But, we cool.  I'll be back tonight.  In the morning.  But, yeah, that's all it was.  I just try to coach him [teach BONDS to cut the narcotics] through the fucking phone and shit.  That's all that was."  SAM HOWARD replied: "Alright.  Motherfucker see you though, motherfucker [U/I]."

e.      LEE responded: "Yeah, go ahead and run through that shit [sell the narcotics]. We cool. Just tell every motherfucker we passing out [handing out samples for free] Tuesday morning. I don't need him. Fuck that shit." SAM HOWARD replied: "Okay." LEE responded: "[U/I] We just gonna do it anyway. You already know how I'm coming out there, I'm passing out [handing out free samples of narcotics] every week anyway." SAM HOWARD replied: "Okay, Okay."

163. Based on my training and experience and knowledge of the investigation, including several prior purchases of narcotics by UCs from FRANKLIN at the Monticello Avenue Drug Spot, I believe that in the above exchange: (a) LEE summarized what FRANKLIN had told him about complaints FRANKLIN had heard about the most recent supply of narcotics; (b) SAM HOWARD told LEE that they wanted to get sell the most recent supply of narcotics; (c) LEE informed SAM HOWARD that he had BONDS cut the narcotics and make them stronger and that each person who cuts bulk narcotics does it differently, but that the quality of the narcotics was high and that the customers were probably not prepared for the strength of the narcotics; (d) LEE told SAM HOWARD that he was being forthright with SAM HOWARD and that, with this supply, he had been trying to teach BONDS to cut narcotics, but by telephone, which may have led to it being too strong; and (e) LEE said that he would be providing free samples of narcotics on Tuesday, September 24, as he had been doing in recent weeks.

E. *BONDS Arranges the Collections of Narcotics Proceeds from FRANKLIN on September 23, 2019.*

164. On or about September 23, 2019, between 4:32 p.m. and 7:22 p.m. (TP2 Sessions 7013, 7014, 7016, 7018, 7019, 7020, 7027, 7028, 7029, 7030, 7032, 7034 and 7035), FRANKLIN, using Target Phone 2, exchanged a series of text messages with BONDS, using Target Phone 4.[28] During that exchange:

a. BONDS wrote: "You got 200 [$200] on you." FRANKLIN responded: "Slide [come by Monticello Avenue Drug Spot]." BONDS replied: "✓."

FRANKLIN responded: "How far r Yu I gotta drop my kids off ion like Dem standing

---

[28] Law enforcement officials identified BONDS and identified BONDS as the user of Target Phone 4 as follows: on or about September 26, 2019, between 1:07 p.m. and 1:14 p.m., law enforcement officials intercepted text messages (TP2 Sessions 7465, 7466, 7467 and 7468) between FRANKLIN, using Target Phone 2, and the user of Target Phone 4. Based on those calls, law enforcement officials anticipated a meeting between FRANKLIN and the user of Target Phone 4 (BONDS). During those text messages: FRANKLIN wrote: "Omw [on my way] to yu [you]." The user of Target Phone 4 (BONDS) replied: "✓" FRANKLIN responded: "Downstairs." The user of Target Phone 4 (BONDS) replied: "Ok." Based on my training and experience and knowledge of the investigation, I believe that in the above exchange, FRANKLIN told the user of Target Phone 4 (BONDS) that he was going to the residence of the user of Target Phone 4 to obtain narcotics and the user of Target Phone 4 indicated that he was ready to re-supply narcotics to FRANKLIN.

At approximately 1:19 p.m., agents conducted surveillance in in the area of W. Jackson Street and N. Hamlin Blvd and observed FRANKLIN outside a vehicle speaking with a man later identified as BONDS. Agents continued surveillance of the unidentified male, and, at approximately 1:33 p.m., agents observed the male enter a silver Pontiac Grand Prix (BONDS Vehicle) and begin driving at a high rate of speed and make an illegal U-turn. Officers conducted a traffic stop of BONDS Vehicle, at which time the driver, the same individual agents had observed meeting with FRANKLIN, provided an Illinois driver's license bearing the name "MORRIO BONDS," which picture matched his appearance.

Later that day, the CPD officers who conducted the traffic stop on BONDS, listened to TP2 Sessions #6876, 6919, 7036 and 7137 and confirmed that the voice of the user of Target Phone 4 was the same man that they had encountered during the traffic stop (BONDS).

On or about October 28, 2019, the Honorable Rebecca Pallmeyer, Chief Judge for the Northern District of Illinois, entered an order authorizing the interception of wire and electronic communications to and from Target Phone 4. Interception began on October 28, 2019 and terminated on November 26, 2019.

on the block." BONDS replied: "Do you just htl [hit the line or call BONDS] when you get back." FRANKLIN responded: "Ight."

      b.    Later that evening, FRANKLIN asked again: "Yooo Yu still coming to grab tht [$200 in narcotics proceeds]." BONDS replied: "Yep." FRANKLIN responded, "Weneva Yu ready." BONDS replied: "On the way." FRANKLIN responded: "Ok."

165.    Based on my training and experience and knowledge of the investigation, I believe that in the above exchange FRANKLIN and BONDS made arrangements for FRANKLIN to provide BONDS with $200 in narcotics proceeds for BONDS to put towards the next supply of narcotics.

166.    On or about September 23, 2019, at approximately 7:17 p.m. (TP2 Session 7036), FRANKLIN, using Target Phone 2, received a call from BONDS, using Target Phone 4. During the call, FRANKLIN stated: "I'm right here. I'm finna turn the corner. I'm hitting one of my people [serving a narcotics customer] real quick." BONDS replied: "A'ight. I'm finna come back around the block. I'm in this Grand Prix, the one that's tinted up." FRANKLIN responded: "Okay."

167.    Based on my training and experience and knowledge of the investigation, including several prior purchases of narcotics by UCs from FRANKLIN at the Monticello Drug Spot, I believe that in the above exchange FRANKLIN informed BONDS that he was in the area supplying a customer with narcotics and that he was available to provide BONDS with the $200 in narcotics proceeds.

F. *LEE Instructs FRANKLIN to Distribute Narcotics to BONDS on September 29, 2019.*

168.   On or about September 29, 2019, at approximately 7:17 p.m. (TP2 Session 8091), FRANKLIN, using Target Phone 2, received a call from LEE, using Target Phone 5.  During the call, LEE stated: "Hey, my little bro, [BONDS] he finna pull up.  They need a whole one [one full pack of heroin], lil bro."  FRANKLIN replied: "Hold on, wait, wait.  You say what now?"  LEE responded: "My little bro [BONDS], he need a whole one [pack of narcotics].  He finna be pulling up in like five minutes."  FRANKLIN replied: "All right, just call me when he [BONDS] right there."  LEE responded: "[U/I] pulling up.  And I'll meet him [BONDS] around here.  He coming."  FRANKLIN replied: "Okay, I gotcha."  LEE responded: "He coming [U/I]."  FRANKLIN replied: "All right."

169.   Based on my training and experience and knowledge of the investigation, I believe that in the above exchange, LEE asked FRANKLIN to supply BONDS with one packet of heroin and FRANKLIN agreed to do so.

170.   On or about September 29, 2019, at approximately 7:23 p.m. (TP2 Session 8095), FRANKLIN, using Target Phone 2, received a call from LEE, using Target Phone 5.  During the call, FRANKLIN stated: "Yeah, where he [BONDS] at?"  LEE responded: "Let me see where he at.  He in a light grey Grand Prix probably. Let me see where he at.  Hold on."

171.   On or about September 29, 2019, between approximately 7:23 p.m. and 7:33 p.m. (TP2 Sessions 8096-8097, 8100), FRANKLIN, using Target Phone 2, exchanged text messages with LEE, using Target Phone 5.  In that exchange, LEE

wrote: "5 mints [minutes] pulling up lil bro." FRANKLIN replied: "'Ight." FRANKLIN then wrote: "Hit me [call] wen [when] he [BONDS] get right here I got my ppl [Monticello DTO members or narcotics customers] waiting on me."

172. Based on my training and experience and knowledge of the investigation, I believe that in the above exchange: (a) LEE told FRANKLIN that BONDS would be arriving in the area of Monticello Ave. in order for FRANKLIN to supply BONDS with one packet of narcotics; and (b) FRANKLIN told LEE to call him when BONDS arrived because he had Monticello DTO members or narcotics customers waiting for him to provide additional narcotics.

173. On or about September 29, 2019, at approximately 7:43 p.m. (TP2 Session 8103), FRANKLIN, using Target Phone 2, received a call from LEE, using Target Phone 5. During the call, FRANKLIN stated: "Yo, he [BONDS] right there?" LEE responded: "Yeah, in the Grand Prix." FRANKLIN replied: "All right."

174. Based on my training and experience and knowledge of the investigation, I believe that in the above exchange: (a) FRANKLIN asked LEE if BONDS was on Monticello Avenue and LEE confirmed that BONDS was on the block in a Grand Prix in order to receive the one packet of narcotics from FRANKLIN; and (b) at around 7:43 p.m. on September 29, 2019, FRANKLIN distributed one packet of narcotics to BONDS at LEE's request.

G. *LEE and BONDS Arrange to Re-Supply FRANKLIN with Narcotics*

175. On or about September 29, 2019, at approximately 8:11 p.m. (TP2 Session 8110), FRANKLIN, using Target Phone 2, sent a text message to LEE, using Target Phone 5. The text read: "The bears are down by one."

176. Approximately four minutes later, at approximately 8:15 p.m. (TP2 Session 8116), FRANKLIN, using Target Phone 2, sent the same text message to BONDS, using Target Phone 4. The text read: "The bears are down by one."

177. Based on my training and experience and knowledge of the investigation, I believe that in the above text messages, FRANKLIN informed LEE and BONDS that the members of the Monticello DTO had distributed narcotics and were down to one packet of narcotics on hand for distribution.[29]

178. On or about September 29, 2019, at approximately 8:58 p.m. (TP2 Session 8121), FRANKLIN, using Target Phone 2, received a call from LEE, using Target Phone 5. During the call, LEE asked: "What's the word?" FRANKLIN replied: "I had text you. I don't know if [you] had got it." LEE responded: "I got it. I was just calling. . . My phone had died." FRANKLIN replied: "All right. Hold on. But yeah, but like my text say the bears down by one [the Monticello DTO was down to one

---

[29] According to publicly available information on ESPN.com, on September 29, 2019, the Chicago Bears played an NFL game against the Minnesota Vikings. Based on my review of the box score, the Chicago Bears won the game 16 to 6 and never trailed the Vikings during the game. Accordingly, as discussed above and below, I do not believe that FRANKLIN's text message was a reference to the score of the NFL game on September 29, 2019 and was instead a reference to the Monticello DTO's narcotics supply.

packet of narcotics for distribution]." LEE responded: "The last one [packet of narcotics], all right." FRANKLIN replied: "All right."

179. Based on my training and experience and knowledge of the investigation, I believe that in the above exchange, FRANKLIN and LEE discussed how the Monticello DTO was down to its last packet of narcotics and FRANKLIN was asking LEE to re-supply him with narcotics in order for FRANKLIN to re-supply the street-level distributors of the Monticello DTO.

180. On or about September 29, 2019, at approximately 11:23 p.m. (TP2 Session 8137), FRANKLIN, using Target Phone 2, received a call from LEE, using Target Phone 5. During the call, LEE said: "I was trying to see if you gonna slide right here before I slid off, going to the crib." FRANKLIN responded: "You can go to the crib [LEE did not need to go to Monticello Avenue]." LEE replied: "I'mma try to get up with you tonight or first thing in the morning. I'm trying to find me a ride. Don't worry about it. [U/I]. I'mma get you right [supply FRANKLIN with narcotics]. You all right." FRANKLIN responded: "All right."

181. Based on my training and experience and knowledge of the investigation, I believe that in the above exchange: (a) LEE asked if he should meet with FRANKLIN on Monticello Avenue in order to re-supply FRANKLIN with narcotics; (b) FRANKLIN told LEE that they could meet tomorrow in order for LEE to re-supply FRANKLIN with narcotics; and (c) LEE assured FRANKLIN that he would re-supply him with narcotics that night or early in the morning the next day.

H. *Law Enforcement Officials Seize Cocaine from BONDS and Individual J on November 22, 2019.*

182. On or about November 22, 2019, between approximately 11:34 a.m. and 12:48 p.m. (TP5 Sessions 2654, 2655 and 2656), LEE, using Target Phone 5, exchanged multiple text messages with BONDS, using Target Phone 4. In these messages, LEE stated: "How u looking on the dog food [heroin]." BONDS responded: "I still got 3 [units of heroin]." LEE replied: "Yoo trinna hold it [heroin] for u how long u gone b."

183. Based on my training and experience and knowledge of the investigation, including approximately 80 undercover purchases of narcotics at the Monticello Avenue Drug Spot and prior and subsequent intercepted communications, I believe that in the above exchange: (a) LEE asked BONDS how much heroin he had left to distribute; (b) BONDS told LEE he had three units of heroin left; and (c) LEE informed BONDS that he was trying to hold onto additional heroin in order to supply BONDS.

184. On or about November 22, 2019, at approximately 12:57 p.m. (TP5 Session 2659), BONDS, using Target Phone 4, called LEE, using Target Phone 5. During the call, LEE stated: "Yo?" BONDS responded: "If you got somebody [customer] that's finna buy [narcotics], go and talk to them. I can't do nothing 'til they run me this other [I/A]." LEE replied: "A'ight." BONDS responded: "Yeah, you know [U/I]. I guess I'mma have to wait. Shit, I can't do nothing 'til they run me this other 100 [$100]. And that's gonna be the while, that's gonna be everything. I guess. I don't know." LEE replied: "A'ight."

185.    Based on my training and experience and knowledge of the investigation, including approximately 80 undercover purchases of narcotics at the Monticello Avenue Drug Spot, I believe that in the above exchange, BONDS told LEE that if LEE had someone else to whom to sell the heroin, he should sell it because BONDS was waiting for narcotics proceeds and could not meet with LEE.

186.    On or about November 22, 2019, at approximately 1:22 p.m. (TP5 Session 2664), LEE, using Target Phone 5, received a phone call from BONDS, using Target Phone 4.  During the call, LEE stated: "Hello?"  BONDS responded: "I need that [heroin] boy.  Hold that [heroin].  I'm finna get with you in 30-40 minutes. Gimme like 30-40 minutes. I'm finna get with you.  I'm putting together the last of it [money for the heroin or heroin to distribute] so I can [I/A]."  LEE replied: "A'ight, just call me."  BONDS responded: "Nah, I'm talking about hold that [heroin].  [I/A]." LEE replied: "I said, a'ight. Just call me."  BONDS responded: "A'ight.  I'm putting together the [U/I] shit [money for the heroin or heroin to distribute] right fast."

187.    Based on my training and experience and knowledge of the investigation, including approximately 80 undercover purchases of narcotics at the Monticello Avenue Drug Spot, I believe that in the above exchange: (a) BONDS told LEE to hold onto heroin in order to supply BONDS and LEE agreed; and (b) BONDS told LEE that he was putting together money to buy the heroin or remaining heroin to distribute.

188.    At approximately 3:42 p.m., surveillance observed a gray Pontiac Grand Prix, which agents had on prior occasions observed BONDS driving (BONDS Vehicle

1) park near a residence on the 2000 block of N. Karlov Avenue, near LEE's Residence.[30]  BONDS entered the driver's seat of the vehicle and walked over to the front of LEE's Residence and used his telephone.

189.   At approximately 3:48 p.m. (TP4 Session 6790), BONDS, using Target Phone 4, called LEE, using Target Phone 5.  During the call, BONDS stated: "I'm in the front [of LEE's Residence]."

190.   Moments after the telephone call between LEE and BONDS, surveillance observed LEE exit the front entrance of LEE's Residence and engage in a conversation with BONDS before both individuals entered the residence.  A few minutes later, surveillance observed BONDS exit the same door surveillance observed BONDS enter, enter the driver's seat of the Grand Prix and depart the area. Law enforcement officials continued to follow BONDS in the Grand Prix.

191.   Based on my training and experience and knowledge of the investigation, including approximately 80 undercover purchases of narcotics at the Monticello Avenue Drug Spot, the intercepted calls discussed above, the seizure of narcotics from BONDS and Individual J, discussed below, and the intercepted call between BONDS and LEE discussed below, I believe that during the meeting between BONDS and LEE in LEE's Residence, LEE supplied BONDS with heroin.

---

[30] Law enforcement officials identified LEE's Residence as follows: law enforcement officials reviewed the call records for Target Phone 5, used by LEE and determined that the person with whom he exchanged the most calls was Individual K.  Law enforcement officials searched a law enforcement database and found numerous reports involving Individual K and LEE associated with LEE's Residence.  Subsequently, law enforcement officials conducted surveillance of LEE's Residence and observed LEE entering and exiting LEE's Residence and FRANKLIN and SAM HOWARD meeting with LEE at LEE's Residence.

192. At approximately 4:04 p.m., law enforcement officials conducted a traffic stop on BONDS in the Grand Prix for failure to signal before changing lanes. During the stop:

a. Law enforcement officials asked the driver (BONDS) and passenger (Individual J) to exit the vehicle.

b. Law enforcement officials observed an item inside of Individual J's mouth, which appeared to be a bag of suspected narcotics and Individual J was instructed to spit out the bag. Both BONDS and Individual J acknowledged that Individual J had contraband concealed in his mouth and Individual J promptly spit a clear plastic bag containing a white chunky substance on the ground.

193. Following this seizure, agents processed the bag containing the white chunky substance into evidence and submitted it to the North Central Lab for testing. According to the North Central Lab, the white chunky substance weighed 3.108 grams and text positive for the presence of cocaine.

194. On or about November 22, 2019, at approximately 4:22 p.m. (TP5 Session 2713), BONDS, using Target Phone 4, called LEE, using Target Phone 5. During the call:

a. LEE stated: "Hello?" BONDS replied: "Boy, them people [police] just booked my uncle with that shit [cocaine seized by police], boy!" LEE responded: "They was finna book him?" BONDS replied: "On my momma! He right here in the car with me. They just made him spit it [cocaine] out his mouth. On my momma! They took the shit [cocaine] and let us go. He [the officer] said: 'we looking for pipes

[guns]. But if ya'll [U/I] anything . . . .'  Uncle was trying to swallow that mother fucker [bag of cocaine] but he couldn't.  I swear to god.  On my momma, they was just finna book us.  He said, 'spit it out now or both of ya'll going to jail.'  Right here on Pulaski and [U/I].  They followed me all the way from up there.  They was on my from all the way up there, just following me, following me and then finally pulled me over. They just took that shit [cocaine].  'If it was some weed, I don't want this shit.  We want some pipe [guns].' Man, that shit scared the fuck outta me."

b.  LEE responded: "Both of y'all [U/I]?"  BONDS replied: "Yeah." LEE responded: "Crazy."  BONDS replied: "That's why I told you go on spit the shit [cocaine] out. 'Cause he's like, 'fuck it.'  He spit it [the cocaine] out. 'We ain't gonna take you.'  He [the officer] was a man of his word though, shit."

c.  BONDS later asked: "When you gonna have some more C [cocaine]?  'Cause I gotta run that shit [deliver additional narcotics for sale].  'Cause I don't got none [cocaine] right now.  They got the last of that shit [cocaine] out there." LEE responded: "Yeah. I'm waiting.  [U/I] to wrap this bread [narcotics proceeds]. That's part of the count, what I just gave you."  BONDS replied: "Damn, this shit crazy."

195.  Based on my training and experience and knowledge of the investigation, including approximately 80 undercover purchases of narcotics at the Monticello Avenue Drug Spot, the intercepted calls between LEE and BONDS discussed above, and the seizure of suspected heroin from Individual J, I believe that in the above exchange: (a) BONDS told LEE about his and Individual J's encounter

with police, during which encounter the officer told Individual J to spit narcotics out of his mouth and agreed not to arrest Individual J; (b) according to BONDS, the officer told BONDS and Individual J that he was looking for guns, not narcotics, and threatened to arrest BONDS and Individual J only if Individual J did not spit out the heroin; (c) BONDS asked LEE when LEE would have additional narcotics to distribute to BONDS, because BONDS needed to deliver additional narcotics and did not have any additional heroin to distribute; and (d) LEE told BONDS that he was counting and packaging narcotics proceeds in order to buy additional narcotics and referenced the narcotics he had just provided to BONDS.

## V.     MONTICELLO DTO MEMBERS DISCUSS THE MANAGEMENT AND OPERATION OF THE MONTICELLO AVENUE DRUG SPOT

196.    Throughout the conspiracy, members of the Monticello DTO discussed the management and operation of the Monticello Avenue Drug Spot, including (i) the coordinated efforts of all street-level traffickers selling narcotics on the block; (ii) the sale of narcotics packaged by and obtained from the same source; (iii) street-level managers directing customers to street-level traffickers to complete hand-to-hand exchanges; (iv) DTO leaders directing DTO block managers to distribute free samples of narcotics to increase sales at the drug spot; (v) DTO members coordinating efforts to monitor and avoid detection by law enforcement; (vi) the possession of firearms to protect the drug spot; (vii) the staffing and hiring of street-level traffickers on the block; and (viii) the monitoring of the narcotics supply and street-level traffickers at the Monticello Avenue Drug Spot.

A. *Monticello DTO Member Acknowledges that Everyone Selling Narcotics at the Monticello Avenue Drug Spot Is Working Together.*

197. As discussed above, on August 19, 2019, DYER sold a quantity of narcotics to UC-2 at the Monticello Avenue Drug Spot. During their recorded conversation, UC-2 asked: "How about your boys out here in the street [Monticello Avenue]. You're not with them? Or?" DYER replied: "Yeah, I'd be fucking with them too, though . . . You know what I'm saying, just say we are all together [Monticello DTO], but I just be fucking with the back. They [other Monticello DTO members] be catching deliveries out there in the front."

198. Based on my training and experience and knowledge of the investigation, I understand that in the above exchange, DYER confirmed that he was working with the other street-level traffickers for the Monticello DTO, as some traffickers handled drug sales in the street and DYER handled drug sales in the alleyway.

B. *Street-Traffickers at the Monticello Avenue Drug Spot Are Selling Similarly Packaged Narcotics Obtained from the Same Stash.*

199. As discussed above, street-level bosses distributed smaller packs of narcotics from larger supplies of DTO narcotics to street-level traffickers, who in turn sold those packaged narcotics to end-use customers.

200. For example, as discussed above, on April 9, 2019, UC-2 purchased 18.095 grams of heroin from DYER and TATE. As UC-2 was approaching DYER to purchase the heroin, BARNES approached UC-2 and asked: "what [narcotics do] you want?" UC-2 replied: "No no . . . he's [DYER] going to take care of me [provide

narcotics to UC-2]." BARNES replied: "We're right here with it [heroin]." UC-2 responded: "No he's [DYER] going to take care of me." UC-2 then purchased the heroin from DYER. After UC-2 purchased the heroin from DYER, and as UC-2 was departing the area, BARNES approached UC-2 again and told UC-2: "It's [the heroin] the same shit too."

201. Based on my training and experience and knowledge of the investigation, I believe that in the above exchange, BARNES informed UC-2 that the heroin BARNES was attempting to sell UC-2 was the same heroin that UC-2 had purchased from DYER because they were both supplied by the same people and both members of the same DTO (the Monticello DTO).

202. In addition, as discussed above, on or about August 16, 2019, SAM HOWARD approached UC-2 after UC-2 purchased approximately 6.34 grams of a substance containing heroin, furanyl fentanyl (a fentanyl analogue), and fentanyl from DYER. During the conversation:

a. SAM HOWARD asked: "Hey you still be fucking with buddy in the house [DYER]?" UC-2 responded: "Yeah with B [DYER]." SAM HOWARD replied: "What he [DYER] sell you?" UC-2 responded: "two [packs of heroin and fentanyl] . . . two packs [of heroin and fentanyl]." SAM HOWARD replied: "They good, they good [quality heroin and fentanyl]?" UC-2 responded: "Yeah they [the narcotics] be good." SAM HOWARD asked: "Aluminum foil? Aluminum foil [packaging]?" UC-2 responded: "What you mean? Say that again?" SAM HOWARD replied: "Aluminum

foil? Aluminum foil baggies?" UC-2 responded: "No, no, no they're tin foils [packaging for the heroin and fentanyl]." SAM HOWARD replied: "Ok, ok, ok alright."

b. UC-2 stated: "Yeah he [DYER] been taking care of me for months now." SAM HOWARD replied: "Ok, that's cool." UC-2 responded: "Alright man, now if you give me a deal, I'll buy from you." HOWARD replied: "I got you next time, next time I got you."

203. Based on my training and experience and knowledge of the investigation, I believe that in the above exchange: (a) SAM HOWARD asked if UC-2 had purchased narcotics from DYER and UC-2 confirmed that he had; (b) SAM HOWARD and UC-2 discussed the packaging and quality of the narcotics; and (c) UC-2 confirmed that he had purchased narcotics from DYER on Monticello Avenue for months, but could purchase directly from SAM HOWARD[31] going forward and SAM HOWARD said that he would sell to UC-2 the next time UC-2 came to Monticello Avenue to purchase narcotics.

C. *DTO Street-Level Bosses Directed Customers at the Monticello Avenue Drug Spot to Street-Level Traffickers.*

203. Street-level bosses directed narcotics customers to particular street-level traffickers. For example, as discussed above, on April 2, 2019, UC-3 and UC-10

---

[31] Based on my training and experience and knowledge of the investigation, I understand that individual street-level traffickers, while working with the Monticello DTO and selling the same product, derive additional profit for personally selling narcotics. Specifically, as discussed above, street-level traffickers typically keep the profit from the sale or 1 or 2 baggies from a jab or pack and return the remaining proceeds to the street-level managers and individuals with connections to the narcotics suppliers. Accordingly, I believe that in the above exchange, SAM HOWARD asked UC-2 to purchase from him directly in the future to maximize SAM HOWARD's personal profit.

purchased approximately 2.194 grams of heroin from SAM HOWARD, HUGHES, and Individual A. Prior to the transaction, UC-3 and UC-10 approached SAM HOWARD to purchase the heroin, however, SAM HOWARD directed both UCs to the end of the block where street-level traffickers (HUGHES and Individual A) were serving customers.

204. Similarly, as discussed above, on April 19, 2019, UC-3 and UC-8 purchased approximately four grams of heroin from SAM HOWARD and GARRAWAY. Prior to the transaction, UC-3 and UC-8 approached SAM HOWARD and SAM HOWARD asked to the UCs: "how many [blows or baggies of heroin]?" The UCs told SAM HOWARD they wanted twelve blows of heroin and SAM HOWARD asked GARRAWAY: "You got a pack [of heroin]?" SAM HOWARD and GARRAWAY then sold the UCs approximately four grams of heroin from GARRAWAY's pack of narcotics.

205. As discussed above, on June 18, 2019, UC-3 and UC-10 purchased approximately 25 grams of heroin and fentanyl-laced heroin from FRANKLIN and SAM HOWARD. Prior to the narcotics transaction, SAM HOWARD approached the UCs and asked: "how much [narcotics] you need?" The UCs told SAM HOWARD that they wanted two packs of heroin and SAM HOWARD directed the UCs to go to a vacant lot on Monticello Avenue. Once the UCs arrived in the vacant lot, FRANKLIN distributed approximately 25 grams of heroin and fentanyl-laced heroin in exchange for $300 in government funds.

206.    On numerous occasions, FRANKLIN negotiated the cost and quantity of DTO narcotics with DTO customers at the Monticello Avenue Drug Spot, then directed those customers to street-level traffickers, like STUCKEY, to handle the hand-to hand exchange of money and narcotics.  For example:

a.    On or about October 4, 2019, at approximately 3:12 p.m. (TP2 Session 9176), FRANKLIN, using Target Phone 2, received a call from Individual B, using Individual B Phone.  During the call, FRANKLIN stated: "Yo."  Individual B responded: "I'm a slide [come to the Monticello Avenue Drug Spot to obtain narcotics] in one minute."  FRANKLIN replied: "What [quantity of narcotics] you need?"  Individual B responded: "Just one [blow or baggie of heroin]."  FRANKLIN replied: "Alright. My homie's [ROBERT STUCKEY] gonna get up with you."

b.    Moments later, at approximately 3:12 p.m. (TP2 Session 9177), FRANKLIN, using Target Phone 2, placed a call to STUCKEY (aka "Ant"), using STUCKEY Phone.[32]  During the call, FRANKLIN stated: "Hey, gray car, heavy tint, one time [one blow or baggie of heroin].  Finna pull up.  Dude in the back [alley], he want one [blow or baggie of heroin]. You hit [serve] him already?"  STUCKEY

---

[32] Law enforcement officials identified STUCKEY as the user of STUCKEY Phone as follows: on or about September 29, 2019, at approximately 2:04 p.m. (TP2 Session 8043), FRANKLIN, using Target Phone 2, called STUCKEY, using STUCKEY Phone.  During the call, STUCKEY identified himself as "Ant."  Based on review of criminal history records for STUCKEY, law enforcement officials understand that "Ant" is STUCKEY's nickname.  In addition, on or about October 1, 2019, law enforcement officials conducted a controlled purchase of approximately 6.294 grams of heroin from SAM HOWARD, STUCKEY, and WARD.  The controlled purchase was audio and video recorded.  Law enforcement officials reviewed the audio and video recording from the October 1, 2019 controlled purchase and intercepted phone calls involving STUCKEY Phone and determined that STUCKEY was the user of STUCKEY Phone.

responded: "Yeah." FRANKLIN replied: "That green [U/I] finna pull up in the front though, he want one [blow or baggie of heroin]." STUCKEY responded: "Alright, bet."

c. Based on my training and experience and knowledge of the investigation, I understand that in the above exchange: (a) Individual B called FRANKLIN and asked for one blow or baggie of heroin; (b) FRANKLIN directed Individual B to another DTO member (STUCKEY), who would handle the narcotics exchange (c) FRANKLIN called STUCKEY and confirmed that STUCKEY had sold narcotics to Individual B in the back alley of the Monticello Avenue Drug Spot, as FRANKLIN had arranged; and (d) FRANKLIN directed STUCKEY to serve another customer with one blow or baggie of heroin in front of a residence on Monticello Avenue.

207. FRANKLIN negotiated the sale of 12 blows of narcotics to another customer on or about October 5, 2019, then directed that customer to STUCKEY to complete the sale. Specifically:

a. On or about October 5, 2019, at approximately 10:46 a.m. (TP2 Session 9307), FRANKLIN, using Target Phone 2, received a call from Individual D, using Individual D Phone. During the call, Individual D stated: "Hey, remember what we talked about?" FRANKLIN replied: "Yeah." Individual D responded: "That's [the narcotics] what I want." FRANKLIN replied: "Okay. What you got though?" Individual D responded: "Huh?" FRANKLIN replied: "What you got 100 [$100] or 120 [$120]?" Individual D responded: "Yeah." FRANKLIN replied: "100 [$100]?" Individual D responded: "Yup." FRANKLIN replied: "Alright." Individual D asked:

"How many [blows or baggies of heroin] can I get? How many tickets [blows or baggies of heroin]?" FRANKLIN replied: "You know I give out 11 [11 blows or baggies of heroin] tickets for 100 [$100], but I'm gonna tell him [STUCKEY] to give you 12 [12 blows or baggies of heroin]." Individual D responded: "Alright, that's good. I'm over here on . . . I'm right down the street." FRANKLIN replied: "Okay, let me [make] a phone call." Individual D responded: "Huh?" FRANKLIN said: "I said let me make the phone call for you. Gonna call you right back." Individual D responded: "Alright."

b.      Two minutes later, at approximately 10:48 a.m. (TP2 Session 9309), FRANKLIN, using Target Phone 2, placed a call to STUCKEY, using STUCKEY Phone. During the call, FRANKLIN stated: "You still got [U/I]]?" STUCKEY responded: "Yeah." FRANKLIN replied: "I got a P [narcotics customer] finna come [to Monticello Avenue]. Give him 12 [blows or baggies of heroin] for the 100 [$100]." STUCKEY responded: "Alright."

c.      Based on my training, experience, and knowledge of the investigation, I believe that, in the above calls: (a) Individual D told FRANKLIN that he wanted to purchase $100 worth of heroin; (b) FRANKLIN told Individual D that $100 would typically get 11 blows or baggies of heroin, but FRANKLIN would have a different street-level distributor give Individual D 12 blows or baggies of heroin; (c) FRANKLIN told Individual D that he had to call the street-level distributor to setup the sale; (d) FRANKLIN then called STUCKEY and directed him to distribute 12 blows or baggies of heroin to Individual D for $100.

208. FRANKLIN negotiated another sale of nine baggies of narcotics to another customer on or about October 6, 2019, and again directed that customer to STUCKEY to complete the sale. Specifically:

a. On or about October 6, 2019, at approximately 1:33 p.m. (TP2 Session 9708), FRANKLIN, using Target Phone 2, placed a call to Individual E, using Individual E Phone. During the call, Individual E stated: "I'm right here." FRANKLIN replied: "Nah, what I was gonna say? Hey look, 'cause something happened over there on the block so I need you to meet me over there [Monticello Avenue]. I'm sorry and I'll give you nine [9 baggies of heroin] for your eighty [$80], okay?" Individual E responded: "Alright. So you want me to go back to the block [Monticello Avenue]?" FRANKLIN replied: "Yeah, I'mma give you nine [9 baggies of heroin] for your eighty [$80] for the inconvenience."

b. Three minutes later, at approximately 1:36 p.m. (TP2 Session 9709), FRANKLIN, using Target Phone 2, called STUCKEY, using STUCKEY Phone. Individual F answered the call from FRANKLIN. During the call, FRANKLIN told Individual F: "Tell Ant [STUCKEY] that Nissan [Individual E] finna pull up. Tell him [STUCKEY] to give her nine [9 baggies of heroin] for eighty [$80]. Tell him to do that off mine [from FRANKLIN's personal supply of narcotics] though." Individual F said [aside]: "Ant [STUCKEY]. Ant [STUCKEY]. It's Kevo [FRANKLIN]. He said do it off his [supply of narcotics]." FRANKLIN replied: "Just give him [STUCKEY] the phone. Just give him the phone." STUCKEY stated: "Hello." FRANKLIN replied: "Go [U/I] for me. That blue Nissan [Individual E] finna pull up. Give her nine [9

baggies of heroin] for eighty [$80] and put the other blows [baggies] [U/I]." STUCKEY responded: "A'ight."

c. Based on my training and experience and knowledge of the investigation, I understand that, in the above calls: (a) Individual E told FRANKLIN that she was in the area to purchase narcotics from him; (b) FRANKLIN directed Individual E to go back to the Monticello Avenue Drug Spot to purchase the heroin; (c) because he was asking Individual E to go back to Monticello Avenue, he was going to provide her with 9 baggies of heroin for $80; and (d) FRANKLIN then called STUCKEY and directed him to sell Individual E nine baggies of narcotics from FRANKLIN's personal supply for $80.

D. *DTO Leader LEE Directs FRANKLIN to Have Street-Level Traffickers Distribute Samples of New Batches of Narcotics to Customers to Increase Sales at the Monticello Avenue Drug Spot.*

209. Leaders of the Monticello DTO, like LEE, coordinated with the street-level bosses, like FRANKLIN, to direct street-level traffickers at the Monticello Avenue Drug Spot to handout samples of narcotics to customers to create demand for new batches of narcotics.

210. For example, on or about October 8, 2019, at approximately 8:31 a.m. (TP2 Session 10037), FRANKLIN, using Target Phone 2, placed a call to Individual E, using Individual E Phone. During the call, Individual E stated: "I'm coming your way, I woke up sick as fuck [ill from heroin withdrawal]." FRANKLIN responded: "That's good, that's good. Come on 'cause I got something [heroin] for you anyway." Individual E replied: "Oh my God. Great. I'm coming straight to you." FRANKLIN

responded: "Alright." Individual E replied: "You know I never come this early." FRANKLIN responded: "I know, I'm passing out [samples of heroin] anyway, that's why I called." Individual E replied: "Okay cool."

211. On or about October 8, 2019, at approximately 8:38 a.m. (TP2 Session 10040), FRANKLIN, using Target Phone 2, received a call from Individual G, using Individual G Phone. During the call, Individual G stated: "Where you at?" FRANKLIN responded: "I'm on Monticello and Augusta, I'm in the back. In the Alley." Individual G replied: "In the Alley?" FRANKLIN responded: "Okay, cool. Alright." Individual G replied: "This one [sample of heroin] is on the house [free], right?" FRANKLIN responded: "Yeah, man. It's called a pass, that's what the pass out is for, to give the shit [heroin] out free." Individual G replied: "Okay, okay, I got you. Alright, I'm going." FRANKLIN responded: "Alright."

212. Two days later, on or about October 10, 2019, LEE directed FRANKLIN to pass out more free samples of heroin at the Monticello Avenue Drug Spot. At approximately 12:05 p.m. (TP2 Session 10340), FRANKLIN, using Target Phone 2, called LEE, using Target Phone 5. During the call, LEE asked: "You all good?" FRANKLIN responded: "Yeah. Knocking this shit down, little by little [selling from a stash of heroin]." LEE replied: "You all good, though?" FRANKLIN responded: "Yeah." LEE replied: "Let everybody [Monticello DTO members] know we passing out [giving out samples of heroin] again Saturday at 6:00." FRANKLIN responded: "Okay." LEE replied: "A'ight." FRANKLIN responded: "Okay."

E. *DTO Members Monitor Police Presence at the Monticello Avenue Drug Spot and Alert Each Other to Avoid Detection of the DTO.*

213. Members of the Monticello DTO were aware of police presence in the area and alerted one another about the police in order to protect their drug distribution business. For example, on or about August 29, 2019, at approximately 6:45 p.m. (TP2 Session 3095), FRANKLIN, using Target Phone 2, placed a call to WILL HOWARD, using WILL HOWARD Phone.[33] During the call, FRANKLIN stated: "Yo'. Hey, Grey trans [unmarked police car] [U/I]." WILL HOWARD responded: "Yeah?" FRANKLIN replied: "Just turned up to the block going towards Thomas." WILL HOWARD responded: "A'ight." FRANKLIN replied: "[U/I] where it went. They going towards [U/I]." Later during the call, WILL HOWARD said [aside]: "Hey. Hey [U/I]. Hey [U/I], hey [U/I] grey trans [unmarked police car] going [U/I]." FRANKLIN later said: "Driving up [U/I] alley right now. The police right there [U/I]. Hey, I think they in traffic coming towards us [Monticello DTO members on Monticello Avenue]. I can't see 'em."

214. Based on my training and experience and knowledge of the investigation, I understand that in the above exchange, FRANKLIN warned WILL HOWARD, a Monticello DTO street-trafficker, that the police were driving around

---

[33] Law enforcement officials identified WILL HOWARD as the user of WILL HOWARD Phone as follows: as discussed above, on September 4, 2019, WILL HOWARD was arrested in connection with the possession and distribution of narcotics around the Monticello Drug Spot. Following the arrest, law enforcement officials was interviewed and booked. The law enforcement officials who participated in the arrest and interview reviewed intercepted phone calls involving the user of WILL HOWARD Phone and determined that WILL HOWARD was the user of WILL HOWARD Phone.

the area of the Monticello DTO and WILL HOWARD warned other street-level traffickers at the Monticello Avenue Drug Spot.

215. On or about September 9, 2019, at approximately 10:23 a.m. (TP2 Session 5612), FRANKLIN, using Target Phone 2, received a call from SAM HOWARD, using Target Phone 3. During the call, FRANKLIN asked: "Where you at?" SAM HOWARD responded: "Shit, just ran to try and talk to these peoples [members of the Monticello DTO]. Why, what's up?" FRANKLIN replied: "Oh. What I was finna say? I'm finna slide to your slot [residence], who there [Monticello Avenue]?" SAM HOWARD responded: "I don't [U/I]. I think Bubba still there. I don't know." FRANKLIN replied: "Alright, well, um, I'm finna sit over here. It's some foogy shit. It too foogy [large police presence] over there right. I don't know what's going on. So, I'm finna go sit at yo' crib. I'm waiting on you. I got the count [proceeds from narcotics sales at the Monticello Avenue Drug Spot], too." SAM HOWARD responded: "Police hot as hell?" FRANKLIN replied: "Man, I don't know what the fuck going on, but today don't seem right, and I'm not gonna stand right there [Monticello Avenue]."

216. Based on my training and experience and knowledge of the investigation, I understand that in the above exchange: (a) FRANKLIN asked SAM HOWARD who was on Monticello Avenue and SAM HOWARD replied that he was not sure; (b) FRANKLIN told SAM HOWARD that there was a large police presence on Monticello Avenue; (c) SAM HOWARD asked if the police were active in the area and FRANKLIN confirmed that they were; and (d) FRANKLIN said he was not sure

why there were so many police in the area but that he was going to avoid Monticello Avenue while the police were around.

217.    As part of the Monticello DTO's operations, street bosses directed other members of the Monticello DTO to act as lookout for police while other members of the Monticello DTO distributed narcotics.  For example:

a.    On February 19, 2019, law enforcement established surveillance near the Monticello Avenue Drug Spot to observe undercover purchases of narcotics. On multiple occasions that day, law enforcement officials observed members of the Monticello DTO walk up and down Monticello Avenue and the surrounding blocks looking into vehicles.  Based on my training and experience, I believe that the Monticello DTO members were looking to vehicles to see if anyone was conducting surveillance of their narcotics distribution operations.

b.    As discussed above, on April 19, 2019, two undercover officers approached SAM HOWARD, GARRAWAY, and BARNES to purchase heroin.  While the UCs purchased heroin from SAM HOWARD and GARRAWAY, SAM HOWARD instructed BARNES to serve as a lookout on the corner to watch out for law enforcement.  BARNES did as SAM HOWARD instructed and SAM HOWARD did not move forward with the sale to the UCs until after he and GARRAWAY had checked-in with BARNES.

F.    *FRANKLIN Directs Individual C to Retrieve Firearm to Protect Monticello Drug Spot on October 5, 2019.*

218.    On or about October 5, 2019, at approximately 1:24 p.m. (TP2 Session 9363), FRANKLIN, using Target Phone 2, placed a call to Individual C, using

Individual C Phone. During the call, FRANKLIN said: "Look, I'm gonna need you to do something very, very important . . . which is something I know you don't wanna do, but since I'm not there, I'm gonna really need you to do this. Hello?" Individual C replied: "I'm listening." FRANKLIN responded: "I need you to go under the mattress, put that [firearm] in a bag, take it to Ant [STUCKEY]." Individual C replied: "Alright." FRANKLIN responded: "Please. And thank you." Individual C replied: "Alright." FRANKLIN responded: "And watch how you handle it [the firearm], 'cause it's loaded and there's one [round] in the head [chamber] already. Or you could just go get him [STUCKEY] and bring him back there, and he grab it [the firearm]. Hello? Hello?"

219. Based on my training and experience and knowledge of the investigation, I understand that in the above exchange, FRANKLIN instructed Individual C to retrieve a loaded firearm from under a mattress and deliver it to STUCKEY.

220. On or about October 5, 2019, at approximately 1:27 p.m. (TP2 Session 9365), FRANKLIN, using Target Phone 2, placed a call to STUCKEY, using STUCKEY Phone. During the call:

a. FRANKLIN stated: "What you doing? Hey, something [the firearm] finna get dropped off to you. You know when I told you, like man, [U/I] under the van, go towards the front of it and you'll find that [the firearm] right there." STUCKEY replied: "[U/I]." FRANKLIN responded: "That's [the firearm] gonna get dropped off to you. Look, even worry about. Look, the green and black thing [the

firearm] finna get dropped off to you in like . . . a good, like 30 minutes." STUCKEY replied: "Okay."

b.      FRANKLIN stated: "You know what I'm saying?  I'm gonna call you . . . ."  STUCKEY replied: "Ah-ha."  FRANKLIN responded: "And gonna you . . . I'm gonna call you when Blood [another Monticello DTO member] when they're ready for it [the firearm], they gonna have it [the firearm].  You feel me?  I just . . . you know where I slide my shit [firearms] at, under there [the van]?"  STUCKEY replied: "Right."  FRANKLIN responded: "That's where you [U/I] that is.  With the . . . under . . . ."  STUCKEY replied: "Alright."  FRANKLIN stated: "On top of the hook thing, so it [the firearm] won't fall down."  STUCKEY replied: "Alright."

c.      FRANKLIN stated: "Alright.  And I'm just gonna call him [Blood] and let him know that you got it [the firearm] already.  But she [Individual C] should be on her way with it [the firearm]."  STUCKEY replied: "Okay."  FRANKLIN responded: "She [Individual C] gonna pull up in the back."  STUCKEY replied: "Okay."

221.   Based on my training and experience and knowledge of the investigation, I understand that in the above exchange: (a) FRANKLIN told STUCKEY that Individual C was going to deliver a firearm to him by attaching it to a hook under a van on Monticello Avenue; and (b) at some point, FRANKLIN was going to contact STUCKEY and have STUCKEY deliver the firearm to another Monticello DTO member (Blood).

222. At approximately 3:15 p.m., law enforcement observed Individual C driving a black Buick SUV on West Thomas Street and conducted a traffic stop for a broken tail light and failure to make a complete stop at a stop sign. During the stop, Individual C informed officers that she had a loaded handgun inside of her bag located on the front passenger seat of the vehicle. Officers then seized a Sig Sauer 9mm handgun, serial number 47A130064. A photograph of the firearms is depicted below:



223. Based on my training and experience and knowledge of the investigation, I believe that FRANKLIN requested that Individual C retrieve a firearm and provide it to Monticello DTO members (STUCKEY and Blood) in order to protect the Monticello Avenue Drug Spot, including the narcotics and narcotics proceeds in the area.

G. *LEE Directs FRANKLIN to Have DTO's Street-Level Traffickers Selling Heroin at the Monticello Avenue Drug Spot in the Early Morning Hours and Discusses Hiring Additional Traffickers to Work that Early Shift.*

224. On or about October 7, 2019, at approximately 2:26 p.m. (TP2 Session 9930), FRANKLIN, using Target Phone 2, received a call from LEE, using Target Phone 5. During the call, LEE asked: "You out of that brown [heroin]?" FRANKLIN responded: "Uh, skoo? Yeah." LEE replied: "Let every motherfuckers [Monticello DTO members] know that start at 7:00 [a.m.]." FRANKLIN responded: "Okay." LEE replied: "Let our latinos and shit know." FRANKLIN responded: "I already know." LEE replied: "Alright." FRANKLIN responded: "I got you. I'm [U/I] doing right now."

225. Based on my training and experience and knowledge of the investigation, I understand that in the above exchange, LEE asked FRANKLIN if the Monticello DTO ran out of heroin to distribute on Monticello Avenue and FRANKLIN said that they had and LEE told FRANKLIN to make sure Monticello DTO street-level traffickers are out on the block selling by 7:00 a.m.

226. On or about October 8, 2019, between approximately 11:50 a.m. and 11:58 a.m. (TP2 Session 10072 through 10080), FRANKLIN, using Target Phone 2, exchanged a series of text messages with LEE, using Target Phone 5. During that exchange:

a. LEE stated: "Find sum body 2 work each corner [of Monticello Avenue] 60 [$60] a day again start time at 6 am." FRANKLIN replied: "Ok bet." FRANKLIN asked: "Wen [when] it starts?" LEE responded: "They can still start 2day." LEE further stated: "But they gotta b on it." FRANKLIN replied: "Ok bt they

can't go no where." LEE responded: "An let me know when they posted [selling narcotics at the Monticello Avenue Drug Spot]." FRANKLIN replied: "Ok." FRANKLIN further stated: "Well I got one on Augusta rn [right now]." LEE responded: "Ok."

227. Based on my training and experience and knowledge of the investigation, I understand that in the above exchange, LEE told FRANKLIN to find additional street-level traffickers for the Monticello DTO to sell heroin on Monticello Avenue for $60 a day.

228. On or about October 9, 2019, at between approximately 6:17 p.m. and 6:48 p.m. (TP2 Session 10160 through 10182), FRANKLIN, using Target Phone 2, exchanged a series of text messages with LEE, using Target Phone 5. During that exchange:

a. LEE wrote: "Bet ok that's what's up lil bro we need to try an get us sum workers [street-level traffickers] to cum out at 5 [5:00 a.m.] until u make it out I'll stand on them if I got 2 untile [until] u make it out cuz." LEE further stated: "we need that am [morning] traffic foreal [for real]." FRANKLIN replied: "Now tht ik [I know] fa a fact is true." LEE responded: "I'll pay 50 [$50] off the pack frum 5 2 7 [5 a.m. to 7 a.m.] or untile [until] u make it around." LEE further stated: "30$ for S frum 5 2 730 an 50 [$50] off the pac frum 5 2 730 [5:00 a.m. to 7:30 a.m.] every am [morning]." FRANKLIN replied: "I'll definitely find me somebody."

b. LEE responded: "We don't b having no workers C i didn't know that an we paying 40 [$40] y is that we should have all type of workers." LEE further

125

stated: "What ever u gotta do to get workers get them an what ever it take to get them 2 cum out early um gone halla bro when he cum out cuz this a real life job for me." LEE further stated: "I jus wanna c all my ppl get money we cum out early like all my other ppl do pees will b coming none stop cuz I'm gone keep it good [the quality of the heroin will be high]." LEE further stated: "But how u looking [how much heroin do you have left]." FRANKLIN replied: "A bit low [low supply of heroin]." FRANKLIN further stated: "Bt I'm on my way ova there." LEE responded: "Ok." LEE further stated: "Call Sam [SAM HOWARD] tell him call me." FRANKLIN replied: "Ok."

229. Based on my training and experience and knowledge of the investigation, I understand that in the above exchange: (a) LEE told FRANKLIN to find a street-level traffickers to sell heroin on Monticello Avenue from 5 a.m. until 7 a.m. or 7:30 a.m. and that trafficker would earn $50 off of every pack of heroin sold; (b) FRANKLIN agreed and said that he will find an additional street-level trafficker to work Monticello Avenue those hours; (c) LEE complained that the Monticello DTO does not have enough workers willing to work early hours and that trafficking heroin is a business to him; (d) LEE told FRANKLIN that, if they can find a street-level trafficker, business will be good because he will continue to supply high-quality heroin to the Monticello DTO; (e) LEE asked FRANKLIN if the Monticello DTO had enough heroin to sell on Monticello Avenue and FRANKLIN said that supply was low; and (f) LEE agreed to re-supply the Monticello DTO and told FRANKLIN to have SAM HOWARD call him.

H. *LEE Monitors the Narcotics Supply and Street-Level Traffickers at the Monticello Avenue Drug Spot in October 2019.*

230.    On or about October 11, 2019, between approximately 7:06 a.m. and 7:10 a.m. (TP2 Sessions 10447 to 10451), FRANKLIN, using Target Phone 2, exchanged a series of text messages with LEE, using Target Phone 5.  During that exchange, LEE asked: "Y'all [Monticello DTO] out [of narcotics or street-level narcotics traffickers], lil bro."  FRANKLIN replied: "Yea."  LEE responded: "Bet, told bro um gone try an find a frew [few] workers [narcotics distributors to work on Monticello Avenue] to help y'all out if I can u Sam [SAM HOWARD] ain't made [make] it out."  FRANKLIN replied: "Yea."

231.    Based on my training and experience and knowledge of the investigation, I believe that in the above exchange: (a) LEE asked FRANKLIN if the Monticello DTO was out of narcotics or street-level dealers at the Monticello Avenue Drug Spot and FRANKLIN replied that they were; and (b) LEE said that he would re-supply the Monticello DTO with narcotics and/or offered additional street-level dealers to sell narcotics on Monticello Avenue.

232.    On October 11, 2019, at approximately 6:10 p.m. (TP2 Session 10543), FRANKLIN, using Target Phone 2, received a call from LEE, using Target Phone 5. During the call, LEE asked: "You good?"  FRANKLIN replied: "Yeah, I'm good.  Slow motion on this cold ass day."  LEE responded: "Okay, just making sure.  Just checking on you."

233.    Based on my training and experience and knowledge of the investigation, I believe that in the above exchange LEE asked FRANKLIN if

FRANKLIN and the Monticello DTO members needed additional narcotics and FRANKLIN responded that they did not because business (selling narcotics) was slow on account of the weather.

234.    On or about October 15, 2019, between approximately 8:24 p.m. and 8:29 p.m. (TP2 Sessions 10957 to 10959), FRANKLIN, using Target Phone 2, exchanged several text messages with LEE, using Target Phone 5.  During that exchange, LEE asked FRANKLIN: "How u looking lil bro."  FRANKLIN replied: "Getting low."  LEE responded: "Ok."

235.    Based on my training and experience and knowledge of the investigation, I believe that in the above exchange: (a) LEE asked FRANKLIN about the Monticello DTO's supply of narcotics; and (b) FRANKLIN informed LEE that the Monticello DTO was running low on narcotics; and (c) LEE agreed to supply additional narcotics to the Monticello DTO.

VI.    <u>BETWEEN FEBRUARY 2019 AND NOVEMBER 2019, THE MONTICELLO DTO DISTRIBUTED AT LEAST 12.6 KILOGRAMS OF HEROIN, 16.2 KILOGRAMS OF FENTANYL-LACED HEROIN, 7.4 KILOGRAMS OF FENTANYL-ANALOGUE LACED HEROIN, AND 2.56 KILOGRAMS OF FENTANYL-ANALOGUE AND FENTANYL-LACED HEROIN AT THE MONTICELLO AVENUE DRUG SPOT</u>

236.    Based on the quantity of narcotics purchased by undercover officers throughout the course of the investigation, intercepted phone calls reflecting thousands of dollars of narcotics proceeds generated on a daily basis during the course of the interception periods alone, surveillance, and CPD Pod camera video reflecting street-level traffickers on Monticello Avenue transacting business, I believe that, between February 2019 and November 2019, members of the Monticello DTO

possessed with intent to distribute and distributed in excess of 12.6 kilograms of heroin, 16.2 kilograms of fentanyl-laced heroin, 7.4 kilograms of fentanyl-analogue laced heroin, and 2.56 kilograms of fentanyl-analogue and fentanyl-laced heroin.

237. Between February 19, 2019 and October 2019, undercover officers conducted approximately eighty controlled purchases of heroin, fentanyl-laced heroin, and fentanyl-analogue laced heroin from various members of the Monticello DTO at the Monticello Avenue Drug Spot. In total, over the course of these eighty controlled purchases, undercover officers purchased:

- approximately 182.315 grams of heroin;

- approximately 243.522 grams of heroin laced with fentanyl;

- approximately 112.859 grams of heroin laced with a fentanyl analogue; and

- approximately 39.954 grams of heroin laced with fentanyl and a fentanyl analogue.

238. Based on the investigation, including the approximately eighty undercover purchases, surveillance of the Monticello Avenue Drug Spot, review of CPD Pole Camera video, and intercepted phone calls and text messages, law enforcement officials understand that:

a. The Monticello DTO obtained and distributed heroin, usually laced with fentanyl or a fentanyl analogue, to customers on Monticello Avenue and in the surrounding area in 0.2 gram user-quantities wrapped in tin-foil or baggies. Customers typically purchased around a "pack" or "jab" which contained twelve or thirteen "blows" or "baggies" (approximately 2.5 grams of heroin and/or heroin-laced fentanyl) for approximately $120, with the street-level traffickers earning $20 as

profit, and the remainder of the proceeds directed to the street-level bosses (SAM HOWARD and KELVIN FRANKLIN) who would then provide a portion to the DTO leaders (WILLIE TATE, MORRIO BONDS, and ANTONIO LEE) who were responsible for obtaining the narcotics from the DTO's source of supply.

b.     The Monticello DTO distributed approximately $7,200 worth of narcotics (heroin, fentanyl-laced heroin, fentanyl-analogue laced heroin, or heroin laced with both fentanyl and fentanyl-analogue) at the Monticello Avenue Drug Spot per day and typically operated the Monticello DTO seven days per week from the hours of 5:30 a.m. through midnight.   Based on intercepted phone calls and statements made by DYER, both discussed below, the 80 undercover purchases of narcotics, and surveillance and pole camera video, law enforcement officials believe that Monticello DTO members provided street-level dealers with approximately three bundles of narcotics in the morning and three bundles of narcotics in the afternoon. Because each bundle contained ten jabs and each jab had twelve baggies or tin foils, each bundle contained approximately 120 baggies/tin foils of narcotics.   In distributing six bundles per day, the Monticello DTO sold approximately 720 baggies/tin foils, which each contained approximately 0.2 grams of narcotics. Accordingly, I believe the Monticello DTO distributed at least 144 grams of narcotics per day.

c.     Throughout the 60-day interception of Target Phone 2, FRANKLIN was intercepted discussing drug transactions over the phone.  Based on a review of intercepted calls of Target Phone 2 between around August 14, 2019 and

October 18, 2019, an approximately 60-day period, FRANKLIN alone discussed the distribution of approximately 2,933 baggies of narcotics (approximately 586.6 grams or 293.3 grams of narcotics per month).[34]

        d.    During the interception of Target Phone 2, law enforcement officials also intercepted numerous calls regarding narcotics proceeds. Based on a review of intercepted calls involving Target Phone 2 between around August 14, 2019 and October 18, 2019, FRANKLIN alone discussed exchanging approximately $12,621 for heroin.[35]

239.  As discussed above, on August 19, 2019, DYER met with and sold narcotics to an undercover agent. During that recorded conversation, DYER stated, "[I] normally get 7 [packs of heroin] in the morning, I've been already run through them [the seven packs of heroin] by the afternoon and then get my next shit [a new supply of heroin] for the night time so I usually run through it [the heroin] . . . ."

240.  Based on my training and experience and knowledge of the investigation, I understand that in the above exchange DYER told the undercover agent that he distributed approximately seven packs of narcotics (a total of 84 blows and approximately 17.5 grams of narcotics) per morning and was then re-supplied with narcotics in the afternoon and that he would distribute all of the afternoon

---

[34] In numerous intercepted calls, FRANKLIN discussed the sale of narcotics with customers and members of the Monticello DTO, but did not reference specific quantities or units of narcotics. The analysis above does not include those calls.

[35] As discussed above, in numerous intercepted calls, FRANKLIN discussed narcotics proceeds with customers and members of the Monticello DTO, but did not reference specific dollar amounts. The analysis above does not include those calls.

supply of narcotics as well.  Accordingly, based on his own estimates, DYER alone was responsible for distributing at least 30 grams of heroin at the Monticello Drug Spot per day.

241.    Moreover, as discussed above, in the approximately 80 undercover purchases between February 2019 and October 2019, LEOs obtained a total of approximately 585.149 grams of narcotics, which consisted of approximately 188.9 grams of heroin (32.6% of total narcotics), approximately 244.39 grams of fentanyl-laced heroin (41.7% of total narcotics), approximately 112.859 grams of fentanyl-analogue laced heroin (19.3% of total narcotics), and approximately 39 grams of heroin laced with fentanyl and a fentanyl-analogue (6.6% of total narcotics).

242.    While the volume of narcotics trafficked on a given day varied based on, among other things, the number of workers at the Monticello Avenue Drug Spot, the weather, the presence of law enforcement, the size of customer orders, or the volume of customers present at the Monticello Avenue Drug Spot, based upon the foregoing, I believe that, on average, the Monticello DTO was selling at least 144 grams of narcotics per day over the course of approximately 282 days (between February 19, 2019, and November 26, 2019).  Based on the percentages of drug types purchased over the course of approximately 80 controlled buys made over an extended period of time, I believe that between February 2019 and November 2019, members of the Monticello DTO possessed with intent to distribute and distributed 12.6 kilograms of heroin, 16.2 kilograms of fentanyl-laced heroin, 7.4 kilograms of fentanyl-analogue laced heroin, and 2.56 kilograms of fentanyl-analogue and fentanyl-laced heroin.

## Conclusion

243.    Based on the above, I respectfully submit that there is probable cause to believe that from no later than in or about February 2019 and continuing to in or about November 2019, SAM HOWARD, WILLIE TATE, also known as "Junebug," KELVIN FRANKLIN, also known as "Kevo" or "Nico," STEVEN DYER, MORRIO BONDS, ANTONIO LEE, BRYANT BARNES, DWAYNE PETERSON, ANTHONY DAVIS, FLOYD STEWART, WILL HOWARD, JEREMY HAMPTON, JOHNNIE DANIELS, TORIAN JOHNSON, JAMES HUGHES, KAMRON GARRAWAY, SAVAN WARD, and ROBERT STUCKEY, also known as "Ant," did conspire with each other, and with others known and unknown to knowingly and intentionally possess with intent to distribute and distribute a controlled substance, namely, 400 grams or more of a mixture and substance containing a detectable amount of fentanyl (N-phenyl-N-[1-(2-phenylethyl)-4-piperindinyl] propanamide), a Schedule II Controlled Substance, one kilogram or more of a mixture and substance containing a detectable amount of heroin, a Schedule I Controlled Substance, and a quantity of a mixture and substance containing a detectable amount of acetyl fentanyl, valeryl fentanyl, and furanyl fentanyl, Schedule I Controlled Substances and analogues of fentanyl (N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propanamide), a Schedule II

Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(1),

all in violation of Title 21, United States Code, Section 846.

FURTHER AFFIANT SAYETH NOT.

JAMES J. LEE
Special Agent, Drug Enforcement
Administration

SUBSCRIBED AND SWORN to before me on July 14, 2020.

HEATHER K. MCSHAIN
United States Magistrate Judge